1  Lori Rifkin, Esq. [S.B. # 244081]
   HADSELL STORMER & RENICK LLP
2  4300 Horton Street, #15
   Emeryville, CA 94608
3  Telephone: (626) 585-9600
   Facsimile:  (626) 577-7079
4  Email: lrifkin@hadsellstormer.com
5
   Dan Stormer, Esq. [S.B. #101967]
6  Joshua J. Nuni, Esq. [S.B. #313724]
   HADSELL STORMER & RENICK LLP
7  128 N. Fair Oaks Avenue
   Pasadena, California 91103
8  Telephone: (626) 585-9600
   Facsimile:  (626) 577-7079
9  Emails: dstormer@hadsellstormer.com
          jnuni@hadsellstormer.com
10
11
12              **UNITED STATES DISTRICT COURT**
13              **EASTERN DISTRICT OF CALIFORNIA**
14
   Estate of BERTRAM HISCOCK, deceased,        Case No.:
15 by and through VINCENT HISCOCK, as
   Administrator; SHERRICK HISCOCK,
16                                             **COMPLAINT FOR DAMAGES:**
                    Plaintiffs,                 1.  Failure to Provide Medical &
17                                                  Mental Health Care (14th
                       v.                           Amendment);
18                                              2.  Failure to Protect from Harm
   COUNTY OF YUBA; COUNTY OF                        (14th Amendment);
19 SUTTER; SHERIFF-CORONER STEVEN              3.  Deprivation of Substantive Due
   L. DURFOR, in his individual and official       Process (1st & 14th
20 capacities; TONY HOBSON, in his                  Amendments);
   individual and official capacities; JOAN
21 ODOM, M.D., in her individual capacity,      4.  Discrimination on Basis of
   and DOES 1-5,                                   Disability (ADA)
22                                              5.  Failure to Furnish Medical Care;
                    Defendants.                 6.  Wrongful Death;
23                                              7.  Negligence;
                                                8.  Negligent Supervision, Training,
24                                                  Hiring, Retention.
25
26                                             **DEMAND FOR JURY TRIAL**
27
28

COMPLAINT FOR DAMAGES

# INTRODUCTION

1.     Despite knowledge of Bertram Hiscock's severe mental health crisis and decompensation for the two months he was in the Yuba County Jail (the "Jail"), the Defendant Counties, Sheriff, and Psychiatrist failed to provide Mr. Hiscock meaningful mental health treatment, isolated him in solitary confinement, and then left him in a rubber "safety" cell to choke to death on his own urine and feces.

2.     Mr. Hiscock had already attempted to commit suicide in a similar manner twice while at the Jail, and, just four days before he died, a court found him incompetent to stand trial, and ordered him evaluated for transfer to a state psychiatric hospital. Yet, even with this information, Defendants did not provide Mr. Hiscock the treatment he so desperately needed. Rather, they put him in an isolated cell and ignored him, failing even to respond to his repeated banging on the door of the cell until it was too late.

3.     Mr. Hiscock was a 34-year-old U.C. Berkeley graduate who had been arrested and admitted to the Jail in the midst of a psychotic episode related to his bipolar disorder. He and his family reported Mr. Hiscock's history of serious mental illness to custody and medical staff at the Jail, and staff themselves repeatedly documented their observations of his bizarre and delusional behavior. However, Defendants failed to provide or refer Mr. Hiscock for minimally adequate assessment and treatment and intentionally placed him in isolated conditions, exacerbating his symptoms and causing him to further decompensate.

4.     Defendants also failed to staff Yuba County Jail with sufficient qualified and adequately-supervised mental health providers, assigning unlicensed counselors to "assess" Mr. Hiscock even as his mental health worsened.

5.     Defendants were well aware that their failure to maintain appropriate policies, procedures, and practices for mental health treatment and suicide prevention placed inmates with mental illness at substantial risk of exactly the type of grievous harm that Mr. Hiscock suffered. In fact, just before Mr. Hiscock committed suicide as a result of Defendants simply locking him away in isolation cells and ignoring his acute

mental health crisis, Defendant Yuba County had actively attempted to end court oversight of a consent decree requiring the County to provide necessary mental health treatment and suicide prevention at the Yuba County Jail.

6.     Bertram Hiscock's brother, Vincent Hiscock, acting on behalf of Mr. Hiscock's Estate, and his father, Sherrick Hiscock, bring this action against Defendants for violations arising out of Defendants' deliberate indifference and negligence that resulted in Mr. Hiscock's needless suffering and death.

## JURISDICTION

7.     This Complaint seeks damages for violations of the civil rights, privileges, and immunities guaranteed by the First and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, and for violations of California state law.

8.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.

9.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, because the claims form part of the same case or controversy arising under the United States Constitution and federal law.

## VENUE

10.     Plaintiffs' claims arose in the County of Yuba, California. Venue therefore lies in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(2). Pursuant to Eastern District Local Rule 120(d), this action is commenced in the Sacramento division.

## PARTIES

11.     Plaintiff Estate of Bertram Hiscock brings this action, by and through Vincent Hiscock, Bertram Hiscock's brother and the administrator of his estate, pursuant to California Code of Civil Procedure §§ 377.10 *et seq.* At the time of his death, Bertram Hiscock was a 34-year-old citizen of the United States and resident of the State of California. Plaintiff Estate brings claims based on violations of Bertram Hiscock's rights under the First and Fourteenth Amendments, and on violations of California state law.

12.     Plaintiff Sherrick Hiscock is the 77-year-old father of Bertram Hiscock. He is suing individually for violations of his civil rights under the First and Fourteenth Amendments and California state law based on the loss of his relationship with his son.

13.     Defendant County of Yuba is a public entity, duly organized and existing under the laws of the State of California. Under its authority, and through the Yuba County Sheriff's Office ("YCSO"), Defendant County of Yuba operates and manages Yuba County Jail and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the YCSO and its respective employees and/or agents. Defendant County of Yuba, through the YSCO, is and was responsible for ensuring the safety of all persons incarcerated in the Jail and providing them appropriate medical and mental health treatment. Defendant County of Yuba, along with Defendant County of Sutter, also operates and manages Sutter-Yuba Behavioral Health ("SYBH"), which provides mental health services at the Jail.

14.     Defendant County of Sutter is a public entity, duly organized and existing under the laws of the State of California. Along with Defendant County of Yuba, Defendant County of Sutter operates, manages, and oversees SYBH, which provides mental health services at the Jail.

15.     Defendant Steven L. Durfor is and, since January 8, 2007, has been the Sheriff-Coroner of the County of Yuba, the highest position in YCSO. As Sheriff, Defendant Durfor is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all YSCO employees and/or agents. Defendant Durfor is and was charged by law with oversight and administration of the Yuba County Jail, including ensuring the safety of the inmates housed therein. Defendant Durfor also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the YCSO alleged herein were committed. Defendant Durfor is sued in his individual and official capacities.

COMPLAINT FOR DAMAGES                    -3-

16.     Defendant Tony Hobson is the Director of Behavioral Health at SYBH. As Director, Defendant Hobson is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all SYBH employees and/or agents. Defendant Hobson also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the SYBH employees and/or agents alleged herein were committed. Defendant Hobson is sued in his individual and official capacities.

17.     Defendant Joan Odom, M.D., is, and was, at all relevant times mentioned herein, a psychiatrist who was responsible for providing psychiatric services at Yuba County Jail, including to Mr. Hiscock, and overseeing provision of mental health services by other mental health staff at the Jail. Defendant Odom failed to provide mental health treatment meeting the standards of care, and failed to ensure that Mr. Hiscock was appropriately monitored and treated. Defendant Odom is sued in her individual capacity.

18.     Defendants Does 1-5 are custody and/or medical staff employed by Yuba and/or Sutter Counties who were responsible for the safety and security of Mr. Hiscock and/or providing him with adequate health treatment. Defendants Does 1-5 supervised and/or participated in the events complained of herein. At the present time, the identities of Does 1-5 are unknown and not discoverable to Plaintiffs. Plaintiffs will substitute the true names of Does 1-5 when Plaintiffs are able to ascertain their identities through discovery. Does 1-5 are sued in their individual capacities.

19.     Plaintiffs are informed and believe and thereon allege that at all times mentioned in this Complaint, Defendants, and each of them, were the agents, employees, servants, joint venturers, partners and/or co-conspirators of the other Defendants named in this Complaint and that at all times, each of the Defendants was acting within the course and scope of said relationship with Defendants.

/ / /

/ / /

**EXHUASTION OF PRE-LAWSUIT PROCEDURES**

**FOR STATE LAW CLAIMS**

20.     Plaintiffs filed a timely notice of governmental tort claims with Defendant County of Yuba on July 18, 2017. County of Yuba rejected these claims on September 11, 2017.

21.     Plaintiffs also filed a timely notice of governmental tort claims with Defendant County of Sutter on July 18, 2017. County of Sutter rejected these claims by correspondence dated October 12, 2017.

**FACTUAL ALLEGATIONS**

**I.      History of Inadequate Mental Health Care in Yuba County Jail**

22.     Yuba County has been on notice for over thirty years that its inadequate provision of mental health care to inmates at the Yuba County Jail results in needless harm. In 1976, inmates in the Jail filed a federal class-action lawsuit, *Hedrick v. Grant*, E.D. Cal. Case No. 2:76-cv-00162-GEB-EFB, against Yuba County officials, alleging that the Jail subjected inmates to cruel and unusual punishment and violated rights secured by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. The plaintiff inmates identified violations including, *inter alia*, inadequate staffing within the Jail and inadequate medical and mental health care.

23.     In 1979, the United States District Court for Eastern District of California approved and entered a Consent Decree governing the Yuba County Jail. The Consent Decree sets minimal medical and mental health staffing requirements including: a Registered Nurse (R.N.) "specifically trained in health assessment" and "trained and capable of delivering limited mental health services, including but not limited to assessment of mental health status"; a Licensed Vocational Nurse (L.V.N.) who "must be able to perform duties in both physical and mental health areas"; a mental health counselor who "must be able to assess the mental health of inmates, provide inpatient and outpatient treatment as indicated, and provide consultation to jailors and other health care personnel;" and physicians and "mental health personnel." In addition, the Consent

Decree mandates that the "Sutter County Crisis Clinic" and the "Bi-County Mental Health Department" provide "inpatient and outpatient mental health care as needed," with inmates in "emergency crisis situations" being able to receive care at Sutter General Hospital.

24.    The Consent Decree also requires Defendants to minimize the risk of inmates committing suicide or engaging in acts of self-harm at the Jail by providing that: the mental health counselor "take steps to assure the safety of an inmate who indicates that he or she may attempt to commit suicide or to harm another"; "[e]mergency … medical[] and psychiatric care . . . be available twenty-four hours per day"; inmates at the Jail be provided "inpatient and outpatient mental health care as needed"; "[n]o inmate shall be denied or unreasonably delayed emergency hospitalization which is medically indicated for security reasons"; "[i]n an emergency situation or at the request of health care personnel, an inmate must be hospitalized for physical or mental reasons"; and, "[t]he Jail must be staffed at a level sufficient to fully comply with the terms of the Consent Decree."

25.    The County of Yuba moved to terminate the Consent Decree in 2013, but the court denied its motion, holding that the County had failed to demonstrate that it was not continuing to violate inmates' constitutional rights. The County appealed, and on April 19, 2016, the Ninth Circuit affirmed the lower court's ruling.

26.    In an October 24, 2016 motion to enforce the Consent Decree, the *Hedrick* plaintiffs stated that "[i]n written correspondence spanning the period from February 2015 to September 2016, as well as during in-person meetings on March 24, 2015 and August 19, 2015, Plaintiffs' counsel has repeatedly informed Defendants of serious violations of the Consent Decree and the Constitution, including Defendants' failure to provide adequate medical and mental health care and adequate access to outside recreation and exercise." According to the motion, "[i]n response to such correspondence, as well as in meetings and public submissions to the Yuba County Board of Supervisors, Yuba County Grand Jury, the Community and Corrections

Partnership, and the Board of State and Community Corrections, Defendants have acknowledged that many of the problems identified by Plaintiffs exist."

27.     For example, in a May 20, 2015 letter to *Hedrick* class counsel, which the *Hedrick* plaintiffs filed in support of their motion to enforce the Consent Decree, Yuba County Counsel wrote: "I could not agree more with your concerns about housing persons in jail cells who are in need of psychiatric hospitalization, and I know that the Sheriff s staff shares those concerns. Our problem, as a county, is that we really can't do much about it." "[I]t is of little value to point out the obvious," Yuba County Counsel continued, "that there is the potential for bad things to happen if some of these inmates are left in a jail setting."

28.     Similarly, in a December 8, 2015 letter to *Hedrick* class counsel, also filed in support of the motion to enforce the Consent Decree, Sheriff Durfor stated, in response to the plaintiffs' concerns regarding the lack of inpatient psychiatric hospitalization, "We continue to evaluate this topic to place inmates in the setting best suited for the situation." Similarly, in regard to the need for 24/7 medical coverage at the Jail, Sheriff Durfor wrote, "we continue to work toward this goal . . . ."

29.     In Defendant Yuba County's 2015 BSCC California, Senate Bill 863, Adult Local Criminal Justice Facilities Construction Financing Program Proposal Form, in which the County sought state funding of $20 million for the construction of inmate programming and medical/mental health treatment space, the County acknowledged, "The existing mental health and medical treatment, . . . medical and mental health beds, inmate programs, staff support . . . spaces are all deficient or non-existent in this facility."

30.     In a 2014-2015 report concerning the Jail (attached hereto), the Yuba County Grand Jury found: (1) "[t]he Mental Health Professional (psychiatrist) although available by phone, is on site only one day per week mainly to evaluate incoming inmates and update prescriptions"; (2) "[t]here are no non-emergency or ongoing mental health services available to the inmates"; (3) "[i]nmates diagnosed as needing treatment

at a state mental hospital wait for months to transfer"; (4) "[s]uicidal inmates can stay in padded cells, with little or no comforts, for weeks"; (5) in-house support groups were suspended two years ago; and, (6) there is no RN on staff, despite such a position being required by Consent Decree."

31.     The Grand Jury further elaborated on Defendants' draconian treatment of suicidal inmates like Mr. Hiscock. According to the Grand Jury's report, "[s]uicidal inmates are confined to an empty cell with a softer, padded floor. To prevent suicide while confined, the inmate must wear a protective jumpsuit; he may or may not have a blanket. Although those confined are to be visually checked every 15 minutes, little stabilization can be expected under such bleak conditions. Inmates who have psychiatric diagnoses requiring state hospital confinement must wait months to be transferred."

32.     In June 15, 2015, Sheriff Durfor submitted a Response to the Grand Jury's findings, acknowledging, *inter alia*, Defendants' inability to fill the R.N. position at the Jail and that "the medical unit is smaller than optimal."

33.     The Grand Jury re-iterated its findings the following year in its 2015-2016 report on the Yuba County Jail, stating that the "treatment of mental health issues appears to be inadequate for the number of inmates potentially requiring care." The report also specifically recommended that the Sheriff's Department hire "a full-time psychiatrist that could allow the Jail to work on a mental health treatment and care plan."

34.     According to the *Hedrick* plaintiffs' motion to enforce the Consent Decree, in the thirty months prior to Mr. Hiscock's booking into Defendants' custody, there were at least forty-one suicide attempts at the Jail.

## II.     Bertram Hiscock's Death in Defendants' Custody

### A.     Mr. Hiscock's Arrest on November 14, 2016 During a Bipolar Episode

35.     Bertram Hiscock was born in Norfolk, Virginia, in 1982 and was raised primarily in Northern California by his parents, Sherrick Hiscock and Judith Messenger. Mr. Hiscock played basketball in high school and graduated as the Valedictorian of his class. He graduated with a Bachelors of Arts degree in English Literature from U.C.

Berkeley in 2004. Mr. Hiscock also attended the Graduate Theological Seminary in Berkeley, CA as a Masters student.

36.     After graduating from college, Mr. Hiscock was diagnosed with Bipolar Disorder Type I. His psychiatric disability caused episodes of hallucinations, agitation, and bizarre behavior, which resulted in multiple inpatient hospitalizations. At times, Mr. Hiscock had some success managing his illness with the psychotropic medication Abilify (aripiprazole).

37.     On November 14, 2016, during a bipolar episode, Mr. Hiscock put his mother in a chokehold and began walking with her down the side of a road. The police were called, and although his mother explained that Mr. Hiscock was mentally ill and in crisis and requested that he be taken to a hospital for psychiatric care, the police arrested Mr. Hiscock, charged him with kidnapping and false imprisonment, and booked him into the Yuba County Jail.

38.     During Mr. Hiscock's intake into the Jail, staff noted that he was making delusional statements. An unlicensed "mental health crisis counselor," Kellie Baker, conducted a "Psychiatric Emergency Services Assessment." Defendants' records indicate that Mr. Hiscock informed Baker that he had previously received psychiatric treatment. Baker also noted that Mr. Hiscock exhibited "significant impairment" and "likely deterioration" in family, social, school, and/or self-care functioning. Despite this information, Baker did not refer Mr. Hiscock to a psychiatrist for treatment.

B.     <u>Defendants' Failure to Provide Mental Health Treatment and Segregation of Mr. Hiscock in November-December 2016</u>

39.     Jail records reflect a call by Mr. Hiscock's brother Vincent to the Jail on November 21, 2016, informing Jail staff of Mr. Hiscock's history of serious mental illness. The records also show that Mr. Hiscock himself told staff at the Jail that same day that he had a history of bipolar disorder and had taken Abilify to manage his illness.

40.     Defendants' records show that Mr. Hiscock requested a psychiatric evaluation on November 22, 2016, and that a nurse then referred him to a mental health

1    counselor.

2        41.    On December 2, 2016, a week and a half after the referral, a social worker

3    evaluated Mr. Hiscock at the Jail. According to Defendants' records, Mr. Hiscock told

4    the social worker that he "had been 5150'd several times in the past" [1] and that he was

5    diagnosed "as Bipolar I." The social worker noted that Mr. Hiscock was not aware why

6    he had been placed in jail and seemed paranoid, but recommended only that mental

7    health staff follow up with him in a month.

8        42.    On December 5, 2016, Kellie Baker, the unlicensed counselor who

9    conducted Mr. Hiscock's initial intake, filled out a "Diagnosis Form" for Mr. Hiscock.

10   Despite Jail staff's notice of Mr. Hiscock's bipolar disorder, Baker listed Mr. Hiscock's

11   primary complaint as "illness, unspecified."

12       43.    Jail records reflect that by December 8, 2016, Defendants had begun

13   housing Mr. Hiscock in administrative segregation. Inmates in the Jail's administrative

14   segregation units are confined in a cell for up to 23 or more hours each day with limited

15   social interaction and environmental stimulation. Furthermore, in the men's

16   administrative segregation cells, there are no exterior windows providing natural light.

17       44.    On December 10, 2016, Defendants' records show that Mr. Hiscock told

18   Jail staff that he wanted to restart his Abilify medication. He was again referred to a

19   mental health counselor instead of a psychiatrist who could prescribe medication.

20       45.    By December 14, 2016, Defendants' records indicate that Mr. Hiscock still

21   had not received psychotropic medication and was being housed in isolation in a medical

22   holding cell with a window that looked only into a narrow hallway illuminated by

23   fluorescent lights. According to Defendants' records, Correctional Officer J. Hulsey,

24   who was conducting a clothing exchange for the inmates housed in the medical holding

25   cells, observed that Mr. Hiscock appeared depressed and was engaging in "bizarre

26

27   _____
     [1] California Welfare and Institutions Code § 5150 allows qualified officers to
28   involuntarily confine a person suspected to have a mental disorder that makes them a
     danger to themselves, a danger to others, and/or gravely disabled.

     COMPLAINT FOR DAMAGES          -10-

behavior." Hulsey documented that Mr. Hiscock was crying, pushing his clothes and bedsheets out of his cell, and rambling incoherently. Hulsey also noted that Mr. Hiscock's demeanor and "how he was talking" made Hulsey believe that Mr. Hiscock was having a mental health crisis and possibly hearing voices.

46.     Hulsey moved Mr. Hiscock to an isolated holding cell with mental health observation checks every thirty minutes. Deputies then found a razor above the sink in the medical holding cell in which he had been housed. According to Hulsey's report, at the time of the incident—between 3:00 PM and 4:00 PM—there were no mental health staff at the Jail.

47.     Hulsey consulted his supervisor, Sergeant Vaughn, about Mr. Hiscock's condition, and Vaughn arranged for Mr. Hiscock to speak with an unlicensed SYBH "crisis counselor" by phone. The counselor's notes from the call indicate that Mr. Hiscock told her, "I think I'm having a mental health crisis from talking to too many Michaels and watching too many Toms . . . . Can you tell them to turn off the light at night so I can sleep? I feel like I should have been put in a firetruck and taken to the hospital. I didn't do anything." Mr. Hiscock also reported difficulties with sleep and seemed to the counselor to be confused about time and events. The counselor noted that Mr. Hiscock "present[ed] with rambling speech, disorganized thought process, and paranoid delusions." She determined that he "may be decompensating" and recommended that Mr. Hiscock "would benefit from further assessment and continued observations at this time."

48.     Despite Mr. Hiscock's symptoms, Defendants failed to provide him or refer him for any mental health treatment or even further evaluation by an appropriately licensed mental health provider. Instead, Defendants kept Mr. Hiscock locked in the holding cell in isolated and anti-therapeutic conditions. Predictably, his mental state continued to deteriorate.

C.     Mr. Hiscock's First Suicide Attempt on December 15, 2016

49.     Defendants' records indicate that the next day, December 15, 2016, officers

heard coughing noises coming from the holding cell area. When the officers looked into Mr. Hiscock's cell, they observed him lying on his back on the cell bench with both hands around his throat, attempting to strangle himself. The officers entered the cell and took control of Mr. Hiscock's wrists. When the officers asked Mr. Hiscock what he was doing, Mr. Hiscock began making bizarre statements, such as, "I stripped my body down to tiny little feet, tendons and a piece of scalp."

50.     After this self-harm incident, Baker, the unlicensed counselor, again "assessed" Mr. Hiscock. According to Defendants' records, Mr. Hiscock told Baker, "I had a purple elephant in my throat, but it's out now." He also again stated, "When I got out of the hospital, I stripped my body down to tiny feet, tendons, and a piece of scalp," and went on to explain that he had rid himself of his psychosis. Baker noted that Mr. Hiscock seemed delusional, was making self-harm gestures, and "seem[ed] to be at risk to self-harm." Baker recommended that Mr. Hiscock's clothing be removed and that he be moved to a "safety cell."

51.     Yuba County Jail's "safety cells"—colloquially referred to as "rubber rooms"—are empty, 7x7 foot cells with padded walls, a padded floor, and no windows. The cells do not contain a bed, mattress, toilet, sink, or any other fixtures or furniture. Inmates are expected to urinate and defecate through a grate in the floor. As a result, inmates are forced to sleep, sit, and eat on the same floor on which they must use the bathroom. The safety cells are reported to be frequently covered in feces and/or blood.

52.     Inmates placed in the safety cells are denied nearly all privileges and human contact. They are not provided with showers, any out of cell time, exercise, or property. Their only connection to the outside world is through a small slot in the wall that is connected to the deputies' office area—through which deputies can conduct safety checks without having any direct interaction with an inmate—and a small window that looks onto the hallway, but is often covered by metal shutters.

53.     Defendants' records indicate that Defendants kept Mr. Hiscock locked in a safety cell continuously for over a week without providing any mental health treatment.

During that time, he rapidly decompensated further.

54.     No psychiatrist or licensed mental health provider saw or evaluated Mr. Hiscock on December 15, 2016, after Baker placed him in the safety cell, nor was he provided any medication.

55.     On December 16, 2016, unlicensed counselor Baker heard Mr. Hiscock responding to unseen others off and on for several hours, at times having a conversation using multiple "voices." In her notes, she wrote that Mr. Hiscock "continue[d] to appear at risk to self harm." However, Baker recommended only that the Jail continue Mr. Hiscock's "current status." No psychiatrist or other licensed mental health provider saw or evaluated Mr. Hiscock on December 16, 2016, nor was he provided any medication.

56.     On December 17, 2016, a social worker noted that there appeared to be no change in Mr. Hiscock's presentation, and Hiscock continued to make delusional statements and exhibit unpredictable behaviors. The social worker did not recommend that Mr. Hiscock receive immediate mental health treatment, but merely notified "custody and medical" about Mr. Hiscock's condition. No psychiatrist saw or evaluated Mr. Hiscock on December 17, 2016.

57.     On December 18, 2016, Jail staff observed Mr. Hiscock playing with his feces and spreading it on himself. Instead of seeking immediate medical attention, the staff simply moved Mr. Hiscock to another safety cell. Mr. Hiscock was then observed talking to himself while naked and bent over as if stretching. In response to communications from another social worker, Mr. Hiscock put his hands to his ears and appeared to mouth words without producing any sounds. Despite Mr. Hiscock's clearly disturbed state, the social worker recommended that Mr. Hiscock remain in isolation. No psychiatrist saw or evaluated Mr. Hiscock on December 18, 2016, nor was he provided any medication.

58.     On December 19, 2016, unlicensed counselor Baker noted that Mr. Hiscock had been writing on safety cell wall "using feces as media." Mr. Hiscock's face was also wet with what she suspected was Mr. Hiscock's own urine. Although Baker

determined that Mr. Hiscock seemed to be decompensating further, she again recommended only that his "current status" be continued. No psychiatrist or licensed mental health provider saw or evaluated Mr. Hiscock on December 19, 2016, nor was he provided any medication.

      D.    <u>Mr. Hiscock's Second Suicide Attempt on December 20, 2016</u>

59.    On December 20, 2016, unlicensed counselor Baker observed Mr. Hiscock putting feces in his mouth in what appeared to be an attempt to choke himself. According to her notes, Mr. Hiscock seemed to be attempting to communicate, but was unable. Baker stated that if Mr. Hiscock did not improve, she would place him on a 5150 hold so that he could receive mental health treatment outside of the Jail. However, for the third time, she recommended that the Jail merely continue Mr. Hiscock's "current status."

60.    That same day, Mr. Hiscock was also seen by a social worker. In his notes, the social worker described Mr. Hiscock as "extremely psychotic" and "unable to communicate logically." Despite the Jail's prior notice as to Mr. Hiscock's bipolar diagnosis, the social worker listed Mr. Hiscock's diagnosis as "unspecified psychosis."

61.    Also on December 20, after six days in a safety cell, Mr. Hiscock was finally seen by a psychiatrist, Defendant Dr. Joan Odom. This was the first time a psychiatrist saw Mr. Hiscock since he was booked into the Jail over a month earlier, despite custody staff and counselors' repeated observations of what they described as his delusional psychotic and decompensated state. Dr. Odom noted that Mr. Hiscock had become "floridly psychotic," "had placed feces in his mouth this AM in an effort to choke himself," and had been drinking urine. Dr. Odom also described Mr. Hiscock as having "a wide-eyed, psychotic stare" and mumbling to himself, unable to participate meaningfully in an interview. Despite Mr. Hiscock's reporting of his prior success with Abilify, Dr. Odom prescribed a different anti-psychotic drug, Zyprexa Zydis (Olanzapine) 20 mg—a medication that Mr. Hiscock's medical records from prior hospitalizations indicated he was allergic to—and noted that she would attempt to

interview Mr. Hiscock again the next day.

62.     When Defendant Odom followed up with Mr. Hiscock the next day, December 21, 2016, she determined that Mr. Hiscock had an "excellent response" to the Zyprexa because he was able to pour a cup of urine down the drain when told to do so. Dr. Odom noted that Mr. Hiscock had "continuing florid psychosis" and was unable to participate in an interview or to be housed with others. Dr. Odom extended the order for Zyprexa and wrote that she would attempt to interview Mr. Hiscock again the following week.

63.     During the next week, Mr. Hiscock informed Jail staff that Zyprexa was not the right prescription for him and began refusing to take his medication. For example, Defendants' records state that Mr. Hiscock told an unlicensed counselor on December 24, 2016 that, due to the medication, he "[felt] like a zebra, my mid-section is shredded cheese." On December 27, 2016, Mr. Hiscock told Jail staff that he was only supposed to take Abilify. Although Jail staff notified unlicensed counselor Baker, she took no action.

64.     On December 29, 2016, eight days after Dr. Odom's last visit with Mr. Hiscock, he was seen by a second psychiatrist, Dr. Kalman, who finally took Mr. Hiscock off the Zyprexa and prescribed Abilify.

65.     By this time, Defendants had continually kept Mr. Hiscock in isolation in administrative segregation, medical holding, and/or safety cells for at least three weeks. In a December 30, 2016 letter to his mother, Mr. Hiscock wrote that he was only permitted to go outside (to yard up on the Jail's roof area) once per week.

E.     Defendants' Failure to Provide Mental Health Treatment and Segregation of Mr. Hiscock in January 2017

66.     On January 4, 2017, Defendants' records indicate that Defendant Odom saw Mr. Hiscock and purportedly conducted a full psychiatric evaluation for the first time in the almost two months that Mr. Hiscock had been in Defendants' custody. According to Dr. Odom's notes, Mr. Hiscock's speech was rapid and he was difficult to

COMPLAINT FOR DAMAGES          -15-

interrupt and direct in the interview. Dr. Odom confirmed Mr. Hiscock's diagnosis of Bipolar Disorder Type I and continued Mr. Hiscock on Abilify. Despite Mr. Hiscock's two suicide attempts as well as additional incidents of self-harm in the prior three weeks, Dr. Odom scheduled a follow-up to take place in thirty days.

67.    On information and belief, for the next three weeks, Defendants continued to subject Mr. Hiscock to solitary confinement, without any mental health treatment other than medication. During this time his mental health again deteriorated drastically but Defendants' records indicate that he was not seen by any licensed or unlicensed mental health staff.

68.    On January 25, 2017, a Yuba County Superior Court judge found Mr. Hiscock not mentally competent to stand trial, and scheduled a hearing for February 9, 2017, to determine Mr. Hiscock's placement in a state mental institution where he could be treated to restore his competence.

69.    Despite this finding, and Mr. Hiscock's ongoing decompensation, Defendants still failed to provide Mr. Hiscock any mental health treatment other than medication.

F.    Defendants' Failure to Adequately Respond to Mr. Hiscock's Acute Mental Health Crisis on January 27 and 28, 2017

70.    On the morning of January 27, 2017, Defendants' records reflect an overnight shift officer for Mr. Hiscock's housing unit advising the day shift officer, Officer Hough, that Mr. Hiscock's "mental status" had been "diminishing." Officer Hough reported that while conducting a headcount in the morning, he noticed that Mr. Hiscock had thrown multiple items out of his cell and appeared pale and sweating. Mr. Hiscock had his arms hanging out of the cell's feed slot, and requested that the Officer Hough "lightly break his knuckles and realign them" and that he be sent to the hospital due to his "organs spoiling."

71.    Officer Hough then moved Mr. Hiscock to an isolated holding cell with "observation checks" every thirty minutes. Defendants' records indicate that soon after

being moved into the holding cell, Mr. Hiscock began slamming his head against the cell window, and demanding that Hough and the other officers present place him in handcuffs.

72.     The officers then began to relocate Mr. Hiscock to a safety cell. According to Defendants' records, Mr. Hiscock resisted going into the cell and removing his clothing, so the officers forced him to the ground, held him down, and cut off his clothing.

73.     A social worker later spoke with Mr. Hiscock through the safety cell's narrow slot opening. The social worker noted that Mr. Hiscock displayed "tangential thoughts" and "disorganized thinking," and that Jail staff had observed him to have engaged in "self-harming behaviors" earlier in the day. Again, despite Mr. Hiscock's acute psychiatric distress, Defendants failed to provide him timely and appropriate access to actual mental health treatment. Instead, Defendants kept Mr. Hiscock locked alone in the safety cell, and the social worker noted that mental health staff would evaluate him "over the weekend." No psychiatrist saw or evaluated Hiscock on January 27, 2017.

74.     The next day, January 28, 2017, another social worker noted that Mr. Hiscock had a shuffled gait, rigid extremities, a blunted affect, and fixed stare. She expressed her concern regarding Mr. Hiscock's condition to Jail nursing staff, but ultimately recommended only that Hiscock "would benefit from continue on observation to monitor for safety."

75.     Also on January 28, according to Defendants' records, a nurse witnessed Sergeant Vaughn strike Mr. Hiscock's hand to make him release his grip on Vaughn's keys. Vaughn then "gassed" Mr. Hiscock with pepper spray. Following the incident, the nurse determined that Mr. Hiscock was uninjured, but his responses to questions were inappropriate, fixated on dinosaurs and frogs. However, no psychiatrist saw or evaluated Mr. Hiscock on January 28, 2017.

/ / /

COMPLAINT FOR DAMAGES                    -17-

G.    Mr. Hiscock's Suicide on January 29, 2017

76.    Defendants' records indicate that on January 29, 2017, Mr. Hiscock continued to decompensate, walking around his cell naked despite being provided a safety blanket, making bizarre statements, attempting to run out of the cell, and smearing feces. When an unlicensed counselor spoke to Mr. Hiscock through the safety cell's slot, the counselor noted that he continued to make nonsensical statements and pushed his entire safety gown out of the slot. In response, the counselor noted only that she recommended Dr. Odom see Mr. Hiscock if his presentation did not resolve.

77.    Although the Jail's policies required custody staff to check inmates housed in safety cells on observation every fifteen minutes, according to the publicly-filed affidavit of an inmate held in a nearby cell, Mr. Hiscock pounded and banged on the door of his cell for approximately forty-five minutes—from 11:30 a.m. until about 12:15 p.m.—on January 29, 2017, and at no point during that time did anyone come to check on Mr. Hiscock. Finally, at approximately 12:30 p.m., an officer entered Mr. Hiscock's cell and found him lying unresponsive on the floor.

78.    Defendants' own records also indicate that officers did not check on Mr. Hiscock every fifteen minutes as was required. These records state that officers last saw him breathing at 12:28 p.m. and then found him not breathing at 12:48 p.m.

79.    When one of the Jail nurses arrived at the safety cell after the officer found Mr. Hiscock unresponsive, deputies reported that that Mr. Hiscock had food in his mouth. Defendants' records indicate that no one had yet checked Mr. Hiscock's pulse or began performing CPR. Jail staff then began performing CPR, but were unable to resuscitate Mr. Hiscock.

80.    Jail staff finally called for an ambulance at 1:06 PM, at least eighteen minutes after the watch officer observed that Mr. Hiscock was not breathing. The paramedics reached Mr. Hiscock six minutes later, at 1:12 PM. Upon arrival, Jail staff informed the paramedics that Mr. Hiscock had a history of mental health disorders and "attempting suicide."

81.     The paramedics continued to administer CPR, but were unable to revive Mr. Hiscock. Upon instruction from Jail staff, the paramedics then transported Mr. Hiscock to Rideout Memorial Hospital.

82.     Mr. Hiscock was pronounced dead at the hospital at 1:53 PM.

83.     On January 31, 2017, forensic pathologist Donald M. Henrikson performed Mr. Hiscock's autopsy. Henrikson's autopsy report indicated that Mr. Hiscock's cause of death was "CHOKING (MINUTES), DUE TO ACUTE PSYCHOSIS, PROBABLE (DAYS), DUE TO CHRONIC BIPOLAR AFFECTIVE DISORDER (BY HISTORY) (YEARS)." Henrikson noted that Mr. Hiscock's choking resulted from "self-consumption of subject's own urine and feces in attempt to induce choking."

84.     Defendants completely failed to provide Mr. Hiscock any mental health treatment other than medications and failed to protect him from substantial risk of serious harm, including self-harm, despite repeated notice both of Mr. Hiscock's acute mental health crisis and of the fact that Defendants' provision of mental health treatment and suicide prevention policies, procedures, and practices were inadequate under the Constitution and industry standards of care.

85.     By failing to provide minimally adequate and necessary mental health treatment and subjecting Mr. Hiscock to isolated and anti-therapeutic conditions, Defendants severely exacerbated Mr. Hiscock's mental illness, resulting in his unnecessary pain and suffering, and, ultimately, untimely death.

86.     As a result of Defendants' actions and omissions, Plaintiff Sherrick Hiscock tragically lost his relationship with his son and has experienced severe emotional pain and suffering, including ongoing depression.

/ / /

/ / /

/ / /

COMPLAINT FOR DAMAGES                    -19-

# CLAIMS FOR RELIEF

## First Claim for Relief

**Failure to Provide Medical and Mental Health Care in**

**Violation of the Fourteenth Amendment to the Constitution of the United States**

**(Survival Action – 42 U.S.C. § 1983)**

(Estate of Bertram Hiscock Against ALL Defendants)

87.    Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

88.    During Mr. Hiscock's incarceration, Defendants had inadequate policies, procedures, and practices for identifying inmates in need of medical and mental health treatment, providing necessary and appropriate medical and mental health treatment, and addressing risk of suicide.

89.    These inadequate policies, procedures, and practices include, but are not limited to:

a.    Defendants failed to staff the Jail with sufficient numbers of qualified, competent, and appropriately-supervised mental health and medical staff to provide adequate mental health care to inmates.

b.    Defendants failed to properly train and supervise staff regarding policies, procedures, and practices necessary for the provision of mental health treatment and the protection of inmates from harm, including self-inflicted harm.

c.    Defendants failed to ensure staff provided medical and mental health treatment meeting standards of care.

d.    Defendants failed to adequately screen and identify inmates with mental health concerns and timely refer them for appropriate assessment and treatment.

e.    Defendants failed to utilize proper screening forms and failed to refer inmates for mental health assessments, medical evaluations, suicide

1    assessments, or inpatient care in a consistent or timely manner.

2    f.    Defendants failed to provide adequate outpatient mental health

3          assessment or treatment, including but not limited to failing to provide

4          necessary psychosocial treatment or therapy, delaying and/or denying

5          the continuation of community-prescribed medications, failing to

6          timely prescribe necessary medications, and failing to appropriately

7          monitor the inmates identified as having mental illness.

8    g.    Defendants failed to provide timely and appropriate access to inpatient

9          care or emergency psychiatric hospitalization for inmates in acute

10         psychiatric distress.

11   h.    Defendants failed to provide timely and appropriate assessment and

12         crisis intervention for inmates exhibiting signs or symptoms indicating

13         increased suicide risk.

14   90.   Defendants' failure to correct their mental health treatment and suicide

15   prevention policies, procedures, and practices, despite notice of significant and

16   dangerous problems, evidences deliberate indifference in the provision of mental health

17   treatment.

18   91.   Defendants knew or should have known that Bertram Hiscock had a serious

19   mental health need and required appropriate mental health treatment.

20   92.   Defendants failed to provide necessary mental health assessment and/or

21   treatment to Mr. Hiscock while he was in their care and custody at the Jail, despite his

22   history of serious mental illness, obvious symptoms of mental health crisis, and overt

23   self-harming behavior.

24   93.   Defendant Odom failed to provide treatment to Mr. Hiscock meeting the

25   standard of care for provision of psychiatric treatment.

26   94.   Defendants failed to ensure that Mr. Hiscock was provided necessary and

27   timely emergency medical treatment when he was found unresponsive in his cell on

28   January 29, 2017.

COMPLAINT FOR DAMAGES                    -21-

95.     Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to provide Mr. Hiscock with appropriate mental health assessment and/or treatment, and failure to adequately identify or address his suicide risk, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to provide treatment and identify suicide risk, constituted deliberate indifference to Mr. Hiscock's serious medical needs, health, and safety.

96.     As a direct and proximate result of Defendants' conduct, Mr. Hiscock experienced physical pain, severe emotional distress, and mental anguish over a period of two and a half months, as well as the loss of his life and other damages alleged herein.

97.     The aforementioned acts of Defendants were conducted with conscious disregard for the safety of Plaintiffs and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Second Claim for Relief

### Failure to Protect from Harm in Violation of the Fourteenth Amendment to the Constitution of the United States

### (Survival Action – 42 U.S.C. § 1983)

(Estate of Bertram Hiscock Against ALL Defendants)

98.     Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

99.     Defendants knew or should have known that Mr. Hiscock was at increased risk of suicide and/or serious self-harm.

100.    Each Defendant could have taken action to prevent unnecessary harm to Mr. Hiscock, but refused or failed to do so.

101.    Defendants were on notice that their deficient policies, procedures, and practices alleged herein were inadequate and gave rise to a substantial risk of serious

harm, including self-harm, to inmates with serious mental illness in the Jail, such as Mr. Hiscock.

102.   Defendants failed to implement minimally sufficient policies and procedures to protect inmates like Mr. Hiscock from harm.

103.   In addition to Defendants' failures to adopt and implement adequate policies, procedures, and practices for identification and treatment of mental illness, Defendants also failed to adopt and implement adequate policies, procedures, and practices to address inmates at increased risk of suicide and serious self-harm at the Jail.

104.   Defendants' inadequate policies, procedures, and practices regarding the treatment of suicidal and mentally ill inmates placed inmates such as Mr. Hiscock at substantial risk of serious harm, including by intentionally housing inmates with mental illness in administrative segregation despite its known increase to the risk of suicide and self-harm; by intentionally placing inmates at risk of suicide and self-harm in isolation cells that are punitive, unsanitary, anti-therapeutic, and dangerous; by utilizing inadequate suicide prevention policies; and by failing to provide adequate emergency response to attempted suicides.

105.   Furthermore, Defendants were on notice of the risks of housing individuals with serious mental illnesses in administrative segregation and isolation, but they housed Mr. Hiscock in such settings despite notice of such risks.

106.   Defendants failed to ensure that adequate assessment, treatment, and monitoring was provided to inmates identified to be at increased risk of suicide, and failed to ensure that even their own inadequate policies and procedures were followed.

107.   Defendants' failure to correct and/or enforce their policies, procedures, and practices despite notice of significant and dangerous problems evidences deliberate indifference to the inmates in their care.

108.   Defendants failed to ensure that Mr. Hiscock received timely and necessary mental health assessment, intervention, treatment, and monitoring despite notice and/or knowledge that he was at increased risk for suicide and/or serious self-harm.

109.   Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to take appropriate measures to protect Mr. Hiscock from harm, along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order to protect Mr. Hiscock from harm, constituted deliberate indifference to Mr. Hiscock's health and safety.

110.   As a direct and proximate result of Defendants' conduct, Mr. Hiscock experienced physical pain, severe emotional distress, and mental anguish over a period of two and a half months, as well as the loss of his life and other damages alleged herein.

111.   The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Mr. Hiscock and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Third Claim for Relief

**Deprivation of Substantive Due Process Rights in Violation of First and Fourteenth Amendments of the United States Constitution – Loss of Familial Companionship (42 U.S.C. §1983)**

(Sherrick Hiscock Against ALL Defendants)

112.   Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

113.   The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Bertram Hiscock's serious medical needs, health, and safety, violating Bertram Hiscock's constitutional rights, and their failure to train, supervise, and/or take other appropriate measures to prevent the acts and/or omissions that caused the untimely and wrongful death of Bertram Hiscock deprived Plaintiff Sherrick Hiscock of his liberty interest in the parent-child relationship in violation of his substantive due process rights as defined by the First and Fourteenth Amendments of the Constitution.

114.   As a direct and proximate result of the aforementioned acts and/or

omissions of Defendants, Plaintiff Sherrick Hiscock suffered injuries and damages as alleged herein.

115.   The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Bertram Hiscock and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Fourth Claim for Relief

### Discrimination on the Basis of Disability

**(Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a)**

(Estate of Bertram Hiscock Against Defendants County of Yuba and County of Sutter)

116.   Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

117.   At all relevant times, Bertram Hiscock suffered from a "disability" within the meaning and scope of 42 U.S.C. § 12102 as a result of his serious mental illness. Accordingly, Hiscock was a member of the class of persons protected by the ADA and Section 504 of the Rehabilitation Act.

118.   Defendants discriminated against Mr. Hiscock because of his disabilities and denied him the benefits of public services, programs, and activities as a result of his disabilities by, among other things: failing to provide proper and reasonable training to Jail staff regarding how to respond to persons in custody with serious mental illness; failing to respond reasonably in dealing with a person with psychiatric disabilities experiencing episodes of psychiatric distress; and by imposing punishments and segregation on Mr. Hiscock for behaviors and/or actions related to his psychiatric disabilities.

119.   The acts and omissions of Defendants violated the ADA and Section 504, which prohibit discrimination on the basis of physical and mental disability, and protect

persons such as Mr. Hiscock from the type of injuries and damages set forth herein.

120.   As a direct and proximate result of Defendants' conduct, Mr. Hiscock experienced physical pain, severe emotional distress, and mental anguish over a period of two and a half months, as well as the loss of his life and other damages alleged herein.

121.   The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Mr. Hiscock and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Fifth Claim for Relief**

**Failure to Furnish/Summon Medical Care**

**(Survival Action – California State Law)**

(Estate of Bertram Hiscock Against Defendants County of Yuba and County of Sutter)

122.   Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

123.   Defendants owed Mr. Hiscock a duty of care to provide him immediate medical and mental health care.

124.   The conduct of Defendants alleged herein, including but not limited to the facts that Defendants knew or had reason to know that Mr. Hiscock was in need of immediate medical and mental health care on January 29, 2017, and that Defendants failed to take reasonable action to summon or provide that care, resulting in Mr. Hiscock's death as alleged herein, violated California state law, including Cal. Govt. Code §§ 844.6 and 845.6.

125.   The alleged conduct of Defendants was committed within the course and scope of their employment.

126.   As a direct and proximate result of Defendants' breach, Mr. Hiscock suffered injuries and damages causing great pain and leading to his death, as alleged herein.

127.   The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Bertram Hiscock and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**Sixth Claim for Relief**

**Wrongful Death**

**(California Code Civ. Proc. § 377.60)**

(ALL Plaintiffs Against ALL Defendants)

128.   Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

129.   Mr. Hiscock's death was a direct and proximate result of the aforementioned wrongful and/or negligent acts and/or omissions of Defendants. Defendants' acts and/or omissions thus were also a direct and proximate cause of Plaintiffs' injuries and damages, as alleged herein.

130.   As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiff incurred expenses for funeral and burial expenses in an amount to be proved.

131.   As a direct and proximate result of Defendants' wrongful and/or negligent acts and/or omissions, Plaintiffs suffered the loss of the services, society, care, and protection of the decedent. Plaintiffs are further entitled to recover prejudgment interest.

132.   Plaintiff Estate of Bertram Hiscock is entitled to recover punitive damages against individual Defendants who, with conscious disregard of Mr. Hiscock's rights, failed to provide him with health care services meeting the professional standard of practice, and/or failed to adhere to legal and professional standards of correctional supervision and administration.

133.   The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Mr. Hiscock and others, and were therefore

malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Seventh Claim for Relief

### Negligence

### (Survival Actions – California State Law)

(Estate of Bertram Hiscock Against Defendants County of Yuba,

County of Sutter, Durfor, and Does 1-5)

134.   Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

135.   Defendants failed to comply with professional standards in the treatment, care, and supervision of Mr. Hiscock during his incarceration at the Jail. Defendants' failures include, but are not limited to: failing to provide timely and necessary medical and mental health treatment; failing to ensure provision of appropriate and necessary psychiatric medications; failing to appropriately assess and evaluate suicide risk; placing Mr. Hiscock in housing conditions which exacerbated his symptoms; and failing to conduct welfare and safety checks at required intervals.

136.   Defendants also failed to appropriately supervise, review, and ensure the competence of provision of care and treatment to Mr. Hiscock by medical and custody staff, and failed to enact appropriate standards and procedures that would have prevented such harm to him.

137.   Together, Defendants acted negligently and improperly, breached their respective duties, and as a direct and proximate result, Plaintiff suffered injuries and damages as alleged herein.

138.   The negligent conduct of Defendants was committed within the course and scope of their employment.

139.   The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Mr. Hiscock and others, and were therefore

malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## Eighth Claim for Relief

### Negligent Supervision, Training, Hiring, and Retention

### (Survival Actions – California State Law)

(Estate of Bertram Hiscock Against ALL Defendants)

140.   Plaintiffs re-allege and incorporate by reference all previous paragraphs as though fully set forth herein.

141.   Defendants had a duty to hire, supervise, train, and retain employees and/or agents so that employees and/or agents refrain from the conduct and/or omissions alleged herein.

142.   Defendants breached this duty, causing the conduct alleged herein.

143.   Such breach constituted negligent hiring, supervision, training, and retention under the laws of the State of California.

144.   As a direct and proximate result of Defendants' failure, Plaintiff suffered injuries and damages as alleged herein.

145.   The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Mr. Hiscock and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.   For compensatory, general and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

2.   For damages related to loss of familial relations as to Plaintiff Sherrick Hiscock;

COMPLAINT FOR DAMAGES
-29-

3.     Funeral and burial expenses, and incidental expenses not yet fully ascertained;

4.     General damages, including damages for physical and emotional pain, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and trauma and suffering, the loss of the services, society, care and protection of the decedent, as well as the loss of financial support and contributions, loss of the present value of future services and contributions, and loss of economic security;

5.     Prejudgment interest;

6.     For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

7.     For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

8.     For restitution as the court deems just and proper;

9.     For such other relief as the Court may deem proper.

### JURY DEMAND

Plaintiffs hereby request a jury trial in this matter.


Dated: December 28, 2017                    Respectfully Submitted,

HADSELL STORMER & RENICK LLP


By:   /s/ Lori Rifkin
          Dan Stormer
          Lori Rifkin
          Joshua J. Nuni
     Attorneys for Plaintiffs

Attachment



# Yuba County Grand Jury Final Report 2014-2015

Release Date: 21 May 2015



# Table of Contents

The Grand Jury Process ........................................................................................5

Members of the 2014-2015 Grand Jury ..............................................................7

Letter from the Grand Jury Foreperson ..............................................................9

Report  1.  Yuba County Airport Safety ............................................................11

Report  2.  County Counsel Dual Representation ..............................................25

Report  3.  Yuba County Jail ...............................................................................33

Report  4.  Marysville Joint Unified School Board of Trustees ...........................49

Report  5.  Yuba County Juvenile Facilities ......................................................59

Report  6.  Emergency Preparedness of Yuba County ......................................69

Report  7.  Camptonville Unified School District ...............................................77

Report  8.  The Mosquito Abatement Report ....................................................83

Appendices:

History of the Grand Jury ..................................................................................97

Matrix of Investigations by Previous Grand Juries ...........................................102

Grand Jury Application Form .............................................................................109

Map of Yuba County ...........................................................................................115

Instructions for the Grand Jury Complaint Form ..............................................116

Grand Jury Complaint Form ...............................................................................118

California Penal Code 933.05 .............................................................................119



# *The Grand Jury Process*

Any United States citizen who is a resident of Yuba County may apply to serve on the Grand Jury. Application forms are available from the Yuba County Superior Court and its website.  Applications for service are received by the Jury Commissioner and reviewed by the Presiding Judge. Every effort is made to impanel a jury of qualified men and women of all age groups and of diverse socio-economic, ethnic and educational backgrounds, representing the geographical areas of the county. By court policy, and at the discretion of the Presiding Judge, up to 10 members of the previous year's jury may serve a second term to provide continuity. A total of 19 people serve on the Grand Jury. A drawing of names of qualified applicants is made to bring the number of Grand Jurors to nineteen. Another drawing of the remaining applicant's names is held to provide a pool of alternates.

Yuba County jurors are sworn in and begin their one-year term commencing the first day of July. The Presiding Judge appoints a foreperson to preside at meetings. The jury then chooses the remaining officers and organizes itself into committees. Each committee sets its own program of meetings, investigations and interviews. Each committee investigates various departments and functions of local government, as decided by a majority vote of the plenary. Department personnel are interviewed, site visits are made and departments' strengths and weaknesses are investigated. The Grand Jury also may choose to review compliance with previous Civil Grand Jury recommendations.

Some of the matters investigated by the Grand Jury are brought up in letters from citizens complaining about mistreatment or suspected misconduct by local government officials, or governmental inefficiencies. Such complaints are kept confidential. If the situation seems to warrant further investigation, the Grand Jury may follow up and make a report with recommendations for action.

A large portion of the public mistakenly believes that an individual's appearing before the Grand Jury, particularly a public official, indicates suspicion of malfeasance or misfeasance. However, it is the constitutional responsibility of the Grand Jury to review the conduct of city, county and other local government entities each year. This often requires having public officials appear before the Grand Jury to provide information about their departments or offices.

While Grand Jurors are a part of the Judicial System and are considered officers of the court, the Grand Jury is an entirely independent body. The Presiding Judge, the District Attorney, the County Counsel, and the State Attorney General act as advisors, but cannot limit or direct the actions of the jury except for illegality.

Because of the confidential nature of a Grand Jury's work, much of it must be done in closed session. Members of a Grand Jury are sworn to secrecy, thus assuring all who appear that their testimony will be handled in a confidential manner. No one may be present during meetings of the Grand Jury except those specified by law (Penal Code 939), and the minutes of its meetings may not be inspected by anyone, nor can its records be subpoenaed.

The Grand Jury Process

The law provides that every Grand Juror must keep secret all evidence adduced before the Grand Jury, anything said by a Grand Juror or the manner in which a grand juror may have voted on any matter. By law, it is a misdemeanor to violate the secrecy of the Grand Jury room. A Grand Juror must not confide any information concerning testimony of witnesses or action of the jury, even to a spouse or close friend. "Leaks" concerning Grand Jury proceedings might impair or even destroy the effectiveness of the Grand Jury's efforts.

Mid - year and final reports are prepared that describe investigations and contain findings and recommendations. Responses are required within 90 days from public agencies, and 60 days from elected county officers or agency heads, that are specified in these reports.

# _Members of the 2014-2015 Grand Jury_

**Harold Beck**

**William Bradbury**

**Craig Callaway,** _Foreperson Pro-Tem_

**Illa Galasso**

**Anna Gragg,** _Treasurer_

**Linda Marquart**

**Mary Jane Mathews**

**Michael Morrison**

**Chuck Poulos,** _Foreperson_

**Debbie Propst,** _Secretary_

**Stephen Propst**

**Harvey Robinson Sr.,** _Archivist_

**Cary Simpson**

**Sue Voelker**

**Richard Webb**

**Norman Wheat**



# The County of Yuba

GRAND JURY



May 21, 2015

The Honorable Julia Scrogin
Judge of the Superior Court
Yuba County Courthouse
215 Fifth Street, Suite 200
Marysville, CA 95901

Re: 2014 - 2015 Civil Grand Jury Final Report

Dear Judge Scrogin:

It is with personal humility that I present to you the final report of the Yuba County Civil Grand Jury for the term 2014 - 2015.

During his 1968 presidential campaign, Senator Robert F. Kennedy ended each of his "Whistle Stop" speeches by paraphrasing George Bernard Shaw, saying: "Some men see things as they are and say, 'Why'. I dream things that never were and say, 'Why not'". Each member of the 2014 - 2015 Yuba County Civil Grand Jury approached his or her tasks, without any preconceived biases or prejudices, with the sole purpose of seeing, "things as they are", while seeking to improve the community by bringing to reality dreams of things, "that never were".

The Grand Jury commenced each of its informal inquiries and formal investigations by addressing the journalist's five W's of, "who, what, where, when, and why". In making various recommendations, the Grand Jury took great pains to reference and relate back each recommendation to a specific finding of fact that the Jury found to exist through numerous interviews and primary and secondary evidence. The Court will find that the resulting report, is dispassionate, concise, and factually accurate. The Court will also find that the recommendations of the Grand Jury are both practical and merely obvious conclusions in light of the evidence.

I am humbled to have spent the last twelve months with citizens of Yuba County that demonstrated daily their personal integrity, personal talent, and extraordinary selflessness. Although limited to a per diem of $15.00, (with a monthly limit of no more than $120.00 per month), it was common to find Grand Jurors working six to eight hours a day with the resources

215 FIFTH STREET, SUITE 200 • COURTHOUSE • MARYSVILLE, CALIFORNIA 95901
PHONE (530) 749-7341 • FAX (530) 749-7304 • E-mail: yubagrandjury@yubacourts.org

# The County of Yuba

### GRAND JURY



The Honorable Julia Scrogin
May 21, 2015
Page Two

allotted to them to perform their responsibilities.

I am also humbled by the integrity and talent of many of the employees of the entities that were interviewed as part of the Grand Jury investigation process. Sometimes, however, I was surprised by the guarded and defensive posture taken by some officials. Rather than recognizing the Grand Jury as an opportunity for a genuine critique of the performance of their various departments and agencies, some officials unfortunately approached the Grand Jury as an adversary.

There is still much work to be done. Many inquiries and investigations were deferred to the Yuba County Grand Jury of 2015 - 2016. For that reason, most of the current Grand Jurors eligible for reappointment to the next Grand Jury wish to be reappointed.

The last months of service has been a genuine pleasure. The enclosed final report is an extraordinary document worthy of implementation by those to whom it is addressed.

Sincerely,

CHARLES S. POULOS, Foreperson
2014 - 2015 Yuba County Civil Grand Jury

215 FIFTH STREET, SUITE 200 • COURTHOUSE • MARYSVILLE, CALIFORNIA 95901
PHONE (530) 749-7341 • FAX (530) 749-7304 • E-mail: yubagrandjury@yubacourts.org

# Yuba County Airport
# Safety

Yuba County Airport Safety

## Summary:

The 2012-2013 Yuba County Grand Jury conducted an investigation of the Yuba County Airport but did not file a report. The 2013-2014 Grand Jury decided to conduct an investigation in response to local pilots' concerns regarding airport operations and the Grand Jury investigation from 2012-2013. The 2013-2014 Grand Jury identified three areas that needed improvement at the Yuba County Airport. These three areas were safety, security, and maintenance.

The 2014-2015 Grand Jury conducted a continuity investigation and follow-up investigation to the responses given to the 2013-2014 Grand Jury Report. Responses were received from the Yuba County Board of Supervisors and a combined response from both the Director of Yuba County Administrative Services and the Yuba County Airport Manager.

## Introduction and Background:

The Yuba County Airport history and information on the facilities can be located at http://en.wikipedia.org/wiki/Yuba_County_Airport:

The Civil Aeronautics Board, and as authorized by Public No. 812, 76th Congress, approved the construction of Alicia Airport. The City of Marysville and the County of Yuba jointly purchased 833 acres for this purpose. Alicia Airport was built in 1941 by contractor L. D. Richardson and Co. of Beverly Hills, California.

In March, 1942, the City of Marysville and County of Yuba leased the airport and its 833 acres to the Army Air Forces to serve as air support command base for Marysville Cantonment (later named Camp Beale) and designated as Marysville Army Airfield. Marysville Army Air Field was used for a short time as a sub-base of Hamilton Field and controlled by the IV Fighter Command. It served there from November 5, 1943, until they moved to Oroville Army Airfield in January, 1944. Marysville Army Air Field was eventually transferred to the Air Technical Service Command and was vacated.

In 1946, the City of Marysville released all interest in the airport to Yuba County, and in August, 1947, through the War Assets Administration, Marysville Army Airfield was released to Yuba County. Yuba County Airport was licensed as an approved airport on September 30, 1949, by the State of California and continues to operate as a municipal airport and industrial park.

Yuba County Airport Safety



Yuba County Airport - USGS Topo by United States Geological Survey (USGS) - USGS via TopoQuest
http://www.topoquest.com/map.php?lat=39.09777&lon=-121.56982&datum=nad83&zoom=4&map=sat1m&coord=d&mode=zoomin&size=l. Licensed under Public Domain via Wikimedia Commons -
http://commons.wikimedia.org/wiki/File:Yuba_County_Airport_-_USGS_Topo.jpg#/media/File:Yuba_County_Airport_-_USGS_Topo.jpg

Yuba County Airport Safety

Yuba County Airport covers 833 acres at an elevation of 64 feet. It has two asphalt runways: 14/32 is 6,006 by 150 feet and 5/23 is 3,281 by 60 feet. In the year ending June 30, 2010, the airport had 35,300 aircraft operations, an average of 96 per day: 99 percent general aviation and 1 percent air taxi. In 2010, 61 aircraft were then based at this airport: 90 percent single/multi-engine, 8 percent helicopter, and 2 percent ultralight.

The Yuba County Airport has one employee that oversees all operations, the Airport Manager. This position is supervised by the Director of Yuba County Administrative Services.

On May 15, 2012, Yuba County notified the commercial paragliding business, including ultra-lights and powered parachutes, operating in the rural area near Wheatland, CA to cease operations due to zoning restrictions. Yuba County suggested the commercial paragliding business operations could be moved to either the Yuba County Airport or the Brownsville Community Airport (*Yuba County Community Development Services Agency Letter dated May 15, 2012*). The Yuba County Airport Manager verbally authorized and approved the commercial paragliding business operation be relocated on County property located near the main entrance to the airport.

## Methodology and Approach:

**Monitoring final report responses:** Elected officials and governing bodies are mandated by law (Penal Code §933.05) to respond to the *findings* and *recommendations* in Grand Jury Reports. The 2014-2015 Grand Jury conducted follow-up investigations on all responses received concerning the responses to the *findings* and *recommendations* in the previous Grand Jury Report. There are three aspects of response monitoring: compliance, responsiveness, and implementation:

**Compliance:** The 2013-2014 responses received met legal requirements as defined in Penal Code §933 and Penal Code §933.05 with respect to the timeliness of the response and whether the response met the mandated format and content.

**Responsiveness:** The 2013-2014 responses were clear and not evasive. The entities understood the issues in the report and responded accordingly.

**Implementation:** Some implementation dates were not clearly identified in the 2013-2014 response to the findings and recommendations (Violation of Penal Code §933.05).

Yuba County Airport Safety

**Documents:**

- FAR (Federal Aviation Regulations), Part 103 concerning ultra-lights: http://www.ultralighthomepage.com/CFR.part103.html

- FAA Regulations, Part 91.119 concerning altitude minimums: http://www.faasafety.gov

- FAA Regulations, Part 91.126 concerning special visual flight rule operations: http://www.faasafety.gov

- Web Site: www.yubacoairport.com (Privately operated web site)

- Wikipedia Yuba County Airport History and Facilities http://en.wikipedia.org/wiki/Yuba_County_Airport

- Yuba County Community Development Services Agency Letter dated May 15, 2012

- Title II: http://www.co.yuba.ca.us/departments/BOS/documents/ordinance/titleII.pdf

- Budget information: http://www.co.yuba.ca.us/departments/CAO/Budget/13-14/Proposed/05%20Administrative%20Services%20Final.pdf

- Budget information: http://www.co.yuba.ca.us/departments/CAO/Budget/08-09/proposed/4%20-%20Administrative%20Services.pdf

- Title XII – Zoning: http://www.co.yuba.ca.us/departments/BOS/documents/ordinance/Title%20XII.pdf

- Job Title, Airport Manager, 1996

- County of Yuba Ordinance Chapter 2.110 Airport Rules and Regulations Dated 16 December 2008

- 2013-2014 Grand Jury Report and Response: http://www.yubacourts.org/divisions/grand-jury/reports

- Yuba County Sheriff's Department, Incident Report, Case Number 1-14-004283 13 September 2014, 10:48 am

Yuba County Airport Safety

**Site visits:** Site visits to the Yuba County Airport and local fire departments were conducted by the 2014-2015 Grand Jury.

**Interviews:** Interviews were conducted with the Yuba County Airport Manager, the Director of Yuba County Administrative Services, Olivehurst Public Utilities District (OPUD) Fire Department, Linda Fire Department, Aircraft Operators and Pilots Association (AOPA) Yuba County Airport Representative, FAA representative, ultra-light representative, hangar renters, and local pilots.

## Discussion and Narrative:

The 2014-2015 Grand Jury decided to conduct a continuity investigation and follow-up to the responses given to the 2013-2014 Grand Jury Report. The 2013-2014 Grand Jury decided to investigate the Yuba County Airport as a result of local pilot's concerns regarding airport operations and the Grand Jury investigation from the previous year. The 2014-2015 Grand Jury conducted site visits, interviews, and document reviews.

Airport safety was identified as the primary area of concern by the 2014-2015 Grand Jury during the investigation.

During an interview with the Yuba County Airport management, the Chief Deputy County Counsel appeared without an invitation and without any prior notice to the Grand Jury. The Chief Deputy County Counsel did not make the Grand Jury aware of the intended appearance. The Chief Deputy County Counsel was asked to leave the Grand Jury interview. The Chief Deputy County Counsel immediately complied.

At a subsequent interview with the same Yuba County Director of Administrative Services that had previously been interviewed while being represented by the Chief Deputy County Counsel, the Director stated that he had been advised again by the office of the County Counsel. The Director stated that he was advised by County Counsel that he was not bound by the terms of a Grand Jury Admonition and was not under a duty to keep secret the Grand Jury proceedings that the Director attended.

The Grand Jury verified, via interviews, that during the past several years, the County Counsel has represented multiple departments regarding Grand Jury inquiries and investigations without Grand Jury invitation. The Office of the County Counsel is in violation of §934 of the California Penal Code.

> *California Penal Code §934(a) states, "Unless advice is requested… the county counsel..., shall not be present during the sessions of the grand jury."*

Yuba County Airport Safety

The Grand Jury recommends County Counsel follow California Penal Code **§**934 (a) and Rule 3-310.

> ***Current Rules of the State Bar of California; Rule 3-310 - Avoiding the Representation of Adverse Interests. Rule 3-310(C) provides, in part: "A member shall not, without the informed and written consent of each client: (1) Accept representation of more than one client in a manner which the interests of the clients potentially conflict: or (2) Accept or continue representation of more than one client in a manner in which the interests of the clients actually conflict…"***

County Counsel should be directed by the Yuba County Board of Supervisors to budget from the existing County Counsel budget a retained attorney to be available to the Grand Jury and to any department of the County when a possible conflict of interest is created by following California Penal Code **§**936**.**

> ***California Penal Code §936. Special counsel and investigators states: "When requested to do so by the grand jury of any county, the Attorney General may employ special counsel and special investigators, whose duty it shall be to investigate and present the evidence in such investigation to such grand jury. The services of such special counsel and special investigators shall be a county charge of such county."***

For further information concerning this issue regarding County Counsel, see the report on County Counsel Dual Representation in this 2014-2015 Grand Jury Final Report.

The 2013-2014 Grand Jury identified three areas that needed improvement at the Yuba County Airport. These three areas were safety, security, and maintenance. The 2014-2015 Grand Jury conducted a continuity investigation and identified safety and maintenance still needs improvement at the Yuba County Airport, however, this report will only address safety issues.

## Findings:

F1.  The 2013-2014 Grand Jury found that there was "no formal accident response plan for the Yuba County Airport."

Yuba County Airport Safety

The Yuba County Administrative Services Director and the Yuba County Airport Manager responded to the finding:

> *"Disagree. There is a posted 'in an emergency' placard in every hangar to call 911 in an emergency, and a plan filed with all emergency responders in the area (including the FAA and the Yuba County Sheriff)."*

The Yuba County Board of Supervisors responded to the same finding:

> *"The Board of Supervisors disagrees with this finding. Plans are on file with local emergency responders, particularly fire."*

The 2014-2015 Grand Jury interviewed the Yuba County Airport primary and secondary fire responders, and the Yuba County Office of Emergency Services. All three agencies stated that there is no formal accident response plan for the Yuba County Airport.

F2.   The 2013-2014 Grand Jury found that there was "no planned Yuba County Airport related exercises with local emergency responders."

The Yuba County Administrative Services Director and the Yuba County Airport Manager responded:

> *"The airport and the local jurisdictions (primarily fire) do conduct emergency response drills and exercises at the airport at various times of the year. And Administrative Services has been working with the Office of Emergency Services to schedule multi-jurisdictional emergency response exercises."*

The Yuba County Board of Supervisors responded to the same finding:

> *"In addition, Yuba County Emergency Services is planning an emergency response exercise for the Airport during the current fiscal year."*

The 2014-2015 Grand Jury interviewed the Yuba County Airport primary and secondary fire responders, and the Yuba County Office of Emergency Services. All three agencies stated that there have been no planned airport response drills or exercises with the Yuba County Airport for the last several years.  In October,

Yuba County Airport Safety

2014, a multi-jurisdictional emergency Slow Rise Flood response exercise was conducted; however, it was not directed to the Yuba County Airport emergency response capability.

F3.     The Yuba County Administrative Services Director and the Yuba County Airport Manager responded to a 2013-2014 finding that:

> *"There is a posted 'in an emergency' placard in every hangar to call 911 in an emergency."*

The 2014-2015 Grand Jury did locate the "in an emergency" checklist placard at the Yuba County Airport (See Figure 1). The Grand Jury, however, found it contained deficiencies:

- Phone numbers are not listed for the Airport Manager or the Airport Lead maintenance worker.

- There is no date listed on the checklist to indicate when it was last reviewed or updated.

- There is no point of contact to notify if there are any issues with the checklist.

- The checklist does not define the acronyms FAA, NOTAM, or ELT.

- The checklist does not identify who is to notify the FAA or how.

Yuba County Airport Safety

## YUBA COUNTY AIRPORT
## EMERGENCY PROCEDURES CHECKLIST

1.  Call 911 and provide nature of fire/emergency, location, and number of injured

2.  Notify Airport Manager

3.  Airport Manager will close runway with NOTAM at 1-877-487-6867 and advise local air traffic of conditions via UNICOM

4.  The FAA will contact National Transportation Security Board (NTSB) to advise of accident

5.  FAA/NTSB/Airport Manager will contact Dennis James, Plain Parts, 916/655-3100, for standby to remove aircraft if runway/taxiway is blocked; (NTSB is the controlling authority; the aircraft belongs to the NTSB when an accident occurs and will determine directions to proceed)

6.  Notify Airport Lead maintenance worker, if necessary, for assistance

7.  As necessary, record sky condition, visibility, temperature, barometric pressure, runway condition, time and any other pertinent information as possible; information also available for Airport's Automated Surface Observation System (ASOS) (742-0695)

8.  Do **NOT** give any information to anyone other than Sheriff, Fire, Airport Personnel, FAA, or NTSB.  Airport Manager or designated Public Information Officer to make statements to the press.

9.  Do **NOT** allow the public to be within 100 feet of the scene, unless it is necessary to assist people who are in danger.

10. Locate and turn off aircraft's ELT, when safe to do so, which would normally be located in rear of fuselage.

*Figure 1. Yuba County Airport Emergency Procedures Checklist*

F4.    The 2013-2014 Grand Jury recommended "the ultra-lights be moved to the west side of runway 14/32 where safer operations with other aircraft at the airport would be improved."

Yuba County Airport Safety

The Yuba County Administrative Services Director and the Yuba County Airport Manager responded:

> *"This recommendation will not be implemented. This would require ultralight flyers to relocate onto actual airport property which would cause greater potential for conflict with aircraft, and would also put them in conflict with County ordinance which prohibits their use on actual airport operational land."*

The Yuba County Board of Supervisors responded to the same finding:

> *"This recommendation will not be implemented. This would require ultralight flyers to relocate onto actual property which would cause greater potential for conflict with aircraft, and would also put them in conflict with County ordinance which prohibits their use on actual airport operational land."*

County of Yuba Ordinance Chapter 2.110.130 AIRPORT RULES AND REGULATIONS, Adopted December 16, 2008 states, "…No motorless aircraft or ultralight vehicles as defined by FAR (Federal Aviation Regulations) Part 103 (http://www.ultralighthomepage.com/CFR.part103.html) may land or take off at the Airport without prior permission of the Airport Manager…"
(See Figure 2)

Yuba County Airport Safety



***Figure 2.*** *Sign located at main entrance at Yuba County Airport.*

The Grand Jury is puzzled why the Airport Management has not exercised the authority provided in the aforementioned ordinance to relocate the ultralight operations to a safer, more suitable location.

Pilots interviewed by the Grand Jury voiced safety concerns regarding the in-flight conflicts between ultralights and other aircraft operating at the Yuba County Airport. Pilots stated they have observed ultralights crossing over the runways and approach/departure zones. Ultralights operate at a much slower speed, have a much slower maneuvering response time, and because of their small size, are very difficult to see.

It was reported to the 2014-2015 Grand Jury that most ultra-light activity occurs along the Feather River which is west of the Yuba County Airport. The interview with an FAA representative confirmed that moving ultralight activities west of runway 14/32 would eliminate their potential runway crossings and greatly improve the safety of ultralight operations and other aircraft operating at Yuba County Airport.

Yuba County Airport Safety

F5.     The 2013-2014 Grand Jury recommended "The Administrative Services Director
        revise  and update the Airport Manager Job Description to reflect current duties
        and responsibilities."

        The Yuba County Administrative Services Director and the Yuba County Airport
        Manager responded:

                *"This recommendation will be implemented. The Administrative
                Services Director will coordinate with the Director of Human
                Resources to review the class specification for the Airport
                Manager and determine if any updates are needed. This will be
                done within 30 days."*

        The Yuba County Board of Supervisors responded to the same finding:

                *"This recommendation will be implemented by requesting a
                review of the job specifications immediately with the intent to
                complete the review by the end of the current fiscal year."*

        The 2014-2015 Grand Jury conducted an interview with the Yuba County
        administrativeServices Director on March 26, 2015. The Airport Manager's class
        specification review (job description), as of that date, was still not complete. The
        Yuba County Administrative Services Director is in violation of Penal Code
        §933.05 (b)(2).

## Recommendations:

R1.     The 2014-2015 Grand Jury recommends the Yuba County Board of Supervisors
        immediately directs the Yuba County Office of Emergency Services (OES)
        develop a formal accident response plan in coordination with all local emergency
        responders for the Yuba County Airport. (See F1)

R2.     The 2014-2015 Grand Jury recommends the Yuba County Board of Supervisors
        immediately directs local districts (primarily fire) conduct emergency response
        drills and exercises in coordination with Yuba County Airport management at the
        Yuba County Airport. The Grand Jury also recommends the Yuba County Board
        of Supervisors immediately directs the Yuba County OES include the Yuba
        County Airport in all multi-jurisdictional emergency response exercises. (See F2)

Yuba County Airport Safety

R3.     The Grand Jury recommends the Yuba County Airport Manager immediately
        update the "in an emergency" checklist posted at the airport to include: (See F3)

        • Phone numbers listed for the Airport Manager and the Airport Lead
          maintenance worker.
        • A date listed to indicate when it was last reviewed and updated.
        • A listed point of contact to notify if there are any issues with the checklist.
        • Spell out the acronyms FAA, NOTAM, and ELT.
        • Indicate who will notify the FAA.

R4.     The 2014-2015 Grand Jury recommends the Yuba County Board of Supervisors
        direct airport management to immediately move ultralight operations to an area
        west of runway 14/32, to a safer and more suitable location. (See F4)

R5.     The Grand Jury recommends the Yuba County Board of Supervisors directs the
        Yuba County Administrative Services Director to ensure the Yuba County Airport
        Manager's job specification review (job description) is complete, as represented,
        by the end of the 2014-2015 fiscal year. (See F5)

**Request for Responses:**

Pursuant to Penal Code §933.05, the Grand Jury requests responses as follows:

• Yuba County Board of Supervisors (F1, F2, F4, F5, R1, R2, R4, R5)
• Yuba County Administrative Services Director (F3, F5, R3, R5)
• Yuba County Airport Manager (F3, R3)

The governing bodies indicated above should be aware that the comment or response of
the governing body must be conducted in accordance with Penal Code §933(c) and
subject to the notice, agenda and open meeting requirements of the Brown Act.

# County Counsel
# Dual Representation

County Counsel Dual Representation

## Summary:

Penal Code §925 and §933(a) require a final report to be written by the Grand Jury. The Grand Jury scheduled and subsequently conducted an interview with management of the Yuba County Airport on September 24, 2014. The Grand Jury invited subject management. The Chief Deputy County Counsel appeared with the Airport management. The Chief Deputy County Counsel did not make the Grand Jury aware of his intended appearance. The Chief Deputy County Counsel was not invited by the Grand Jury to attend the interview. The County Counsel's office created an apparent conflict of interest to the Grand Jury by offering unsolicited comments during its interview of the Yuba County Airport management.

The Grand Jury is required to investigate whether the County is in compliance with the Consent Decree dated November, 1978. The Consent Decree requires the Grand Jury to do an annual analysis of whether the Yuba County Jail is in compliance with the provisions of the Consent Decree and include the results in its yearly report. The Grand Jury shall receive its copy of the Consent Decree from Yuba County on an annual basis. The Chief County Counsel did not notify the Grand Jury of its 2013 motion to terminate the Consent Decree of November, 1978.

The Office of the County Counsel appears to be in violation of §934 of the California Penal Code.

The Grand Jury expects to operate with a sense of confidence when dealing with the County Counsel's office. However, the Grand Jury finds difficulty utilizing the office of the County Counsel for legal advice and for confidential legal sufficiency of reports prior to release. The Grand Jury is lacking confidence with the office of the County Counsel.

County Counsel should be directed by the Yuba County Board of Supervisors to budget from the existing County Counsel budget a retained attorney to be available to the Grand Jury and to any department of the County when a possible conflict of interest is created.

## Introduction and Background:

The County Counsel is appointed by the Board of Supervisors. The Office of the County Counsel renders legal advice and affords legal representation to the County Board of Supervisors, County departments, and many special districts. County Counsel attorneys do not provide legal advice to the public.

The Chief Deputy County Counsel is subordinate to the County Counsel. The Chief Deputy County Counsel uses considerable independent judgment and discretion in department administration and management.

County Counsel Dual Representation

The Chief Deputy County Counsel meets with and advises the Board of Supervisors, County Administrator, and other County boards and commissions, and boards of directors of special districts with respect to both legal advice and representation.

The role of the Grand Jury in California is unique due to statutes passed in 1880. The Grand Jury is fundamentally a group of citizens who have volunteered their time to act as watchdogs on local government as a service to their fellow citizens. The duties include investigation of county government.

The Grand Jury is part of the judicial system. The Grand Jury Judge, the District Attorney, the County Counsel, and the State Attorney General act as its advisors.

## Methodology and Approach:

The Grand Jury has conducted a number of interviews in its investigations as per The Yuba County Grand Jury Handbook, The California Grand Jury Association and The California Penal Code with reliance upon §914 through §940.

**Documents:**

- Opinion Letter by The California Grand Jurors Association
- Current Rules of the State Bar of California; Rule 3-310 - Avoiding the Representation of Adverse Interests
- Consent Decree of November, 1978
- Opinion of University of California, Davis Civil Rights Clinic
- Appeal of Denial to Terminate Consent Decree (DARRIL Hedrick, ET AL.; *Plaintiffs-Appellees* v. JAMES GRANT, ET AL.; *Defendants-Appellants*)
- The California Rules of Professional Conduct (www.calbar.ca.gov)

**Interviews:**

- County Counsel
- Former Forepersons of the Yuba County Grand Jury

## Discussion and Narrative:

The Grand Jury scheduled and subsequently conducted an interview with management of the Yuba County Airport on September 24, 2014. The Grand Jury invited subject management. The Chief Deputy County Counsel appeared with the Airport management.

County Counsel Dual Representation

The Chief Deputy County Counsel did not make the Grand Jury aware of his intended appearance. The Chief Deputy County Counsel was not invited by the Grand Jury to attend the interview.

The Grand Jury queried the reason for the appearance of the Chief Deputy County Counsel. The Grand Jury was informed by the Chief Deputy County Counsel the purpose of his attendance was to resolve any misunderstandings between the Grand Jury and the Yuba County Airport; that the County Counsel represents both the Airport and the Grand Jury. When the Chief Deputy County Counsel began to answer a question directed to the Airport management, the Grand Jury requested the Chief Deputy County Counsel to leave per §934 of the California Penal Code. The Chief Deputy County Counsel complied.

The Grand Jury is required to investigate whether the County is in compliance with the Consent Decree dated November, 1978. The Consent Decree requires the Grand Jury to do an annual analysis of whether the Yuba County Jail is in compliance with all provisions of the Consent Decree and include the results in its yearly report. The Grand Jury shall receive its copy of the Consent Decree from Yuba County on an annual basis. The 2013 motion to terminate the Consent Decree was denied on April 2, 2014. Subsequently, County Counsel's office filed an appeal on April 29, 2014, and the County Counsel made no comment of this action to the Grand Jury.

The Grand Jury was informed by the County Counsel that the County Counsel represents the Board of Supervisors, 28 county departments, 43 special districts, and the Grand Jury. Current Rules of the State Bar of California; Rule 3-310 - Avoiding the Representation of Adverse Interests states in part:

> **"A member shall not, without the informed and written consent of each client: (1) Accept representation of more than one client in a manner which the interests of the clients potentially conflict: or (2) Accept or continue representation of more than one client in a manner in which the interests of the clients actually conflict…"**

> Explained in ***Walker v. Berkeley, supra, 951 F.2d 182, 184, " … (1) that an attorney for a governmental entity usually has only one client, namely, the client itself, which acts through constituent sub-entities and officials…."***

Through research of various cases relative to "conflict of interest" (conflict of interest is defined in Encarta Dictionary – *a conflict between the public and private interests of somebody in an official position, or conflicts between a number of public resources*) the Grand Jury found several cases.

County Counsel Dual Representation

In Howitt v. Superior Court (1992) 3 Cal.App.4th 1575 (Howitt), the court concluded that county counsel could not undertake dual representation, in which the office was both advocate and adviser to the decision maker in a contested hearing, unless adequate internal safeguards were established to avoid a conflict of interest. The court concluded *"By definition, an advocate is a partisan for a particular client or point of view. The role is inconsistent with true objectivity, a constitutionally necessary characteristic of an adjudicator."*

In Nightlife Partners, Ltd. v. City of Beverly Hills (2003) 108 Cal.App. 4th 81(Nightlife Partners) the court again concluded that when a public attorney acts as an advocate in a matter, the attorney is generally precluded by due process concerns from advising the decision maker in the same matter.

The 1991-1992, Los Angeles County Grand Jury justified *"...We could find no other jurisdiction that operates the way Los Angeles County does..... Dual representation in its present form does not appear to be the answer."* (Los Angeles County Dept. of Children etc. Services v. Superior Court (Shawn B.) (1996) 51 Cal.App.4th 1257)

In Civil Service Com. v. Superior Court (1983), the court held that county counsel was disqualified from representing the county in litigation against its own Civil Service Commission because the same attorney from that office had provided pre-litigation advice to both the county and the commission.  (City of Santa Barbara v. Superior Court-Stenson- (2004) 122 App.4th 17)

The Grand Jury verified, via interview, that during the last six months, the County Counsel has physically represented multiple departments.

The County Counsel's office is customarily used to verify legal sufficiency of the Grand Jury's Final Reports, as per §934 of the California Penal Code. The Grand Jury has a reasonable expectation of confidentiality when the County Counsel's office is utilized. Through interviews, it has been revealed that the County Counsel's office has prematurely released "Final Report" information to the department of investigation. The Grand Jury has verified through the California Grand Jury Association that the County Counsel's office released confidential opinion information to a third party department of the county.

The Grand Jury expects to operate with a sense of confidence when dealing with the County Counsel's office. However, the current Grand Jury finds difficulty utilizing the office of the County Counsel for legal advice and for confidential legal sufficiency of reports prior to release. The Grand Jury is lacking confidence with the office of the County Counsel.

County Counsel Dual Representation

## Findings:

F1.   During an interview with the Yuba County Airport management, the Chief
      Deputy County Counsel appeared without an invitation and without any prior
      notice to the Grand Jury. The Chief Deputy County Counsel did not make the
      Grand Jury aware of his intended appearance. The Chief Deputy County Counsel
      was asked to leave the Grand Jury interview of the Yuba County Airport
      management. The Chief Deputy County Counsel immediately complied.

      The Grand Jury verified, via interviews, that during the past several years, the
      County Counsel has represented multiple departments regarding Grand Jury
      inquiries and investigations without Grand Jury invitation. The Office of the
      County Counsel appears to be in violation of §934 of the California Penal Code.

      > *California Penal Code §934(a) states, "Unless advice is
      > requested… the county counsel..., shall not be present during the
      > sessions of the grand jury."*

F2.   The County Counsel did not notify the 2013-2014 and current Grand Juries of its
      motion to terminate the Consent Decree of November, 1978. Such motion to
      terminate was filed by the County Counsel's office in 2013. The Consent Decree
      requires the Grand Jury to do an annual analysis of whether the jail is in
      compliance with the provisions of the Consent Decree and include the results in
      its yearly report. The 2013 motion to terminate the Consent Decree was denied
      April 2, 2014, by the 9th District Court of Appeals. The County Counsel filed a
      Notice of Appeal April 29, 2014. The current Grand Jury was not made aware of
      this Notice of Appeal.

F3.   The County Counsel's office created an apparent conflict of interest to the Grand
      Jury by offering unsolicited comments during its interview of the Yuba County
      Airport management. The Chief Deputy County Counsel volunteered comment to
      a Grand Jury question asked of the Yuba County Airport management, a
      department of the county. The question was directed to the manager of the airport.
      It became clear to the Grand Jury that the Chief Deputy County Counsel
      voluntarily appeared in the interview to represent the interests of the Yuba County
      Airport; even though the Grand Jury was informed his presence was to solely
      clear up any misunderstandings between the Yuba County Airport and the Grand
      Jury; that the County Counsel represents both the Airport and the Grand Jury.

F4.     The Grand Jury was informed by the County Counsel that the County Counsel
        represents the Board of Supervisors, 28 county departments, 43 special districts,
        and the Grand Jury. The office of the County Counsel appears to be in violation of
        the State Bar of California; Rule 3-310.

> *Current Rules of the State Bar of California; Rule 3-310 -*
> *Avoiding the Representation of Adverse Interests. Rule 3-310(C)*
> *provides, in part: "A member shall not, without the informed*
> *and written consent of each client: (1) Accept representation of*
> *more than one client in a manner which the interests of the*
> *clients potentially conflict: or (2) Accept or continue*
> *representation of more than one client in a manner in which the*
> *interests of the clients actually conflict…"*

> Explained in: *Walker v. Berkeley, supra, 951 F.2d 182, 184, " …*
> *(1) that an attorney for a governmental entity usually has only*
> *one client, namely, the client itself, which acts through*
> *constituent sub-entities and officials…."*

## Recommendations:

R1.     The Grand Jury recommends County Counsel follow California Penal Code §934
        (a) and Rule 3-310. County Counsel should be directed by the Yuba County
        Board of Supervisors to budget from the existing County Counsel budget a
        retained attorney to be available to the Grand Jury and to any department of the
        County when a possible conflict of interest is created by following California
        Penal Code §936. (See F1, F3)

> *California Penal Code §936. Special counsel and investigators*
> *states: "When requested to do so by the grand jury of any county,*
> *the Attorney General may employ special counsel and special*
> *investigators, whose duty it shall be to investigate and present the*
> *evidence in such investigation to such grand jury. The services of*
> *such special counsel and special investigators shall be a county*
> *charge of such county."*

R2.     In accordance with the Consent Decree of 1978, the County Counsel, as well as
        the Yuba County Sheriff, shall ensure that all current Grand Juries are made
        aware of the yearly requirement for the Grand Jury to perform an annual
        assessment of the jail's compliance with all provisions of the Consent Decree of
        November, 1978. (See F2)

County Counsel Dual Representation

R3.    The County Counsel should seek an ethics opinion from the State Bar as to
       potential conflicts of interests in simultaneously representing the County of Yuba,
       the Yuba County Sheriff, the Yuba County Jail, and the Yuba County Grand Jury.
       (See F3)

R4.    The County Counsel should abstain from representing the Grand Jury and other
       County departments if there is a potential conflict of interest. (See F4)

> ***Current Rules of the State Bar of California; Rule 3-310 –
> Avoiding the Representation of Adverse Interests. Rule 3-310(C)
> provides, in part:  "A member shall not, without the informed
> and written consent of each client:  (1) Accept representation of
> more than one client in a manner which the interests of the
> clients potentially conflict: or (2) Accept or continue
> representation of more than one client in a manner in which the
> interests of the clients actually conflict…"***

> Explained in: ***Walker v. Berkeley, supra, 951 F.2d 182, 184, " …
> (1) that an attorney for a governmental entity usually has only
> one client, namely, the client itself, which acts through
> constituent sub-entities and officials…."***

## Request for Responses:

Pursuant to California Penal Code §933.05, the Grand Jury requests responses as follows
from the following individuals:

- Yuba County Counsel (F1, F2, F3, F4, R1, R2, R3, R4)

- Chairman of the Board of the Yuba County Board of Supervisors (F1, F2, F3, F4,
  R1, R2, R3, R4)

The governing bodies indicated above should be aware that the comment or response of
the governing body must be conducted in accordance with Penal Code §933(c) and
subject to the notice, agenda and open meeting requirements of the Brown Act.

# Yuba County Jail

Yuba County Jail

## Summary:

The Grand Jury has routinely conducted yearly inquiries into the condition and management of the Yuba County Jail (YCJ) as authorized by §919(b) of the California Penal Code. This year the investigation took a different turn, as a Consent Decree issued in 1978 by The United States District Court was reviewed. This Consent Decree mandates the Grand Jury to monitor the Yuba County Jail in very specific detail. Yuba County Counsel filed a motion in 2014 to terminate the Consent Decree; that motion was denied by the U.S. District Court. An appeal has been filed by Yuba County Counsel (Darrel Hedrick, et al., v James Grant, et al., 2014, 2:76-cv-00162-GEB-EFB, (Eastern District of California)) and is currently pending. In accordance with the Consent Decree as it now stands, more thorough attention than usual was applied to certain aspects of the jail. Identified items of non-compliance are included in this report and will be addressed herein.

Aside from specific Consent Decree items, other observations were made and will be noted. Significant increases in the numbers and classifications of detainees and their lengths of stay have greatly impacted the operation of the jail, and in particular, the care and safety of inmates. This year's Grand Jury placed particular attention on the medical and mental health services available for inmates. Medical and mental health issues have grown considerably since the passing of Assembly Bill AB109; known as "Public Safety Realignment" in 2011, (Public Safety Realignment, 2013). Due to recent changes in Federal laws, the US Immigration and Customs Enforcement (ICE) detainees are remaining longer (Your Complete Guide to Obama's Immigration Executive Action, 2014) and have further increased the demanding tasks of this jail. The purpose of this report is to comply with mandated duties by identifying areas of concern and non-compliance, and make recommendations regarding possible correction and improvement. Acknowledgement of the ongoing accomplishments and dedication of those in charge of Yuba County Jail and its detainees, in spite of immense challenges, is also important.

## Introduction and Background:

Over the past twenty years, changes in California prison law have impacted the numbers of incarcerated persons immensely. As time passed, these changes greatly contributed to the numbers and lengths of stay for inmates in county jails. In addition to housing locally convicted prisoners, YCJ has, for many years, housed ICE detainees. The number of ICE detainees fluctuates, but the individuals were only housed a short period prior to deportation.

In 2011, Assembly Bill 109, known as the Realignment Act, was placed into California law. The Bill changed the location of incarceration for many people convicted of a non-serious, non-violent, non-sexual felony, from state prisons to local county jails. A portion of state sales tax revenue was dedicated to local agencies to fund this change (Public Safety Realignment, 2013). The Realignment Act impacted county jails that were

Yuba County Jail

designed to hold inmates for a maximum of 12 months, as the jails now must hold some individuals for many years. In addition to AB 109, recent changes in how illegal aliens are handled have increased the time the ICE detainees remain in local custody (Your Complete Guide to Obama's Immigration Executive Action, 2014).

Because of more lengthy stays, medical and mental health issues have become increasingly important. Overcrowding, compromised safety, and inadequate recreation have all added to the burden of housing hundreds of persons in facilities designed for shorter terms. Locally, jails have been unable to keep pace with the need to provide more in-depth services to a longer-detained population. Lawsuits have been filed to ensure that changes are made.

One recent lawsuit was specifically aimed at Sutter County Jail (Cyndie Denny Bock, et al. v. County of Sutter, et al., 2013, 2:11 cv 00536 MCE KJN (Eastern District of California). It outlines detailed improvements designed to reduce suicides, suicide attempts, and addresses health related issues. A much older lawsuit, impacting Yuba County Jail specifically, resulted in a Consent Decree (1978) which directs that each Grand Jury be given a copy of same, and instructs each jury to inspect in detail a number of aspects of inmate treatment and benefits.

This Grand Jury has attempted to comply with the Consent Decree and determine how those in charge are providing a necessary environment of protection during detainment.

## Methodology and Approach:

A combination of interviews, tours, and research was used to investigate the current conditions of Yuba County Jail.

### Documents and References:

- 2008-2010 and 2010-2012 Biennial Inspections by Corrections Standards Authority
- 2014 Appeal from the United States District Court Case No. 2:76-CV-00162-GEB-EFB
- A brief history of California prisons and jails leading up to AB109 ("Public Safety Realignment") by David Fowler July 11, 2014
  https://lightinprison.org/2014/07/11/a-brief-history-of-california-prisons-and-jails-leading-up-to-ab-109/

Yuba County Jail

- o   America, Sign of the Times, California, Reforms for Mentally Ill Inmates
- o   Appeal-Democrat; Local Law Program Probes Jail over Attempted Suicide
- Board of State and Community Corrections Population Reports, 1st & 2nd quarter
- Complaints received from inmates
- Consent Decree of 1978 with additional information compiled and provided by UC Davis Civil Rights Clinic at U.C. Davis School of Law
- Consent Decree, 1978; Derril Hedrick, et al. v James Grant, et al., US District Court for the Eastern District of California, CIVIL S-76-162 TJM
- Grand Juror Reports; 2012-2013 and 2013-2014 on Jails and the responses: http://www.yubacourts.org/divisions/grand-jury/reports
- Human Rights Watch report - Ill Equipped: U.S. Prisons and Offenders with Mental Illness, retrieved from:  http://www.hrw.org/reports/2003/usa1003/1.htm
- Inmate Handbook (English and Spanish versions) provided by Jail personnel
- Jail Inspection Handbook by California Board of State and Community Corrections revised April 2014
- Jails and Mentally Ill: Issues and Analysis, a briefing paper developed by The California Corrections Standards Authority (CSA) retrieved from: http://www.cdcr.ca.gov/COMIO/docs/MENTALLY_ILL_IN_JAILS_PAPER.pdf
- Fire Safety Correction Notice dated 5/8/12 and Re-inspection Report dated 7/13/12 from the Office of State Fire Marshal
- Job Descriptions of Medical Staff Positions
- Mental Health Problems of Prison and Jail Inmates, Highlights, U.S. Department of Justice, Bureau of Justice Statistics Special Report, Retrieved 03/19/15 from: http://www.bjs.gov/content/pub/pdf/mhppji.pdf.
- Public Safety Realignment, 2013, retrieved from: http://www.cdcr.ca.gov/realignment/
- Realignment – The Bottom Line by Board of State and Community Corrections, 2013, retrieved from: http://lpmt.calbar.ca.gov/Publications/TheBottomLine.aspx
- Related articles:
- US District Court Case No. 2:11-cv-00536-MCE-KJN can be located at: http://www.gpo.gov/fdsys/pkg/USCOURTS-caed-2_11-cv-00536/pdf/USCOURTS-caed-2_11-cv-00536-12.pdf
- US District Court No. 2:76 cv 00162 GEB EFB, 2014 Appeal (Can be located at: http://www.gpo.gov/fdsys/pkg/USCOURTS-caed-2_76-cv-00162/pdf/USCOURTS-caed-2_76-cv-00162-5.pdf)
- Various jail forms such as YCJ Inmate Medical Screening Form, and Non-Prescription Medication Log

Yuba County Jail

- Your Complete Guide to Obama's Immigration Executive Action, retrieved from web site: http://www.washingtonpost.com/blogs/wonkblog/wp/2014/11/19/your-complete-guide-to-obamas-immigration-order/#economy
- Yuba County Inmate Handbook (English and Spanish versions) provided by Jail personnel
- Yuba County Jail Division Overview
- Yuba County Jail Manual, provided by the Yuba County Sheriff staff during the visit.
- Yuba County Job Classification: Correctional Facility Medical Assistant, Human Resources Department of Yuba County, retrieved from: http://www.co.yuba.ca.us/departments/personnel/specifications.aspx#c
- Yuba County Job Classification: Executive Assistant, Human Resources Department of Yuba County, retrieved from: http://www.co.yuba.ca.us/departments/personnel/documents/Specifications/E/Executive%20Assistant%20December%202013.pdf

**Site Visits:**

- Pre-arranged tours of the Yuba County Jail located at 215 Fifth Street, Marysville, CA were conducted on August 26, 2014 and again on September 11, 2014.

- An unannounced visit was made on December 17, 2014 to complete the checklist of mandated inspection items. Other unannounced visits were conducted to interview inmates.

**Interviews:**

- Jail Employees: Medical Assistants, Substance Abuse Counselor, LVN, Executive Assistant in Medical Services, Dentist, Captain and Undersheriff. Also interviewed a former YCJ inmate in custody at Sutter County Jail at the time of interview.
- Mental Health Employees: Forensic Psychiatrist and Crisis Counselor
- A presentation by UC Davis Civil Rights Clinic and law students from U.C. Davis

Yuba County Jail

## Discussion and Narrative:

The following is a reporting of the results of this year's Grand Jury investigation of Yuba County Jail. The jury was aided in its quest by staff members of the jail and by associates who provide services by contract. Eight inmates filed formal complaints, however, only one agreed to meet with the Grand Jury. It was possible to converse with inmates during tours and other visits, although not in seclusion. Some inmates had been released prior to their complaint being acted upon, and had provided no forwarding contact information. It was noted that every complaint letter addressed to the Grand Jury marked "Legal Mail," had been opened and then re-sealed with tape prior to delivery. All staff interviewed about this matter stated that Legal Mail is never opened.

A temporary arrangement was established by the Grand Jury with the Probation Department in an effort to establish a confidential pathway for former inmates to express their thoughts and ideas without fear of retaliation regarding their treatment while in custody at Yuba County Jail. A two-page form and a pre-addressed envelope were given to probationers as they met their probation officers for prescribed appointments. Each former inmate was invited to complete the form and mail it to the Grand Jury, or seal it, and deposit it in a box to be delivered to the Grand Jury. There was no need to state his or her name, but the probationer could provide contact information if desired. Results were disappointing as only five out of 55 forms were returned. Of the five responses, most were unresponsive on the treatment received while at the jail.

The Consent Decree court order, issued in 1978, was agreed upon and signed by the County Counsel of Yuba County and the plaintiffs' attorneys (Consent Decree, 1978). It addresses certain areas in the housing and treatment of inmates in the Yuba County Jail. It has not been updated in 36 years, therefore, some requirements are not compatible with current technology or are lacking in relevance.

The Consent Decree requires that a copy be provided to the Grand Jury each year. Yuba County Counsel filed a motion in 2014 to terminate the Consent Decree; that motion was denied by the U.S. District Court. An appeal has been filed by Yuba County Counsel (Darrel Hedrick, et al., v. James Grant, et al., 2014, 2:76-cv-00162-GEB-EFB, {Eastern District of California}) and is currently pending. This court action shows that the County Counsel is aware of the mandates of the Consent Decree and failed to provide a copy to the members of this year's Grand Jury. This is in violation of the Consent Decree, §XV, Paragraph 4, pg. 49. The Grand Jury only became aware of the Consent Decree through media reports regarding another agency.

The original intent of the Consent Decree was designed to correct conditions found wanting at the time. Since then, no review or changes have been made to the document. The Grand Jury members were advised by the Undersheriff that YCJ follows the

Yuba County Jail

California Code of Regulations, Title 15 Crime Prevention and Corrections, as well as Title 24 Building Codes. Grand Jury members were also told by the Undersheriff that the jail has oversight from many sources: fire inspections, facility inspections, and health inspections are all conducted on a regular basis. Copies of those reports were provided to the Grand Jury and it was noted that the inspections are quite thorough and cite very few infractions. Improvements are made as funds and plans coincide. At the time of the Grand Jury's last visit, call buttons were being installed in an older part of the jail in an effort to update communications for inmates.

It became apparent during our investigation that the officers and other staff that serve this particular jail are challenged not only by the large number of inmates and their complicated needs, but by the inadequacy of the facility itself. One portion of the jail was built in 1962 and is referred to by staff and inmates as "the dungeon". It was observed by this Grand Jury that space is quite limited, with narrow halls, low ceilings, and almost no windows except a very few above head height. The showers are dark and the entrance opening is covered by a heavy dark curtain. Female detainees and males with expected shorter stays are housed in "tanks," cells housing from four to 20 persons. The male and female sides of this part of the jail are completely separated, although the areas are similar in darkness and limited space.

The other half of this facility was built in 1995 in a pod formation. One deputy can observe all cells from a central location and can communicate with inmates via an intercom system. According to jail staff this requires fewer personnel and is, therefore, more economical to operate.

The kitchen area was observed to be clean, well-organized, and special diets were clearly posted. There were no complaints about the food served; it was stated by more than one inmate that this jail has a reputation of serving the best food in the north-state area offered by a correctional facility.

The medical unit, also located in this older structure, is cramped, with only four small workstations that are shared by the visiting doctor, mental health psychiatrist, dentist, LVNs and medical assistants on staff. It is common practice for a doctor to make use of two stations during hours worked. There are also four cells in the medical unit; two holding cells where inmates wait for treatment, and two used for the isolation of contagious diseases. The Executive Assistant in medical services has an office upstairs away from his team, as there is no room for an additional desk. It was observed that this area, although spatially challenged, was clean and well-organized. To conserve space, paper copies of inmate requests such as Sick Call Sheets are scanned into the computer and then shredded. Unfortunately, the computer goes down periodically for about a day. Since backup is performed each night, recovery can be made with minimal difficulty.

Yuba County Jail

Several members of the medical staff expressed dedication to their duties. They did, however, humorously deny liking the working conditions.

Interviewees agreed that the addition of a Registered Nurse (RN) would be of great benefit to the unit, as there are frequent times that Medical Assistants (MA) are working without a certified nurse at hand. Also, an RN can perform more procedures than a Licensed Vocational Nurse (LVN) or MA, thereby supplementing medical coverage when a doctor is not on site. The Consent Decree (1978), and the Human Resources Department of Yuba County (Job Classification: Correctional Facility Medical Assistant), both specify certification of the Medical Assistants.

The Grand Jury was advised, during interviews and confirmed by the Undersheriff, that YCJ does not require continuing certification for MAs. Some of the current MAs were previously certified, but have not kept their credentials current. The four LVNs are certified and routinely update their credentials. They are not, however, scheduled to cover all 24 hours of the day.  As medical and mental health issues do not arise in neatly timed occurrences, this lack of coverage is of concern.

Although a full-time Registered Nurse has been recommended by previous Grand Juries and the Consent Decree (1978) mandates a part-time RN; there has been none on staff for more than three years. The Yuba County Fiscal Year 2013-2014 Budget was finalized with the elimination of the Supervising Correctional Facility Registered Nurse position, and the Yuba County Fiscal Year 2014-2015 Budget is also devoid of funding for that position. This is a specific violation of the Consent Decree (1978).

The Executive Assistant advised the Grand Jury that Jail staff is investigating the hiring of a Nurse Practitioner (NP) or Physician Assistant (PA) instead of filling the supervising RN position. A Nurse Practitioner is a Registered Nurse with additional education and training who can diagnose and prescribe under the direction of a physician. A Physician Assistant is not required to have Registered Nurse qualifications but has extensive education and training and also works under the direction of a physician. (www.calhr.ca.gov/state-hr-professionals/). Although hiring a PA would help the Jail comply with ICE requirements, the Jail would remain in violation of the Consent Decree if a PA without a RN license is hired.

A physician comes to the medical unit six days per week for approximately two to four hours per day. The physician did not respond to the Grand Jury's letter requesting to set up a meeting date. Nor did he respond to messages left and attempts to contact him at the jail through the Undersheriff. While his input would have been

Yuba County Jail

welcomed, the Grand Jury felt rather than subpoenaing him to appear, the information supplied by the Medical Department employees was adequate enough to complete this report.

It was reported to the Grand Jury that mental health supports are mainly centered on prescription medication. A Board Certified Forensic Psychiatrist comes one day per week to review and update prescriptions. This doctor is available by phone. There is a second doctor with the same credentials available to fill-in if necessary.

Suicidal inmates are confined to an empty cell with a softer, padded floor. To prevent suicide while confined, the inmate must wear a protective jumpsuit; he may or may not have a blanket. Although those confined are to be visually checked every 15 minutes, little stabilization can be expected under such bleak conditions. Inmates who have psychiatric diagnoses requiring state hospital confinement must wait months to be transferred.

Those with substance abuse problems have access to a certified Substance Abuse Counselor who appeared enthusiastic and dedicated. The Counselor advised that when released, such individuals would be best served by being enrolled in recovery programs but funds are not available. The Counselor reports an unknown success rate since follow-up to his work does not occur.

Additional counseling is provided by a dedicated, although uncertified, Crisis Counselor who is employed by Sutter Butte Mental Health. This individual makes it a point to walk throughout the female holding units to inquire about detainees' well-being and ask if any help is needed. No corresponding service is provided to the male inmates, although they have the option to request a counseling session with a psychiatrist by filling out a form. This counselor previously conducted on-site support groups which were suspended two years ago.

One area of concern identified by the jury was the procedure for fire drills and evacuation. The medical staff does not participate in drills and many expressed confusion about procedure in case of evacuation. Although there are evacuation maps posted throughout the facility, the method of leaving the area can be confusing: the elevators are not to be used, stairwells are locked, and cameras are relied upon for communication with the upper floors. However, the medical staff is aware of where fire extinguishers are stored. Correctional Officers are well trained in procedures necessary for safe fire evacuation and are knowledgeable about which areas are segregated for fire control. That information, shared with medical staff, could help reduce confusion and possible panic.

Yuba County Jail

A nearby facility has been purchased to alleviate the crowded situation in the jail. That facility requires remodeling, however, and funding is an issue. The current plan is for administrative staff located in the Yuba County Courthouse (above the Jail), to move to the newer facility. Most of the vacated space would be used for training areas for deputies and correction officers. At the same time, a storage area near the medical unit is to be remodeled to alleviate the current cramped conditions. The Executive Assistant in medical services would join his team in this larger medical area instead of moving with the other administrators.

## Findings:

F1.   Longer periods of incarceration, due to the Realignment transfer of state prisoners to local facilities (Public Safety Realignment, 2013: http://www.cdcr.ca.gov/realignment/) and the extended stay of ICE prisoners (Your Complete Guide to Obama's Immigration Executive Action, web site: http://www.washingtonpost.com/blogs/wonkblog/wp/2014/11/19/your-complete-guide-to-obamas-immigration-order/#economy) , have increased the medical and mental health needs of inmates. The Mental Health Professional (psychiatrist) although available by phone, is on site only one day per week mainly to evaluate incoming inmates and update prescriptions. There are no non-emergency or on-going mental health services available to the inmates. Inmates diagnosed as needing treatment at a state mental hospital wait for months to transfer. Suicidal inmates can stay in padded cells, with little or no comforts, for weeks. The California Department of Corrections and Rehabilitation advised:

> *"Where there are options, however, it is recommended that there be a limit to the length of time an inmate can be housed in a safety cell. Title 15 requires medical and mental health checks and regular review by a watch commander for retention in a safety cell. Additionally several large counties have established internal policies in this regard, saying that after 24 hours, the person must be removed either through a 5150 process or by placement somewhere else in the jail. Of course, extensive housing in a safety cell or sobering cell should be avoided to the greatest extent possible for mentally ill inmates as well as for all others."* (Jails and Mentally Ill: Issues and Analysis, a briefing paper developed by The California Corrections Standards Authority (CSA), pg. 26. http://www.cdcr.ca.gov/COMIO/docs/MENTALLY_ILL_IN_JAILS_PAPER.pdf )

Yuba County Jail

Additionally a Human Rights Watch Report states:

> *"Yet most independent psychiatric experts, and even correctional mental health staff, believe that prolonged confinement in conditions of social isolation, idleness, and reduced mental stimulation is psychologically destructive. How destructive depends on each prisoner's prior psychological strengths and weaknesses, the extent of the social isolation imposed, the absence of activities and stimulation, and the duration of confinement."* (Human Rights Watch report - Ill Equipped: U.S. Prisons and Offenders with Mental Illness, §VII paragraph http://www.hrw.org/reports/2003/usa1003/1.htm)

Female inmates have a higher rate of mental health problems than the males: 75% of female inmates v. 63% of male inmates (Mental Health Problems of Prison and Jail Inmates, Highlights, U.S. Department of Justice, Bureau of Justice Statistics Special Report, from: http://www.bjs.gov/content/pub/pdf/mhppji.pdf).

F2.    As reported by the substance abuse counselor, in-house support groups, which were beneficial to inmates' mental health, were suspended two years ago, and there are limited funds for referring released inmates to recovery programs.

F3.    The Consent Decree (Consent Decree, 1978; Derril Hedrick, et al. v James Grant, et al., US District Court for the Eastern District of California, CIVIL S-76-162 TJM) mandates a licensed Registered Nurse (RN) on site at least 15 hours per week; however, there is not a RN currently on staff. This is a violation of the Consent Decree §V A1, pg. 11. The need for a RN is even more vital with the extended stays caused by Realignment (Realignment – The Bottom Line by Board of State and Community Corrections, 2013, http://www.bscc.ca.gov/s_californiapublicsafetyrealignment.php) as well as the change in housing the Immigration and Customs Enforcement (ICE) detainees (Your Complete Guide to Obama's Immigration Executive Action, http://www.washingtonpost.com/blogs/wonkblog/wp/2014/11/19/your-complete-guide-to-obamas-immigration-order/#economy).

Yuba County Jail

The Executive Assistant in medical services advised that YCJ are considering several persons that have Physician Assistant (PA) credentials which will more than meet the requirement. However, a PA may not necessarily have nursing experience (A Patients Guide to the Physician Assistant, http://www.pg2pa.org/PA_NP.html); therefore, unless the PA also has RN certification, the PA will not satisfy the mandate listed in the Consent Decree for a RN. YCJ is also considering hiring a Nurse Practitioner, which would more than meet the requirements of the Consent Decree.

F4.   Several of the Medical Assistants (MA) and one contracted crisis counselor do not have the appropriate credentials and is in violation of Yuba County Human Resources Job Classification for Medical Assistants.

F5.   The Executive Assistant in medical services does not have a degree, although his job description requires a two-year degree (Job Classification: Executive Assistant, Human Resources Department of Yuba County; http://www.co.yuba.ca.us/departments/personnel/documents/Specifications/E/Executive%20Assistant%20December%202013.pdf).

There is a disparity between the Consent Decree (1978), the Yuba County Human Resources and the Yuba County Jail policies in regards to the licensing/credentialing requirements.

F6.   The medical unit staff does not participate in fire drills, nor understand the procedure for emergency evacuation. The supervisor conducting the tour was unable to explain the procedure to the Grand Jury members on the tour.

F7.   A copy of the Consent Decree has not been provided to the Grand Jury for an undetermined number of years, and was not provided to this year's Grand Jury until the Grand Jury discovered the omission through a news report. This is in violation of the Consent Decree, §XV, Paragraph 4, pg. 49.

The Consent Decree §XV (1978) holds the Law Enforcement Committee of each Grand Jury as responsible for monitoring  jail compliance of the Consent Decree. There has been a failure of the parties to the Consent Decree to provide the Grand Jury with a copy of the Consent Decree as mandated by the Consent Decree.

Yuba County Jail

The Grand Jury was unable to find a recent record of prior Grand Juries having been informed of the Consent Decree.

> **"The members of the Yuba County Grand Jury who serve on the Court and Law Enforcement Committee shall be provided each year with a copy of the Consent Decree so that they will know the minimum legal standards for conditions of confinement in the Jail. The Grand Jury shall be requested to do an analysis of whether the Jail is in conformity with all provisions of the Consent Decree and include that analysis in its yearly report."**
> (Consent Decree, 1978; Derril Hedrick, et al. v. James Grant, et al., US District Court for the Eastern District of California, CIVIL S-76-162 TJM §XV, paragraph 4, pg. 49)

F8.    The medical unit is housed in cramped quarters below street level as observed during the Grand Jury YCJ tour. Until the upstairs administrative staff is moved to a remodeled facility expansion plans for the medical unit are on hold.

F9.    As observed during the Grand Jury's tours of the jail, the physical layout of the jail raises safety issues for the staff and the inmates, most notably the section built in 1962 known by staff and inmates as the "dungeon".

F10.   A copy of a summary of the Consent Decree is provided to the inmates upon booking; however, it is not identified as a "Consent Decree", as a mandate for the jail to follow, nor does it explain that a full copy can be obtained in writing (Yuba County Inmate Handbook).

The Consent Decree (1978) states it is to be posted in the 'Libraries and the Women's Tank'. The Undersheriff advised that the Consent Decree is posted in the 'Law Library' and that the information is available in the Inmate Handbook.

## Recommendations:

R1.    The Yuba County Jail Commander request and the Board of Supervisors approve a budget for a full-time licensed mental health counselor, within the next budget cycle. (See F1)

R2.    Reinstate and expand support groups. Support staff use creative means of financing to include grant applications for funds to support in-house groups and inmates in programs when they are released. (See F2)

Yuba County Jail

R3.    Hire a full-time Registered Nurse or a full-time Nurse Practitioner for the medical unit to be on the job no later than October 15, 2015. This will bring the Jail into compliance with the Consent Decree (1978). (See F3)

R4.    The Sheriff shall uphold the mandates of the Yuba County Human Resources regulations in regards to job classification requirements by supporting and facilitating the Medical Assistants to obtain and maintain their MA credentials. Proper certification is to be in effect by June 30, 2016. (See F4)

R5.    The Sheriff shall uphold the Yuba County Human Resources regulations in regards to job  classification requirements for the position of Executive Assistant and support the Executive Assistant in medical services to obtain the minimum two-year college degree by June 30, 2016. (See F5)

R6.    For the safety of all YCJ staff and personnel, an immediate review and implementation of all fire drill procedures, with an emphasis on making sure all staff members in the medical unit of the facility are well-informed about evacuation. (See F6)

R7.    The Yuba County Board of Supervisors, the County Counsel and the Sheriff shall determine and name which agency will be responsible for delivering the Consent Decree to the Foreperson of the Grand Jury in the future. The Consent Decree will be provided to the new Grand Jury, along with a report as to how the Jail is complying with the conditions listed in the Consent Decree (1978). The Consent Decree and the report of compliance will be provided by July 30th of each year to the Grand Jury Foreperson. (See F7)

R8.    Because the expansion of the medical unit quarters does not involve making use of any of the upstairs administrative space to be vacated, remodeling of the nearby storage area should be planned and completed by June 30, 2016. (See F8)

R9.    It is recommended that the Sheriff and the Board of Supervisors explore all available federal, state, county, and grant funding sources to build a new facility or upgrade the 1962 portion of the facility utilizing optimum architectural design for the safety and well-being of staff and inmates. This will assist the Correctional Officers in managing inmates and to meet the needs of the growing inmate population. (See F9)

R10.   The Yuba County Inmate Handbook is to be immediately corrected by the Sheriff to identify the Consent Decree as a legally enforceable Judgement, and that a copy of which can be obtained upon request. The Sheriff shall order copies of the Consent Decree to be posted immediately in the 'Libraries and the Women's Tank'. (See F10)

Yuba County Jail

## Commendations:

C1.    The 2014-2015 Grand Jury commends the personnel involved in the daily
       activities of the Yuba County Jail and for their dedication and enthusiasm while
       working under trying conditions with limited resources. Additionally, the entire
       Yuba County Sheriff's Department is to be commended for their professionalism.

C2.    The medical unit, in particular, is commended for the dedication and enthusiasm
       for their duties as exhibited by its members. They are working under trying
       conditions with limited resources, including the lack of a registered nurse, but
       manage to maintain an impressive passion for providing care.

C3.    The Substance Abuse Counselor is commended for the enthusiasm and dedication
       shown in helping not only the specific clients, but by making contact with as
       many other inmates as possible.

## Request for Responses:

Pursuant to Penal Code §933.05, the Grand Jury requests responses as follows:

- The Executive Assistant in medical services (F5 and R5)
- Yuba County Jail Commander (F1, F2, F6, F8, F10, R1, R2, R6, R8 and R10)
- Yuba County Sheriff (F1-F10 and R1-R10)
- Yuba County Counsel (F7 and R7)
- Yuba County Board of Supervisors (F1, F3, F7, F9, R1, R3, R7 and R9)

The governing bodies indicated above should be aware that the comment or response of
the governing body must be conducted in accordance with Penal Code §933(c) and
subject to the notice, agenda and open meeting requirements of the Brown Act.



# Marysville Joint Unified School District Board of Trustees

Marysville Joint Unified School District Board of Trustees

## Summary:

To ensure the continuity of last year's Grand Jury report, an investigation by the 2014-2015 Yuba County Grand Jury has found that a review of the practices and policies of the Board of Trustees of the Marysville Joint Unified School District (MJUSD) needed to be completed.

This report will highlight three areas that the Board needs to focus on; improving communication between the Superintendent and the Board, establishing a simplified confidential complaint process, and eliminating a hostile work environment within the District.

## Introduction and Background:

The following information was copied from the MJUSD website as it appeared on April 21, 2015:

### MJUSD and LCAP Goals (Local Control and Accountability Plan)

GOAL 1:  Provide learning opportunities that result in increased academic achievement and ensure quality classroom instruction for all students, including support systems which meet the needs of the targeted population.

GOAL 2:  Enhance the current learning environment to ensure that our schools provide a physically and emotionally safe environment that is culturally responsive to all students.

GOAL 3:  Increase parent, family, and community involvement in the education of all students.

7/1/14

### Our Vision for the Education of Children

All students can meet even exceed the outcomes established in Board Policy for graduation requirements and grade level promotion/retention standards.

All students will have multiple ways of learning and demonstrating that they have learned those things required by district graduation requirements and grade level promotion/retention standards.

Marysville Joint Unified School District Board of Trustees

Student success is a self-fulfilling process; the more we believe that all students can be successful and the more students experience success, the more success will happen.

We have the ability within our district and community to develop the resources necessary to ensure that all students experience success.

The achievement of this belief will take place in a life-long learning environment for Board, staff, students, and parents.

Although the Marysville Joint Unified School District has the above goals on its website, MJUSD Board members stated in interviews that goals for MJUSD Superintendent had not been formally approved and exist only in draft form. As per the Superintendent's contract, annual evaluations are based on the Contract, Job Description, District's Goals and Objectives as established by the Board and Superintendent, and the Superintendent Self-Evaluation.

## Methodology and Approach:

The Grand Jury interviewed MJUSD members of the Cabinet, principals, administrators and managers, staff in the MJUSD, and five MJUSD Board Members; two Board Members declined interviews. In addition to the interviews, the Grand Jury asked for and received multiple documents related to the investigation and performed public records searches via the internet and accessible databases.

**Documents:**

- Marysville Joint Unified School District 9000 Board Bylaws 9270, accessible at http://www.mjusd.k12.ca.us/board/policies
- Government Code Section 1090 (http://www.leginfo.ca.gov/cgi-bin/displaycode?section=gov&group=01001-02000&file=1090-1099)
- Current Employment Contracts of Cabinet Members between the Governing Board of the Marysville Joint Unified School District of Yuba County, California
- Board Policy on hiring/filling positions http://www.mjusd.k12.ca.us/board/policies
- Human Resources Policy http://www.mjusd.k12.ca.us/board/policies
- Grand Jury Reports and Responses
- Human Resources Complaints Policy http://www.mjusd.k12.ca.us/board/policies
- Illegal contracts/bid split http://www.mjusd.k12.ca.us/board/policies

Marysville Joint Unified School District Board of Trustees

- Brown Act Government Code §54950 - §54963
- Board Meeting Minutes, Audio and Written, http://www.mjusd.k12.ca.us

**Site visits:** Members of the Grand Jury attended numerous meetings of the MJUSD Board of Trustees. A site visit was made to Lindhurst High School.

**Interviews:**

The Grand Jury interviewed MJUSD members of the Cabinet, principals, administrators and managers, staff, and attempted to interview all MJUSD Board Members (two Board Members declined interviews). It is unknown to the Grand Jury why the two members of MJUSD Board have chosen to be uncooperative at best, and perhaps, obstreperous. At any rate, the Grand Jury declined to request subpoenas as a fruitless and idle act.

## Discussion and Narrative:

The 2014-2015 Grand Jury has identified an apparent lack of communication between the Superintendent and the MJUSD Board of Trustees. The 2013-2014 Grand Jury identified a perceived conflict of interest that occurred within the Marysville Joint Unified School District (MJUSD). The 2014-2015 Grand Jury has confirmed through multiple interviews with MJUSD Board Members and other MJUSD staff and employees that  the MJUSD Superintendent did not inform the MJUSD Board of potential conflict of interest, State Code Infractions and the violation of State of California Government Code 1090 concerning Contractual Conflicts of Interest (http://www.leginfo.ca.gov/cgi-bin/displaycode?section=gov&group=01001-02000&file=1090-1099). The 2014-2015 Grand Jury has also confirmed through interviews that the Superintendent did not communicate with the Board of a potential violation of established board by-laws (Board By-Laws 9270 http://www.mjusd.k12.ca.us/board/policies) by hiring an employee with known affiliations or connections to district contractors and who therefore had a potential conflict of interest (http://www.yubacourts.org/divisions/grand-jury/reports).

The 2014-2015 Grand Jury has additionally identified the apparent lack of communication between the Superintendent and the MJUSD Board of Trustees. The Superintendent did not communicate to the MJUSD Board of potential illegal contracts or contract bid splitting of the demolition of MJUSD facilities. It was reported to the Grand Jury through interviews that the Superintendent was aware of, and allowed, the contract

Marysville Joint Unified School District Board of Trustees

splitting of demolition of facilities. The Superintendent did not seek prior approval from the Board for the demolition. As a result, a lawsuit was filed by the lowest bidder and an out of court settlement cost the MJUSD approximately double the work completed. (Board Meeting Minutes, Audio and Written, http://www.mjusd.k12.ca.us)

The 2014-2015 Grand Jury identified that the MJUSD Board does not properly provide the public with board meeting agendas. Grand Jury members attended numerous Board meetings and could not locate the agendas posted in some of the stated locations. The MJUSD Board does not properly provide the public with the meeting agenda as specified in the published MJUSD Board Meeting Agendas.

Through interviews, the 2014-2015 Grand Jury has found the Superintendent and MJUSD Board have not established the District's goals and objectives for the MJUSD Superintendent for each succeeding year, no later than 15 June of the new school year as stipulated in the Current Employment Contract between Superintendent and the Governing Board of the of the Marysville Joint Unified School District of Yuba County, California. Interviews with Board Members confirmed that the Superintendent and the MJUSD Board did not establish District's goals and objectives by June 15, 2014. The Contract states that the Board evaluates the MJUSD Superintendent with the Contract, Job Description, District's Goals and Objectives as established by the Board and Superintendent, and the Superintendent Self-Evaluation. The District goals and objectives are a portion of the MJUSD Superintendent evaluation. The Superintendent and the Board are in violation of the current Contract stipulation to jointly establish the District's goals and objectives and reduce to writing for the current school year no later than June 15 of each subsequent year.

The 2014-2015 Grand Jury has confirmed through interviews from MJUSD employees, staff and Board members that a hostile work environment exists within the Marysville Joint Unified School District. Fear of reprisal, retaliation, retribution and loss of job or position has been given to the Grand Jury as examples. Interviews have also revealed loss of faith in the MJUSD system along with fear of speaking to Board members. Employees and staff have expressed that intimidation and manipulation exist within the District.

The Grand Jury identified the formal MJUSD system Uniform Complaint Procedures, Board Policy 1312, (http://www.mjusd.k12.ca.us/board/policies). Interviews with District employees, staff and Board members indicated that this is a cumbersome and non-confidential system and is not being utilized. District employees and staff members stated they fear use of this system will result in possible reprisal, retaliation, retribution and loss of job or position.

Marysville Joint Unified School District Board of Trustees

## Findings:

F1.   The 2014-2015 Grand Jury has identified and confirmed a lack of communication between the Superintendent and the MJUSD Board of Trustees. The 2013-2014 Grand Jury identified a perceived conflict of interest that occurred within the Marysville Joint Unified School District (MJUSD). The 2014-2015 Grand Jury has confirmed through multiple interviews with MJUSD Board Members and other MJUSD staff and employees that the MJUSD Superintendent did not inform the MJUSD Board of potential conflict of interest, State Code Infractions and the violation of State of California Government Code 1090 concerning Contractual Conflicts of Interest (http://www.leginfo.ca.gov/cgi-bin/displaycode?section=gov&group=01001-02000&file=1090-1099). The 2014-2015 Grand Jury has also confirmed through interviews that the Superintendent did not communicate with the Board of a potential violation of established board by-laws (Board By-Laws 9270 http://www.mjusd.k12.ca.us/board/policies) by hiring an employee with known affiliations or connections to district contractors and who therefore had a potential conflict of interest (http://www.yubacourts.org/divisions/grand-jury/reports).

F2.   The 2014-2015 Grand Jury has additionally identified a lack of communication between the Superintendent and the MJUSD Board of Trustees. The Superintendent did not communicate to the MJUSD Board of potential illegal contracts or contract bid splitting of the demolition of MJUSD facilities. It was reported to the Grand Jury through interviews that the Superintendent was aware of, and allowed, the contract splitting of demolition of facilities. The Superintendent did not seek prior approval from the Board for the demolition. As a result, a lawsuit was filed by the lowest bidder and an out of court settlement cost the MJUSD approximately double the work completed. (Board Meeting Minutes, Audio and Written, http://www.mjusd.k12.ca.us)

F3.   The 2014-2015 Grand Jury identified that the MJUSD Board does not properly provide the public with board meeting agendas. Grand Jury members attended numerous Board meetings and could not locate the agendas posted in some of the stated locations. The MJUSD Board does not properly provide the public with the meeting agenda as specified in the published MJUSD Board Meeting Agendas.

Marysville Joint Unified School District Board of Trustees

See below MJUSD Notification of Meetings as stated in every Board Meeting Agenda:

> ### *Notification of Meetings*
>
> ***To provide the public with information about what will be on each board meeting agenda, a public notice is published in the newspaper on Thursday prior to a regularly scheduled board meeting listing items of interest being considered by the Board. In addition, a copy of every board meeting agenda is posted at all schools, sent to each PTA President and School Site Council Chairperson, posted on the district website, and available for review at the following locations: District Office "Public Notice Bulletin Board," Yuba County Library, and the Chamber of Commerce.***

The Grand Jury identified that the MJUSD Board does not properly provide the public with information on the MJUSD Office Public Notice Bulletin Board, Board Meeting Location, and various schools, County Library or the Chamber of Commerce.

F4.   Through interviews, the 2014-2015 Grand Jury has found the Superintendent and MJUSD Board have not established district goals and objectives for the MJUSD Superintendent for each succeeding year, no later than 15 June of the new school year as stipulated in Current Employment Contract between Superintendent and the Governing Board of the of the Marysville Joint Unified School District of Yuba County, California. Interviews with Board Members confirmed that the Superintendent and the MJUSD Board did not establish District goals and objectives by June 15, 2014.

The Contract states that the Board evaluates the MJUSD Superintendent with the Contract, Job Description, District Goals and Objectives as established by the Board and Superintendent, and the Superintendent Self-Evaluation. The District goals and objectives are a portion of the MJUSD Superintendent evaluation. The Superintendent and the Board are in violation of the current Contract stipulation to jointly establish goals and objectives and reduce to writing for the current school year no later than June 15 of each subsequent year.

F5.   The 2014-2015 Grand Jury has confirmed through interviews from MJUSD employees, staff and Board members that a hostile work environment exists within the Marysville Joint Unified School District. Fear of reprisal, retaliation, retribution and loss of job or position has been given to the Grand Jury as

Marysville Joint Unified School District Board of Trustees

examples. Interviews have also revealed loss of faith in the MJUSD system along with fear of speaking to Board members. Employees and staff have expressed that intimidation and manipulation exists within the District.

The Grand Jury identified the formal MJUSD system Uniform Complaint Procedures, Board Policy 1312, (http://www.mjusd.k12.ca.us/board/policies). Interviews with District employees, staff and Board members indicated that this is a cumbersome and non-confidential system and is not being utilized. District employees and staff members stated they fear use of this system will result in possible reprisal, retaliation, retribution and loss of job or position.

## Recommendations:

R1.   The Grand Jury recommends the MJUSD Board of Trustees shall immediately direct MJUSD Superintendent to improve communications with the Board. (See F1)

R2.   The Grand Jury recommends the MJUSD Board of Trustees shall immediately direct MJUSD Superintendent to improve communications with the Board. Improved communications would give the Board information needed to ensure that potential illegal contracts or bid splitting is avoided. (See F2)

R3.   The MJUSD Board needs to properly provide the public with every future board meeting agenda as specified in the published MJUSD Board Meeting Agendas. (See F3)

R4.   The MJUSD Board establish district goals and objectives for the MJUSD Superintendent for each succeeding year, no later than 15 June of the new school year as stipulated in Current Employment Contract between Superintendent and the Governing Board. The contract clearly states the MJUSD Board shall evaluate the MJUSD Superintendent in writing no later than 31 May of each subsequent full year of the contract.
The evaluation shall include the Contract, Job Description, District Goals and Objectives as established by the Board and Superintendent, and the Superintendent Self-Evaluation. (See F4)

R5.   The MJUSD Board must immediately address and eliminate the hostile work environment within the district. Suggested areas for the Board to address include; open communications without fear of reprisal and a simplified confidential complaint system. (See F5)

Marysville Joint Unified School District Board of Trustees

## Request for Responses:

Pursuant to Penal Code §933.05, the Grand Jury requests a response as follows:

- Marysville Joint Unified School District Board of Trustees (F1– F5, R1– R5)

The governing bodies indicated above should be aware that the comment or response of the governing body must be conducted in accordance with Penal Code §933(c) and subject to the notice, agenda and open meeting requirements of the Brown Act.



# Yuba County Juvenile Facilities

Yuba County Juvenile Facilities

## Summary:

The Yuba-Sutter Juvenile Hall and Maxine Singer Youth Guidance Center are operated by the Yuba County Probation Department to house youths aged nine to eighteen years old from Yuba and Sutter Counties. Juvenile Hall was established in 1976, under a joint agreement between Yuba and Sutter Counties. The Maxine Singer Youth Guidance Center was built in 1996, with grant monies from Colusa County in an agreement that guaranteed some bed space to Colusa County juveniles. Courtesy housing may be offered to surrounding counties when available. Facilities appeared well-maintained. There are numerous programs offered to the residents for their well-being and growth. Facilities are mainly funded by Yuba and Sutter Counties.

Staffing remains at a minimal level. If anyone is ill or wants time off, it can create problems in ensuring the supervision of the juveniles. This problem was noted previously in the 2013-2014 Grand Jury Report. Although additional employees were hired as recommended, other personnel left, creating a continuing deficit in personnel.

The surveillance system is inadequate and has not been upgraded as was recommended by previous Grand Juries (Yuba County Grand Jury Reports 2011-2014).

## Introduction and Background:

Under California Penal Code §919(b) the Grand Jury is mandated to inspect prisons and jails in its county annually. The Yuba-Sutter Juvenile Hall and the Maxine Singer Youth Guidance Center operate under a joint agreement between both Yuba County and Sutter County. As such, it is inspected by both the Yuba County Grand Jury and the Sutter County Grand Jury annually. Any other counties that utilize the facilities for their juveniles may also inspect at any time. The Corrections and Standards Authority, a division of the State of California Department of Corrections and Rehabilitation, also inspects these facilities in depth. Within the last year inspections were also performed by Marysville Fire Department, the local health officer, Yuba County Environmental Health and Nutritional Health officer in compliance with the Board of State and Community Corrections §1313 County Inspection and Evaluation of Buildings and Grounds ("Title 15", 2014, pg. 18).

## Methodology and Approach:

The Grand Jury met with senior staff and toured Juvenile Hall, Camp Singer and the Special Housing Unit (SHU) in September, 2014. Staff interviews were held during the tour. No juveniles were interviewed as they were in classes. The juveniles were observed in their interactions with teachers, the Facility Director, and with other juveniles.

Yuba County Juvenile Facilities

**Documents and Reference Sources:**

- Yuba County Probation Department Juvenile Services web site:
  http://www.co.yuba.ca.us/departments/probation/juvprobserv.aspx

- Yuba County Probation Department Detention Services web site:
  http://www.co.yuba.ca.us/departments/probation/detention.aspx

- The Yuba County Grand Jury Reports and Responses for 2009-2010, 2010-2011, 2011-2012, 2012-2013 and 2013-2014,
  http://www.yubacourts.org/divisions/grand-jury/reports

- Juvenile Probation Community Service man hour logs

- Computerized admission forms and records on file at Juvenile Facilities

- Board of State and Community Corrections (BSCC) report on Title 15 from:
  http://www.bscc.ca.gov/downloads/Juvenile_Title_15_Strike_Out_Underline_REVISIONS_effective_2014-4-1.pdf

- Yuba-Sutter Camp Singer from: https://localwiki.org/yuba-sutter/Camp_Singer

**Site Visits**:

- Annual Grand Jury tour was performed in September, 2014.

**Interviews:**

- Assistant Chief Probation Officer
- Deputy Superintendents of Institutions
- Registered Nurse
- Staff members

## Discussion and Narrative:

The Grand Jury tour of the facilities included areas for intake, visiting, medical, housing, the Special Housing Unit (SHU), kitchen, dining hall, indoor and outdoor recreation, and classrooms. The medical office is staffed by a Registered Nurse on Tuesdays, Wednesdays, and Thursdays. A physician is present on Mondays and Fridays, and is available on-call anytime.

The area referred to as Juvenile Hall has 60 beds used by juveniles under 18 years of age who are charged with less serious acts and are awaiting adjudication. Juveniles are housed according to gender but have supervised interaction during school, meals, and

Yuba County Juvenile Facilities

special activities. Juveniles usually stay less than three months in Juvenile Hall.

The SHU is a 15-bed area for individuals charged with more serious or violent crimes. The SHU is a separate building with its own enclosed outdoor recreation area, classroom, shower and bathroom.

Camp Singer is a minimum security facility which can house 48 males and 12 females. These individuals are involved in a program to redirect negative or undesirable behavior and for rehabilitation. Separated by gender, the juveniles are housed in dormitories with individual sleeping areas separated by waist high cinder block walls. They are responsible for daily upkeep of those areas including bathrooms and the grounds. The insulation on a wall in the indoor recreation area is falling down. This was also noted in the Grand Jury Report for 2010-2011, Finding #4: "Members of the Grand Jury noted that there was damage to the exposed insulation within the indoor recreation area of the Camp Singer building. This building also houses classrooms, laundry facilities, as well as woodworking and construction classes."

The Grand Jury report of 2012-2013 found the facility to be deteriorating. They recommended adequate funding be made available for maintenance. The Program Manager agreed and advised that there are many costly repairs and maintenance for the facility and that they were looking into possible State funding ("Grand Jury Report Responses", 2012). This condition does not pose a health hazard; however, it is unsightly and messy. While the staff works hard to build self-esteem of these juveniles, this neglect is sending a message that they are not worth the time and money it would take to repair the insulation in the recreation area.

The 2012-2013 Grand Jury found, "*Staffing in the Juvenile complex is only minimally adequate*".
The Probation Program Manager responded: "*We agree with this finding. Current staffing levels make it increasingly difficult to provide program and rehabilitative services.*"

The 2012-2013 Grand Jury recommended that "*Additional funds be made available for additional staffing.*" The Probation Program Manager responded:

> **"Increasing the staff allocation would benefit the quality of programming offered to the residents of the facilities. Additionally, it would alleviate current logistical problems that are encountered during various aspects of daily operations. In light of the current economic climate, funding for additional staffing is unlikely. Once the county coffers regain fiscal sustainability, increasing staffing allocations will be of the highest priority."**

Yuba County Juvenile Facilities

The 2013-2014 Grand Jury Report also found the minimal staffing and that Juvenile Hall had been authorized to hire two additional staff members; this finding is agreed to by both Probation and the Yuba County Board of Supervisors. There was no recommendation for this finding, however. The current Grand Jury has determined that the staffing levels remain low. When asked this year about possible overtime issues created by being short staffed, the Deputy Superintendent of Institutions advised that they normally use extra help employees to fill in when needed. Although there were new employees hired, other employees left; therefore the recommendation of the 2013-2014 Grand Jury has not been resolved.

Camp Singer programs encourage the development of a sense of achievement and personal responsibility, teaching life skills which can aid these minors in making positive decisions after release so that are not negatively influenced by peers. Length of stay varies from 7-12 months.

Camp Singer's teachers are provided by the Yuba County Office of Education. A variety of vocation certificates are offered including basic tool knowledge, general construction techniques, and basic electrical. Juveniles have the opportunity to receive a certificate for successful completion of a drug and alcohol counseling program. In addition to the vocation certificates, there is a woodworking and furniture building class.

The Deputy Superintendent of Institutions advised that two companies; Titan American CNC Machine Experts, Grass Valley, and GoEngineer, Sacramento, have donated several computers with a 3-D Computer Animated Drafting program. This introduces these juveniles to the design and engineering processes. GoEngineer also sends one of their highly skilled employees to work with the youths; training them on the ideas and concepts of working with computer drafting. Once they become proficient in the software programming they are allowed to submit their project for approval and, if approved, the project is then printed out in 3-D on the Makerbot 3-D Printer. Juveniles are encouraged to use their imaginations, conceptualize, apply cognitive skills, and actually see their product developed in front of them.

All of these programs; from understanding and working with basic tools, electrical and construction skills, woodworking and engineering training, give the participants a sense of accomplishment. This training gives them basic skills that can be used in the outside world and allows them to see themselves as more desirable in the workforce.

Both facilities use a points system in which the inmates can elevate their status, increase privileges, which may include; a later bedtime hour, additional recreational activities and special family visits with outside food.

Yuba County Juvenile Facilities

The 2011-2012 Grand Jury Report stated:

> **"Members of the Grand Jury were told by Juvenile Hall's interim superintendent that the surveillance system was 'inadequate'. The current system has no recording capability, and there is a need for additional cameras to cover several high security/high liability areas of the property."**

The 2012-2013 and 2013-2014 Grand Juries also found the surveillance system to be inadequate. All three Grand Jury Reports recommended that the system be updated. In response to the 2011-2012 Report both the Probation Office and the Board of Supervisors agreed with the finding and advised that plans were being developed to determine the system requirement costs for this project. In response to the 2012-2013 report the Probation Program Manager advised that they were still looking into the cost requirements. In response to the Grand Jury Report 2013-2014 the Yuba County Board of Supervisors advised that it is not cost effective to update the system at this time, it will be implemented with the construction of the new Tri-County Juvenile Hall facility. When questioned by the current Grand Jury about the expected date for the new facility, the Deputy Superintendent of Institutions replied that beginning construction is expected in September, 2016 with occupancy expected in 2018. At this time, the surveillance system has been "inadequate" for more than five years and this deficiency is not expected to be corrected for another three years, minimum. This security surveillance system does not have recording capability and too few cameras to cover several high security and high liability areas.

During the tour, the Grand Jury members were advised by the Deputy Superintendent of Institutions and the Assistant Chief Probation Officer that it was financially desirable to wait until the new facility is built which will include a new surveillance system. When questioned by the current Grand Jury about the expected date for the new facility, the Deputy Superintendent of Institutions replied that beginning construction is expected in September, 2016 and occupancy is expected in 2018. On April 20, 2015, it was reported in the Appeal Democrat that funding has been allocated, but the County is awaiting approval from CA State Public Works Board and CA State Department of Finance (web site: http://www.appeal-democrat.com/news/new-juvenile-hall-funding-complete/article_421b940a-e727-11e4-96fe-6390fbbce1a8.html).

Yuba County Juvenile Facilities

## Findings:

F1.    The surveillance system is inadequate to handle the security for Juvenile Hall.
       The 2010-2011 Grand Jury Report stated:

> ***"Members of the Grand Jury were told by Juvenile Hall's interim
> superintendent that the surveillance system was 'inadequate'.
> The current system has no recording capability, and there is a
> need for additional cameras to cover several high security/high
> liability areas of the property."***
> (http://www.yubacourts.org/sites/default/files/pdfs/GrandJury/GJR
> 2010.PDF)

The 2011-2012, 2012-2013 and 2013-2014 Grand Juries also found the
surveillance system to be inadequate. The Probation Office and the Yuba
County Board of Supervisors agreed with these findings.
(http://www.yubacourts.org/sites/default/files/pdfs/GrandJury/GJR2012.PDF;
http://www.yubacourts.org/sites/default/files/pdfs/GrandJury/GJR2013Resp.pdf;
http://www.yubacourts.org/sites/default/files/pdfs/GrandJury/GJR2014Resp.pdf)

All three Grand Jury reports recommended that the system be updated. Two
responses advised that the cost was being examined and the third response
advised that it was not cost effective at this time. As of this date the surveillance
system has been 'inadequate' for more than five years and this security deficiency
is not expected to be corrected for another three years, minimum. This security
surveillance system does not have recording capability and too few cameras to
cover several high security and high liability areas.

F2.    Staffing levels remain low which can create problems in the supervision of the
       juveniles when staff members take time off due to vacation or illness, however
       extra help employees are available to reduce overtime. The recommendation of
       the 2013-2014 Grand Jury has not been met.

F3.    The 2014-2015 Grand Jury found insulation on a wall in the indoor recreation
       area continues to be in disrepair. No action has been taken to remedy this same
       finding from previous Grand Jury Reports.

Yuba County Juvenile Facilities

The 2011-2012 Grand Jury found:

> *"Members of the Grand Jury noted that there was damage to the exposed insulation within the indoor recreation area of the Camp Singer building. This building also houses classrooms, laundry facilities, as well as woodworking and construction classes."*
> (http://www.yubacourts.org/sites/default/files/pdfs/GrandJury/GJR 2012Resp.pdf )

The 2012-2013 Grand Jury found that the facility was deteriorating due to inadequate funding and recommended that funding be allocated for maintenance. The Program Manager agreed and advised that there are many costly repairs and maintenance for the facility and that they were looking into possible State funding (http://www.yubacourts.org/sites/default/files/pdfs/GrandJury/GJR2013Resp.pdf).

## Recommendations:

R1.    The Yuba County Board of Supervisors approves funds to upgrade the presently inadequate surveillance cameras to provide broader security. Although funding has been allocated for a new facility, it is not expected to be occupied for a minimum of three years. For the safety of the juvenile inmates, this deficiency must be corrected immediately. Further recommend that the Chief Probation Officer immediately, upon approval of funding by the Board of Supervisors, should direct installation of needed cameras. (See F1)

R2.    The Chief Probation Officer and the Facility Director immediately hire additional staff. (See F2)

R3.    Repair the insulation in the indoor recreation area. (See F3)

## Commendations:

C1.    The staff of both juvenile facilities were observed during the site visit showing a caring manner in which they interact with juveniles encouraging the youths to express themselves in socially acceptable ways. The staff was also observed guiding the juveniles to view themselves as worthy and capable.

C2.    Camp Singer has implemented highly admirable enrichment programs. Vocational programs include basic tool knowledge, general construction techniques, and basic electrical. There also is a woodworking/furniture building class as well as computerized drafting and engineering training.

Yuba County Juvenile Facilities

## Request for Responses:

Pursuant to Penal Code §933.05, the Grand Jury requests responses as follows:

From the following governing bodies:

- Yuba County Chief Probation Officer (F1-F3, R1-R3)
- Deputy Superintendents of Institutions (F1- F3, R1- R3)
- Yuba County Board of Supervisors (F1- F3, R1- R3)

The governing bodies indicated above should be aware that the comment or response of the governing body must be conducted in accordance with Penal Code §933(c) and subject to the notice, agenda and open meeting requirements of the Brown Act.



# Emergency Preparedness
# Of
# Yuba County

Emergency Preparedness of Yuba County

## Summary:

During the 2011-2012 fiscal years, the Yuba County Grand Jury conducted an investigation and published a report entitled "History of Flood and Flames - Emergency Preparedness of Yuba County". The Yuba County Office of Emergency Services, along with the incorporated cities of Wheatland and Marysville were the subjects of the report. While the investigation and subsequent report gave credit to the County Office of Emergency Services (OES) management for being well-prepared for a major event, it also revealed that there were significant deficiencies with the City of Marysville's compliance with California Emergency Administration (CalEMA) requirements and Federal Emergency Management Agency's (FEMA) National Incident Management System (NIMS). This report shall serve in part, as a continuity check on the findings of the previous report, but will also outline the ongoing efforts to maintain/improve emergency preparedness within the county and the incorporated cities within.

## Introduction and Background:

Yuba County with its varying terrain ranging from 35 feet to over 4800 feet above sea level and its geographic location is subject to any number of natural or human caused disasters. Two major rivers and the associated levee system protecting the valley floor from flooding have and always will be a major focus for emergency preparedness. Major flood events in 1986 and 1997 caused significant economic and property damage to the unincorporated areas of Linda, Olivehurst, and Plumas Lakes when sections of levee failed respectively on the Yuba and Feather Rivers. Ongoing improvements to Yuba County's levee system will hopefully reduce the likelihood of future flooding, but can never completely eliminate the threat. Increasing population densities in these flood prone areas only add to the importance of emergency preparedness.

Equally important is the disaster threat from fire in Yuba County as evidenced by the 1997 Williams fire and the 1999 Pendola fire. The 2011-2012 Grand Jury reported that these two fires burned thousands of acres destroying homes, buildings, and vehicles which displaced thousands of people, pets and livestock; and cost the county taxpayers more than six million dollars.

Emergency management and response is the primary function of the County OES. Disaster events may have similarities; however, they will never be exactly the same. Continuous changes in technology and "lessons learned" from prior events mandate frequent and consistent training are performed. This training will ensure all emergency responders are up to date on the most current policies and procedures and that costly and potentially fatal flaws are minimized.

Emergency Preparedness of Yuba County

## Methodology and Approach:

Members of the Grand Jury reviewed the 2011-2012 Grand Jury report; toured the Yuba County Office of Emergency Services facilities; observed a multi-agency slow rise flood training exercise, and conducted multiple interviews with:

- Emergency Operations Manager and staff
- Marysville City Manager
- Marysville Chief of Police
- Yuba County Administrative Officer

**Documents:**

- http:yubacourts.org/divisions/grandjury/reports
- www.co.yuba.ca.us/Departments/OES/
- *U.S. Department of Homeland Security. (2013). Homeland Security Exercise and Evaluation Program (HSEEP). Washington, DC: U.S. Government Printing Office*

## Discussion and Narrative:

The charge of the Grand Jury is to review, and if deemed necessary, conduct a continuity check on prior years' Grand Jury findings and recommendations. Continuity is defined as "an uninterrupted flow; a coherent whole and uninterrupted connection; unbroken succession; close union of parts" (Webster's Revised Unabridged Dictionary).

The 2011-2012 Grand Jury conducted an investigation into the emergency preparedness of Yuba County and the incorporated cities within. That investigation disclosed many positives to that preparedness effort; however, there were some deficiencies in need of attention. Those findings in the "Flood and Flames – Emergency Preparedness of Yuba County" report were as follows:
(http:yubacourts.org/divisions/grandjury/reports)

*Prior Findings from 2011-2012 Final Report:*

*F-1.    The Office of Emergency Services Manager has made good use of available grant monies to create a center that is cost effective, organized and user friendly.*

*F-2.    The City of Wheatland is NIMS compliant.*

*F-3.    The City of Marysville is not NIMS compliant.*

*F-4.    The City of Wheatland has adopted the OES Emergency Operations Plan.*

Emergency Preparedness of Yuba County

*F-5.    The City of Marysville does not have a qualified emergency operations plan.*

*F-6.    The City of Marysville does not have an emergency management plan that coordinates emergency response among other organizations.*

*F-7.    The Marysville Chief of Police has failed to take advantage of offers from the OES to assist in achieving a compliant emergency operations plan.*

***Prior Recommendations from 2011-2012 Final Report****:*

*R-1.    The City of Marysville should complete an emergency operations plan, which is Cal EMA qualified or adopt the OES Emergency Operations Plan.*

*R-2.    The City of Marysville should consider the negative effects on the community by its apparent unwillingness to work with other emergency responders and other appropriate agencies.*

*R-3.    The City of Marysville should take advantage of the certified, no-cost training provided by the OES.*

**Request for Responses to 2011-2012 Final Report:**

Consistent with California Penal Code §933.5 the Grand Jury requested responses to the aforementioned findings and recommendations from the City of Marysville Chief of Police and Mayor on Findings F-3, F5-7, R1-3. The Chief of Police formally responded to the Grand Jury by letter dated August 1, 2012. He was in agreement with the Grand Jury finding (F-3), but was in disagreement on <u>all</u> of the remaining findings and recommendations. The Chief of Police responded to the Grand Jury by stating in part that:

> ***"After reviewing the document produced by the members of the Grand Jury our response is that we disagree with the findings and recommendations made. Furthermore, the summary, discussion, findings and recommendations sections of this report are, in our opinion, erroneous and misleading.  It is the intention of the City to continue with its process of preparing for emergencies and we are making great strides in this area."***

The 2012-2013 Grand Jury received, as part of the response from the Chief of Police, a City Resolution No. 2010-34 which does adopt the County of Yuba's operational area emergency operations plan.

Emergency Preparedness of Yuba County

The Mayor of Marysville provided no response until the subsequent 2012-2013 Grand Jury called it to his attention that he was required by Penal Code § 933.5 to respond. In his response letter to the Superior Court dated October 6, 2012, he stated he would only "…*adopt the Police Chief's written report as his written response…*" to the Grand Jury. Members of the current Grand Jury determined that the City of Marysville was less than cooperative in responding to the concerns presented in the 2012-2013 Grand Jury report.

**2014-2015 Grand Jury**

Members of the 2014-2015 Grand Jury began this investigation by touring the County Office of Emergency Services in Marysville and then interviewing the Emergency Operations Manager and Emergency Operations Planner. It should be noted that when the 2011-2012 report was published, there was only one full time employee in OES; the Operations Manager. In early 2014, a full time Emergency Operations Planner position was filled. The OES manager reported this new position has been a great benefit in balancing the workload and enhancing the office's ability to provide necessary on-going management and response training. The Grand Jury members requested and received, on compact disk, a copy of the "County of Yuba Emergency Operations Plan". The current document is in draft form and represents an updated revision to the previously approved 2008 management plan.

During the initial interview with the OES manager, he indicated that his office would be conducting a multi-jurisdictional slow rise flood training exercise titled Operation Slow Rise. Several Grand Jury members requested and were given permission to observe a portion of the training exercise held on October 13, 2014. This training and exercise program is quite extensive in nature and included coordination with 23 outside organizations throughout the region and participation by 86 Yuba County employees. The County of Yuba utilizes the US Department of Homeland Security's Homeland Security Exercise and Evaluation Program (HSEEP) to conduct all exercise activities. HSEEP provides a set of guiding principles for exercise programs. It is a common approach to exercise program management, design and development, conduct, evaluation, and improvement planning. (Ref: *U.S. Department of Homeland Security. (2013). Homeland Security Exercise and Evaluation Program (HSEEP). Washington, DC: U.S. Government Printing Office.)*

Planning for Operation Slow Rise began by assembling a planning team consisting of representatives from many jurisdictions, functional areas, and disciplines. More than 20 local, state, and federal entities participated. Planning and coordination meetings were held over a six month period which culminated in the exercise held on October 23, 2014. The objective of the exercise was to evaluate the effectiveness of plans and procedures, operating environments, and the achievement of desired outcomes. The OES staff selected five objectives:

Emergency Preparedness of Yuba County

- Evaluate the activation and execution of the County Emergency Operations Plan and Annexes:
  - o Annex K: Slow-Rise Flood Standard Operating Procedures (SOP)
  - o Annex E: Evacuation SOP
  - o Annex L: Tactical Interoperability Communication Plan (TCIP)
- Evaluate the functionality of the County Emergency Operations Center (EOC)
- Evaluate the ability of the EOC Management Team to develop and complete an Action Plan
- Evaluate the ability of the EOC Management Team to conduct a shift change
- Test radio communications between County entities and the Reclamation Districts

To develop a realistic and challenging scenario, the Yuba County OES partnered with the National Weather Service to create a series of weather reports, river level stages and river graphics based on historical data from prior events. The primary intent of the exercise was to bring observed river levels to specific heights in order to activate the stages within Annex K: Slow Rise Flood Standard Operating Procedure. Participants in the exercise were given the weather forecast and allowed time to analyze the forecast and take appropriate steps to respond as needed.

Post evaluation of the exercise identified a number of strengths as well as some areas where improvements could be made. The Grand Jury recognizes the value of this scale of exercise as an important tool to ensure the citizens of Yuba County are protected during an emergency in a professional well-organized manner.

The City of Wheatland and the City of Marysville have adopted the County's Emergency Operations Plan and utilized the operations procedures and checklists during the most recent exercise. Additionally, the City of Marysville has developed its own Multi-Hazard Plan. The Grand Jury questioned the need for a separate plan and expressed concerns of potential conflicts. The OES manager emphasized that the City plan, while not mandatory from the County, State, or Federal perspective, would serve as an over-view document for City staff. The City plan could be helpful for situations that do not necessarily escalate to the level of County OES involvement. The City Multi-Hazard Plan's final draft is currently under review by City management. It has not been reviewed by the County OES manager, nor formally adopted by the Marysville City Council. The Multi-Hazard plan should be reviewed by the OES manager so as to ensure consistency with the County Emergency Operations Plan.

Emergency Preparedness of Yuba County

Marysville has a new City Manager, Mayor, and Chief of Police and much has been accomplished in rectifying non-compliance issues. Marysville City staff has been actively working with the County OES and is now well within acceptable levels of compliance. OES staff stated both the City of Wheatland and the City of Marysville worked proactively with County OES during the recent training and evaluation exercise.

The 2014-2015 Grand Jury is pleased with the level of commitment shown by all of the local agencies and the attention given to preparedness for a disaster. The County EOC is well-organized and well-equipped.  The location of the Office of Emergency Services, however, is a concern. The operations center is located in the County Government Center in downtown Marysville, adjacent to the 10th Street Bridge. While convenient for assembling County emergency operations staff, it is adjacent to an active railroad track, inter-regional State Highway 20, and within the confines of the Marysville levee system. The OES does have a fully operational mobile unit located off site, and a secondary emergency operations center located well above any potential flood zone. Careful consideration should be given to move the OES operations center to a location with less potential for disruption during a flood or major transportation event.

## Findings:

F1.     In October, 2014, current Grand Jury members observed a portion of the Operation Slow Rise training exercise. The Office of Emergency Services (OES) operates in a proactive, professional, and well-organized fashion. OES leads the effort in coordinating emergency responses in Yuba County; whether it is flood, fire, traffic, rail, chemical, or any other like disaster. (www.co.yuba.ca.us/Departments/OES/)

F2.     The City of Marysville does not have an approved Multi-Hazard Plan. The city's draft of the Multi-Hazard Plan has been submitted to the City Manager's office for review and will be subsequently submitted to the Marysville City Council for adoption.

F3.     The Emergency Operations Center located at the County Government Center, (915 8th Street, Marysville, CA) is convenient for training given the number of county employees that participate in the training exercises. However, its physical location is at-risk due to its close proximity to an active railroad line, inter-regional State Highway 20, and within the confines of the Marysville levee system.

F4.     The City of Marysville has made significant progress in addressing the concerns of the 2011-2012 Grand Jury. City Management has been open to discussions with the current Grand Jury and the Yuba County OES. City Management has made significant progress in addressing previous non-compliance issues.

Emergency Preparedness of Yuba County

## Recommendations:

R1.    The County Office of Emergency Services should continue with their proactive, professional, and well-organized approach to training and coordination of emergency service activities. (See F1)

R2.    The Marysville City Council complete and formally adopt their Multi-Hazard Plan and continue working proactively with the County Office of Emergency Services. (See F2)

R3.    The Yuba County OES and the Board of Supervisors give careful consideration to relocating the Emergency Operations Center to a location with less exposure to disruptions impacting the ability to respond to a disastrous event, should one occur, on the adjacent railroad line, State Highway 20, or breach in the Marysville levee system. (See F3)

## Commendation:

C1.    The Grand Jury appreciates the hard work and focus of the Yuba County OES and the City of Marysville and acknowledges their emphasis on the wellbeing and safety of the citizenry of Yuba County in the event of a natural disaster or other life threatening emergency. The Grand Jury appreciates and recognizes the positive attitude, outlook, and openness of the Marysville City Manager and the Chief of Police.

## Request for Responses:

Pursuant to Penal Code §933.05, the Grand Jury requests responses as follows:

From the following governing bodies:

- County Administrator (F3, R3)
- OES Manager (F3, R3)
- City Manager, City of Marysville (F2, F4, R2)
- Chairman, Yuba County Board of Supervisors (F1, F3, R1, R3)

The governing bodies indicated above should be aware that the comment or response of the governing body must be conducted in accordance with Penal Code §933(c) and subject to the notice, agenda, and open meeting requirements of the Brown Act.

# Camptonville Union School District

Camptonville Union School District

## Summary:

The 2014-2015 Grand Jury decided to investigate the practices, policies and management of Camptonville Union School District.

## Introduction and Background:

Located in northeastern Yuba County, Camptonville Union School District is in the historical town of Camptonville. A small town with a share of California gold rush history, Camptonville still holds its sense of community that began in the 1850s. The original school building was built in 1871 and now serves as gymnasium and auditorium. Blended grade levels fill three classrooms; Kindergarten – 2nd, 3rd – 5th, and 6th – 8th grades. Student population averages slightly more than 60. The preschool is run by the Camptonville Community Partnership. There is a strong parent group who raises money for student activities.

The Grand Jury chose to investigate Camptonville Union School District because of its small size, remote location, and because it had not been investigated since 1990.



*Camptonville Union School District (March, 2015)*

Camptonville Union School District

## Methodology and Approach:

Members of the 2014-2015 Grand Jury toured the school, its grounds and facilities, attended one Board meeting and held interviews and conversations with the Superintendent, Board members, staff members, and parents. Also referenced were the following websites:

- http://www.cville.k12.ca.us

- http://www.coretca.org

- http://camptonville.com/the_courier.html

## Discussion and Narrative:

Members of the 2014-2015 Grand Jury attended a Board meeting and were enthusiastically welcomed. The meeting agenda was clearly posted on the front door and copies were also made available. The Board President followed Robert's Rules of Order yet allowed questions to be as asked. Board members were willing to answer questions and provide background information for agenda items. All Board members were involved in discussions and opinions were expressed freely. In addition, the Superintendent, who also serves as principal and special education coordinator, provided concise reports. It was clear to the Grand Jury members that the Camptonville Board and the Superintendent share mutual respect for each other.

On a site visit to the school, the Superintendent gave a tour of the classrooms, library, preschool, the outdoor theater and school vegetable garden. It is the Grand Jury's opinion that detailed attention is given to the campus and grounds as the buildings were in good condition and the outdoor areas were neat and well-maintained. Although Camptonville School is in a close-knit community, security cameras are placed in strategic locations.

The Superintendent informed the Grand Jury members that some staff, including teachers, wears "more than one hat" due to budget and population limits. Certificated staff has gone above and beyond to serve students by becoming "librarians" so students can access library materials. In their blended classrooms, teachers often spend extra time to work with students and also write a weekly newsletter for students and their families. All classes enjoy outdoor learning. The school vegetable garden, in which students utilize and help maintain, provides many learning opportunities as well as fresh vegetables for the lunch program. Breakfast and lunch are freshly prepared every school day.

Camptonville Union School District

In 1998, Camptonville Union School District established Camptonville Academy, a CORE (Community Options for Resources in Education) charter school. Camptonville Academy has been accredited by WASC (Western Association of Schools and Colleges) and serves more than 420 students.  Although the charter school has since moved to Marysville, Camptonville Union School District still holds the authorization wherein the Academy reports to the District.

At the time of the Grand Jury's visit to Camptonville School, there was not an Information Technology (IT) person. The Superintendent acknowledged that this has hindered the upkeep of the District's website and maintenance of other technologies. The Jury members were advised that the District is looking for a new IT person. It was reported that budget and population limits make this a difficult position to fill. This has not stopped the District from utilizing up-to-date technologies; iPads are available to students and teachers use current presentation devices. The Superintendent assured Jury members that when funds are available, more will be purchased.

The District also utilizes an automatic call system to notify parents of school closures, events, and weekly Superintendent messages. This system provides the opportunity to stay connected with the community. The Superintendent ensures the Camptonville Courier; a local monthly community newsletter, receives school news, calendar of events and dates of Board meetings.

In a time when schools are forced to make budget and services cuts, Camptonville Union School District appears to be prudent in their spending and management. It also appears that limited resources have not stopped this District from delivering a well-rounded education to students in an atmosphere of caring, attention to individual student needs, as well as safety.

## Findings:

F1.     At the time of our visit to Camptonville School, the Grand Jury found there was not an Information Technology (IT) person. The Superintendent acknowledged that this has hindered the upkeep of the District's website http://www.cville.k12.ca.us and maintenance of other technologies. The Jury members were advised that the District is looking for a new IT person. It was reported to the Grand Jury that budget and population limits make this a difficult position to fill. This has not stopped the District from utilizing up-to-date technologies.

## Recommendations:

R1.     The Grand Jury recommends that the District continues its search for an Information Technology (IT) person to oversee the upkeep of their website as well as maintenance of other technologies in use at the District. (See F1)

Camptonville Union School District

## Commendations:

C1.    The Grand Jury acknowledges and appreciates the dedication and hard work of Camptonville Union School District's Superintendent who provides strong, caring leadership and maintains a personal relationship within the District as well as the community.

C2.    The Grand Jury acknowledges the diligence and commitment of the Camptonville Union School District Board of Trustees who have sincere interest and involvement in the District and its well-being.

C3.    The Grand Jury commends the Camptonville Union School District's teachers and staff for their extra efforts and time spent in providing services and safety to students.

## Request for Responses:

Pursuant to Penal Code §933.05, the Grand Jury requests responses as follows:

From the following governing bodies:

- Superintendent of Camptonville Union School District (F1, R1)

- President, Board of Trustees, Camptonville Union School District (F1, R1)

The governing bodies indicated above should be aware that the comment or response of the governing body must be conducted in accordance with Penal Code §933(c) and subject to the notice, agenda, and open meeting requirements of the Brown Act.



# The Mosquito Abatement Report

The Mosquito Abatement Report

## Summary:

The Sutter Yuba Mosquito and Vector Control District (SYMVCD) could easily be called Sutter Yuba Mosquito Control District because the majority of what they do relates to the control of the approximately 55 species of mosquitoes in California. When you look at the types of diseases that these little blood-suckers can potentially transmit, you soon come to realize that without control and abatement programs, we humans would not be able to live, work, or play without misery accompanying our every action. The District's area of responsibility covers approximately 706 square miles, 486 of which are located in Sutter County and 220 square miles in Yuba County.

The Grand Jury relied on the SYMVCD website: http://www.sutter-yubamvcd.org/ for some of this report. Each year, the District prepares for the coming season utilizing a set of standards contained within a document called Best Management Practices Manual. The document is assembled from a number of sources including scientific literature, state and inter-agency documents, and experienced vector control professionals. Other procedures contained within this document come from District Affiliates, the California Department of Public Health: 2014 California Mosquito-Bourne Virus Surveillance and Response Plan and the U.S. Fish and Wildlife Service, specifically, a document titled: Environmental Effects of Mosquito Control appendix K4.

The goal of this report is to enlighten citizens of our counties, and highlight the myriad of activities of the District that are required to successfully control mosquitoes and the diseases that they bring. This report will cover the history, entomology, species, diseases transmitted, and areas where disease is found. The Grand Jury explored methods of detection, control, and abatement employed by the Mosquito Control Technicians (MCT) of the District. In 2012, the start of the current ongoing drought in California, the number of cases of West Nile Virus (WNV) infected humans tripled from 158 to 479, the most since 2005. In 2014, there were 798 reported cases of WNV throughout California and this year is predicted to be another year with a high count of WNV cases. The diseases of concern transmitted by mosquitoes within the Sutter-Yuba District are West Nile Virus, Dengue Fever, Chikungunya, Encephalitis, Heartworm, Malaria, Hanta Virus, Lyme disease, and Rabies.

## Introduction and Background:

Before California was settled by pioneers and gold seekers, thousands of seasonally flooded acres of lowlands, marshes and other wetlands produced hordes of mosquitoes impacting the lives of Native Americans. Certain evidence of an archeological and anthropological nature suggests that these native cultures were seasonally compelled to move or abandon coastal and lowland areas. Similarly, other tribes inhabiting mountain environments would face springtime hatches of snow-pool and floodwater mosquitoes. As the Gold Rush drew miners to California in the 1850's, the prospectors were quickly

The Mosquito Abatement Report

introduced to the mosquitoes, their bites and the pathogens they transmit.

The origins of organized mosquito control in California began in the Bay Area. Salt marshes were producing massive numbers of mosquitoes, disrupting the lives of residents. Initial control efforts focused on constructing drainage canals and ditches in these marsh areas. In 1903-04, an attempt was made to form a national organization of mosquito control workers, called National Mosquito Eradication Society (NMES). The society was formed by noted entomologists. Unfortunately, the association only held two meetings. In 1905, New Orleans had a massive outbreak of yellow fever that was eradicated by a concentrated effort by entomologists which proved conclusively that abatement works. In 1913, New Jersey became the first state to pass a law authorizing mosquito abatement districts. In 1915, California passed a law creating its first abatement district. Today, there are more than 60 abatement districts throughout the state.

## Methodology and Approach:

**Documents and Reference Sources:**

- http://www.sacbee.com/news/state/california/water-and-drought/article11054219.html

- http://www.cdc.gov/malaria/about/biology/mosquitoes/

- http://wwwnc.cdc.gov/eid/article/8/12/02-0536_article

- http://www.mosquito.org/history

- http://www.sutter-yubamvcd.org/district_history.asp

- http://cvec.ucdavis.edu/about

- http://www.cdph.ca.gov/programs/vbds/Pages/default.aspx

- http://www.sutter-yubamvcd.org/mosquitofish.asp

- http://www.sutteryubamvcd.org/Public%20Health%20Pesticide%20Application%20Notification.asp

- http://floridamosquito.org/App_Docs/Meetings/2014/2014_FMCA_Annual_Meeting_Packet.pdf

- http://floridamosquito.org/App_Docs/Meetings/2014/FMCA_2014_Fall_Program.pdf

The Mosquito Abatement Report

- The first mosquito control board of renowned entomologists: Wilton E. Britton, Daniel W. C. Quilett, Harrison G. Dyer, Ephrim P. Felt, Leland O. Howard, Vernon L. Kellogg, Herbert Osborn, and John B. Smith.

**Video and Picture Sources:**

- "Mosquito Mayhem" Cartoon Guy's <u>"Mosquito Mayhem"</u> Uploaded to YouTube by Joep Vrienten May 23, 2013

- <u>"Protect Your Family"</u> picture

**Site visits:**

On September 15th a tour of the SYMVCD was conducted by the Grand Jury.

**Interviews:**

The following were interviewed by the Grand Jury:
- SYMVCD Board of Trustees
- District Manager
- District Entomologist
- Mosquito Control Technicians

## Discussion and Narrative:

The District operates on an abatement schedule that is based upon the seasonal reproductive cycles of the various mosquito species found within the Districts' area of responsibility. Batches of various formulas using a pesticide family called <u>pyrethrins</u> are the poisons which have been the most effective against mosquitoes for quite some time. However, when they become resistant, the District Manager is responsible for choosing when and which poisons to test for resistance. The method used in the testing is called an <u>assay</u>. The District continually sends Mosquito Technicians and members of the Board of Trustees to state, and national conferences to learn of new and better ways of mosquito abatement. One recent new technique for early detection of resistance to pesticide formulas was learned at the annual <u>Florida Mosquito Control Association's</u> meeting held in Palm Beach last November. Once perfected, this new tool will allow managers to change a formula long before mosquitoes can build resistance to it. This will save money by not having to purchase new pesticides, and not having to discard resisted pesticides.

The District gives notice that it intends to control immature and adult mosquitoes in the District as necessary to protect the public's health. Applications may be made between

The Mosquito Abatement Report

January 1st, and December 31st; however, fogging usually doesn't begin until May 1st, and ends September 30th. The District takes advantage of the local newspaper, direct mail, radio stations, and the internet to make residents aware of when fogging operations will occur. Dates and times for spraying depend upon which areas will need it. A spraying schedule is available on the SYMVCD website during the season which typically begins in late June and continues through July, August, and September. For additional information about pesticide safety in residential environments, check the Centers for Disease Control (CDC) website on pesticides used for mosquito control. The philosophy of the District is to approach the control and abatement by utilizing their operations manual titled: Best Management Practices Manual. Within the manual is an Integrated Mosquito Management program that is an ecosystem-based strategy.

**Integrated Mosquito Management Program**

The Integrated Mosquito Management program outlines four types of mosquito control options set in an algorithmic format which is practiced by the District. These methods allow for a common sense approach to accomplish abatement using the most economical means and with the least possible hazard to people, property, and the environment.

**Control Method 1:** Source reduction, manipulation, and/or elimination; also called Physical Control.

**Control Method 2:** Biological mosquito control uses biological agents to reduce larval populations.

**Control Method 3:** The use of federal and state registered pesticides to control mosquito populations. Adulticides are used to kill adult mosquitoes and Larvacides for immature aquatic-stage (larvae) mosquitoes.

**Control Method 4:** Cultural control is designed to change the behavior of the county's residents through public education and outreach so that their actions prevent mosquitoes.

Each method of control is designed to eliminate or minimize breeding sites, reduce mosquito populations, and reduce transmission of vector-borne diseases. These materials are registered by the Environmental Protection Agency and applied according to label directions by the District's trained certified technicians. A list of pesticides potentially used by the District is available on the SYMVCD website. "Mosquito" a 3:49 animation

**Laboratory Work**

During a tour of the facility, mosquito control in the Sutter-Yuba District begins in the on-site laboratory staffed by a trained, educated medical entomologist. Walking into the

lab one gets a sense of order, and purpose. The attention to detail, and efficiency with professional routine became more evident as the tour continued. Upon visiting the workplace; one would find there are shallow pans filled with water. Inside the pans, mosquito eggs hatch into larvae and go through the pupal stage until they metamorphose into adult structures. Once this change is complete, an adult mosquito will emerge from the pupal case. The whole process from eggs to emergence is 4 to 14 days. The entomologist then places the adult mosquitoes into special testing jars to monitor their tolerance for the chemicals that are used in the spray that is specially formulated. Periodically, the mosquitoes build tolerances to the mixtures, thereby necessitating changing the formulas from time to time. Should the adult mosquitoes last as long as 45 minutes in a test jar, that would be an indicator that resistance to that formula has been achieved, signaling the need for the introduction of a new poison.

**Mosquito Species around Sutter-Yuba**

**Culex tarsalis**
The Culex tarsalis is sometimes referred to as "The Encephalitis Mosquito." This mosquito is the primary genera strain that the entomologist uses to maintain colonies of mosquitoes in various stages of development. The "cup test" is laced with Bacillus Thuringensis Israelensis. It prefers standing water to lay its eggs directly on the surface in groups called rafts. Some favorite breeding sites include: ditches, rice fields, and wetlands. This mosquito carries the WNV that can infect humans and birds. It also causes encephalitis in humans and horses.

**Anopheles freeborni**
There are approximately 3,500 species of mosquitoes grouped into 41 genera. Human malaria is transmitted only by females of the genus Anopheles. Of the approximately 430 Anopheles species, only 30-40 transmit malaria; i.e. vectors, in nature. In Sutter and Yuba counties the Anopheles, also known as Western Malaria Mosquito and Western Rice Mosquito,   are standing water mosquitos, and can be found in ditches, rice fields, rain pools, and wetlands.

**Aedes sierrensis**
As a flood water mosquito, this female lays her eggs individually in rot holes that develop in some trees. As spring rains or irrigation water fills the tree-hole, the eggs are stimulated to hatch. The adults do not fly far from that location. They can transmit the canine heartworm parasite and is a severe pest of humans. They take blood meals any time of day, even in full sun.

**Aedes melanimon**
Sometimes called "The Wetlands Mosquito" is also a flood water mosquito. The female lays eggs singly on damp or muddy soil. The eggs may lay dormant for long periods of time until stimulated to hatch when flooded. It can also become involved in the

encephalitis transmission cycle. These mosquitoes are found in irrigated pastures, and intermittently flooded duck club ponds. Like the Aedes sierrensis, the Aedes melanimon will take blood meals any time of day, even in the full sun.

## Culex pipens

This mosquito is possibly the most common of the five or so genera of mosquito in Sutter and Yuba Counties. It prefers to lay its eggs in rafts in standing water. It loves foul, stale or stagnant water found in containers, such as catch basins, sumps, tires, roof gutters, uncovered boats, ornamental ponds, and fountains, neglected swimming pools and hot tubs, barrels, or other artificial containers. Although it prefers birds, it commonly enters houses in search of a blood meal during the night. The Culex pipens is another competent WNV vector.

### Detection and Monitoring:

The District employs three primary methods for detecting the presence of mosquitoes carrying WNV throughout the two counties.

## Sentinel Chickens

When the term "sentinel chickens" is heard, one envisions a chicken dressed in a little uniform, and helmet, and shouldering a weapon while patrolling a perimeter.

Chickens are used in the detection of WNV because they are not adversely affected when they are bitten by mosquitoes carrying the virus. Instead, their immune systems develop anti-bodies that can be detected by entomologists, and lab technicians through blood testing. They serve as an early warning system by alerting officials of the presence of the WNV in a specific location. By identifying the locations where WNV is present, the appropriate abatement recipe can be selected and applied. The sentinel chicken program begins anew each year in April with the acquisition of eight flocks of seven chickens ordered from hatcheries licensed by the State of California.

There is a hatchery in Modesto which serves Northern California mosquito abatement districts. At 18-19 weeks old, the young pullets are mature enough to begin service. They are placed strategically throughout the District. The chickens are tested before being placed in the field. Blood samples are taken from the chickens comb and kept for a base-line comparison if the chicken later tests positive for WNV. Each week, a small sample of blood is drawn, labeled, dated, and recorded from each chicken. The samples are then sent to the California Department of Food and Agriculture, or the U.C. Davis Center for Vectorborne Diseases for analysis.  Results of the tests become available electronically within days. The Sutter-Yuba Abatement District performs a service for other Northern California abatement districts by taking a large truck to Modesto to pick up many flocks,

The Mosquito Abatement Report

and brings them back for distribution. Once a chicken is infected it is retired to a farm for the rest of its life.

## Mosquito Traps

Mosquitoes are attracted to heat, carbon dioxide, certain odors, and incandescent light bulbs. The entomologist incorporates these items into red box traps. They are devised to attract, and then trap mosquitoes in the field. Once per week, mosquitoes are collected and sent back to the lab to be processed. They are put through a centrifuge and blood samples are dried on slips of specially coded lab paper and recorded. They are then sent to the California Department of Public Health (CDPH), or the Center for Vectorborne Diseases (CVEC) for testing. The District pays for these tests. Larger mosquito abatement Districts have the necessary funding and equipment to do their own testing. Results of those samples are readily available using a computerized program that accesses the State database. All red boxes are registered by number with the California Department of Public Health.

## Dead Birds

The District provides an online WNV hotline for reporting dead birds found by citizens.

**Fogging:**

## Bti

Bacillus Thuringensis Israelensis are spores that produce a crystalline toxin. Some of it is ingested by mosquito larva. The product causes the gut wall to disintegrate resulting in the death of the larva. Bti is target specific. It only produces these effects on mosquito, and black fly larvae. Many years of research with Bti have shown it has no harmful effects in humans, animals, plants, fish, or other aquatic organisms, including predators of mosquitoes even at rates higher than the maximum prescribed label application rates. This is good because the District currently treats in excess of 100,000 acres of rice each growing season with Bti. Larvacides work on stage two of the four stages that mosquitoes must go through to become adults. Fogging for these large areas is accomplished by aircraft equipped with foggers.

## Adulticides

Adulticides are used when adult mosquitoes emerge from areas not well-suited for or too expensive to use a larvicide. Years ago, mosquito abatement districts used thermal foggers to create space sprays for subjecting mosquitoes to toxic doses of a pesticide. That method produced too many hydrocarbons because thermal foggers burn a concentrated pesticide diluted with a petroleum oil to create a thick smoke.

Today's foggers use alternative technologies that don't emit hydrocarbons as they produce the tiny particles necessary to kill mosquitoes, while at the same time using small amounts of pesticides. Fogging must be done during a temperature inversion.

The Mosquito Abatement Report

During the summer months, temperature inversions typically occur at dawn and dusk. For the foreseeable future town fogging will begin at dusk. Fogging at this time will better target the mosquito responsible for transmitting the WNV. When the possibility for public exposure increases, only the safest materials are considered for use.

**Mosquito Fish**
Mosquito fish are bred by the District specifically for distribution throughout the two counties to control mosquitoes. They are small compared to other fish with females reaching an average length of 2.8 in. and males 2.5 in. The fish eat mosquito eggs, larvae, and pupa arresting mosquitoes at a very early stage of their development. One mosquito fish can eat up to 50 mosquito larvae in a 30 minute period, and 168 in an eight hour period. They are live bearers and can give birth from just a few to a couple of hundred baby fish. This process can occur three to five times a season, usually in warmer months. Mosquito fish are very resilient, able to survive in waters with low levels of dissolved oxygen where other species would suffocate. They have a wide range of temperature tolerance. They have been known to survive temperatures in Utah as low as 32.9 degrees F, and in Arizona living in hot springs as hot as 107 degrees F. They also do well in brackish waters.

The District makes use of mosquito fish in thousands of mosquito sources annually. Technicians evaluate a mosquito source based on how long they believe a water source will last, and if it will support fish life. Some typical sites where mosquito fish are used include stock troughs, ditches, ornamental ponds, rice fields, sewage oxidation ponds, barrow pits, sumps, agricultural or irrigation seepage, and any other area that will produce mosquito larvae for a long period of time. One of the free services provided by the District includes making mosquito fish available to residents from April through September each year.

**The Future of Mosquito Control**

A further example of the proactive nature of the District is that several members of the Board of Trustees and employees attend conferences held around the country sponsored by various mosquito abatement associations and districts. At its annual conference last fall the Florida Mosquito Control Association's four day meeting featured a representative from a company called Oxitec. The representative presented a lecture on the subject of genetically modified mosquitoes that could be used to reduce the number of biting female mosquitoes in an environment. Briefly, the way it works is Oxitecs workers begin by modifying a select swarm of mosquitoes then manually remove females, aiming to release only males, which feed on nectar and don't bite for blood like females do. The modified males then mate with wild females whose offspring die, reducing the

The Mosquito Abatement Report

population. This technique is currently limited to Aedes Aegyptus mosquitoes which carry dengue, and chikungunya viruses.

Oxitec is awaiting permission to release its modified mosquitoes this spring in Key Haven Florida, a neighborhood of more than 400 homes closely clustered on a relatively isolated peninsula at the north end of Key West. There are ongoing concerns that accompany any discussion which involves genetic modification of plants or animals.

While genetic manipulation of any species of mosquitoes is still in its relative infancy, the mosquitoes responsible for transmitting WNV are just now getting attention from geneticists within the scientific community. The primary reason for low priority of concern over WNV is that compared to malaria, West Nile Virus is not only survivable, but is much less debilitating, especially in the long term.

The District provides plenty of detailed information on all of its operations on its website. The already abundant information is soon to be updated. The public's ability to report and request assistance with problems relating to mosquito or other vector issues, or just obtain information, can be easily addressed online or by calling the District's office.

The Mosquito Abatement Report

**Home and Property Maintenance**



## Finding:

F1.    The Yuba County Grand Jury finds that the Sutter Yuba Mosquito and Vector Control District (SYMVCD) appear to be in compliance with their Best Management Practices manual. Genetically modified mosquitoes released into areas of concentrated West Nile Virus (WNV) cases could reduce the overall occurrences of the virus over time. Each year, the District prepares for the coming season utilizing a set of standards contained within a document called Best Management Practices Manual. The document is assembled from a number of sources including scientific literature, state and inter-agency documents, and experienced vector control professionals. Other procedures contained within this document come from District affiliates, the California Department of Fish and Game, and the U.S. Fish and Wildlife Service, specifically, a document titled: Environmental Effects of Mosquito Control appendix K4.

The Grand Jury relied on the SYMVCD website: http://www.sutteryubamvcd.org/Public%20Health%20Pesticide%20Application%20Notification.asp for the majority of this report.

The Mosquito Abatement Report



**Figure 1.** *An example of a SYMVCD fogger unit. (January 2015)*

A further example of the proactive nature of the District is that several members of the Board of Trustees and employees attend conferences held around the country sponsored by various Mosquito abatement associations and districts. At its annual conference last fall the Florida Mosquito Control Association's four day meeting featured a representative from a company called Oxitec. The representative presented a lecture on the subject of genetically modified mosquitoes that could be used to reduce the number of biting female mosquitoes in an environment. Briefly, the way it works is Oxitecs workers begin by modifying a select swarm of mosquitoes then manually remove females, aiming to release only males, which feed on nectar and don't bite for blood like females. The modified males then mate with wild females whose offspring die, reducing

The Mosquito Abatement Report

the population. This technique is currently limited to Aedes Aegyptus mosquitoes which carry Dengue, and Chikungunya viruses. Oxitec is awaiting permission to release its modified mosquitoes this spring in Key Haven Florida, a neighborhood of more than 400 homes closely clustered on a relatively isolated peninsula at the north end of Key West. There are ongoing concerns that accompany any discussion which involves genetic modification of plants or animals. While genetic manipulation of any species of mosquitoes is still in its relative infancy, the mosquitoes responsible for transmitting WNV are just now getting attention from geneticists within the scientific community. The primary reason for low priority of concern over WNV is that compared to Malaria, West Nile Virus is not only survivable, but is much less debilitating, especially in the long term.



*Figure 2. An example of a SYMVCD fogger unit in use. (January 2015)*

The District provides plenty of detailed information on all of its operations on its website. The already abundant information is soon to be updated. The public's ability to report and request assistance with problems relating to mosquito or other vector issues, or just obtain information, can be easily addressed online or by calling the District's office.

## Recommendation:

R1.    The Grand Jury recommends that the Sutter Yuba Mosquito and Vector Control District not only continue furthering its current proactive approach to the control of mosquitoes; but explore next generation abatement techniques such as genetic modification of WNV transmitting mosquito species.

## Commendation:

C1.    The Grand Jury commends the Sutter Yuba Mosquito and Vector Control District in the compliance of their mandate as outlined in the Best Management Practices Manual.

The Mosquito Abatement Report

## Request for Responses:

Pursuant to Penal Code §933.05, the Grand Jury requests responses as follows:

From the following governing bodies:

- Chairman, Yuba County Board of Supervisors
- Chairman of the Board of Trustees of Sutter Yuba Mosquito and Vector Control District

The governing body indicated above should be aware that the comment or response of the governing body must be conducted in accordance with Penal Code §933(c) and subject to the notice, agenda, and open meeting requirements of the Brown Act.

# *History of the Grand Jury*

**A.      History of the Grand Jury System**

One of the earliest concepts of a Grand Jury may date back to ancient Greece where the Athenians used an accusatory body.  Others claim the Saxons initiated the Grand Jury system. In 987 to 1016 A.D., one of Dooms (laws) stated that for each 100 men, 12 shall be named to act as an accusing body. "They shall not accuse an innocent man nor spare a guilty one."

The Grand Jury can also be traced back to the time of the Norman conquest of England in 1066. There is evidence that the courts of that time summoned a body of sworn neighbors to present crimes which had come to their knowledge. The members of that accusing jury were selected from small jurisdictions. Thus, it was natural and, indeed, expected that the members would present accusations based on their personal knowledge.

Historians generally agree that the Assize of Clarendon in 1166 was the beginning of our present Grand Jury system. During the reign of Henry II (1154-1189), in an effort to regain for the crown the powers usurped by Thomas Becket, Chancellor of England, 12 "good and lawful" men in each village were assembled to reveal the names of those suspected of crimes. It was during this same period that juries were divided into two types: civil and criminal, with the development of each influencing the other.

Originally, an "assize" meant a court session or assembly. As used today, it refers to the accomplishment of enactments of such groups. Thus, the "Assize of Clarendon", in which the use of the jury was for the purpose of discovery and presentation to royal officials those persons suspected of crime. Additionally, they were asked to report on other matters relating to the maintenance of order and good government in their district.

The oath taken by these jurors was that they shall "do this faithfully, that they will aggrieve no one through enmity nor defer to anyone through love, and that they will conceal those things which they have heard."

By the year 1290, we find that the accusing jury was given the authority to inquire into the maintenance of bridges and highways, the defects of jails, and whether the sheriff had kept in jail anyone who should have been brought before the justices.

"Le grand inquest" evolved during the reign of Edward III (1368) when the "accusatory jury" was increased in number from 12 to 23, with a majority vote necessary to indict an accused.

History of the Grand Jury

### 1. Colonial America

The Massachusetts Bay Colony empanelled the first Grand Jury in 1635 to consider the cases of murder, robbery and wife beating.  As early as 1700, the value of the Grand Jury was recognized in opposing the Royalists. These colonial grand juries expressed their independence by refusing to indict leaders of the Stamp Act (1765), and a Boston Grand Jury refused to bring libel charges against the editors of the Boston Gazette (1765). A union with other colonies to oppose British taxes was supported by a Philadelphia Grand Jury in 1770.

By the end of the colonial period the Grand Jury had become an indispensable adjunct of government: they proposed new laws, protested against abuses in government, and wielded tremendous authority in their power to determine who should and should not face trial.

### 2. U. S. Constitution

Originally the Constitution of the United States made no provision for a Grand Jury. The Fifth Amendment, ratified in 1791, guaranteed that:

"...no person shall be held to answer to a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except for cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger..."

Public support of grand juries began to wane in the early 1800's. Adoption of the Fourteenth Amendment in 1868 made it illegal to "deprive any person of life, liberty or property without due process of law." As interpreted by some states, this amendment meant that prosecution of crimes no longer mandated a Grand Jury indictment.

### 3. California

California is one of the states to initiate prosecution by either indictment or complaint. The first California Penal Code contained statutes providing for a Grand Jury. Early grand juries investigated local prisons, conducted audits of county books and pursued matters of community concern. The role of the Grand Jury in California is unique in that by statutes passed in 1880, the duties include investigation of county government.

As earlier stated, the authority for the Grand Jury system in the United States lies in the Fifth Amendment of the U. S. Constitution. Provision for the Grand Jury in California is contained in Article 1, Section 23 of the California Constitution. California is served by a Grand Jury system which provides (with certain exceptions where separate civil and criminal grand juries are authorized) one Grand Jury for each county. Its functions are (1) Civil: to review the conduct of local government and (2) Criminal: to inquire into public offenses committed or triable within

History of the Grand Jury

the county. This system is unusual. Federal and county grand juries in most states are concerned with criminal indictments and have no civil responsibilities.

Only seven states provide for investigation of county government by a Grand Jury beyond alleged misconduct of public officials.

## B.      Grand Jury System Today

As constituted today, the Grand Jury is a part of the judicial branch of government. It is an arm of the court. It does not have the functions of either the legislative or administrative branches and it is not a police agency. It is an investigative body having for its objective the detection and correction of flaws in government.

The primary civil function of the Grand Jury, and the most important reason for its existence, is the examination of all aspects of county and city government, including special districts and joint powers agencies, seeing that the county's monies are handled judiciously and that all accounts are properly audited - in general, assuring honest, efficient government in the best interest of the people.

The Grand Jury has three ways to exercise its powers:

1. By reports and recommendations regarding county government, cities, special districts, and joint powers agencies.

2. By indictment bringing charges against an individual for a criminal offense.

3. By civil accusation of an official or employee where the result, on conviction, would be removal from office.

A large portion of the public wrongly believes that an individual, particularly a public official, appearing before the Grand Jury suggests a malfeasance or misfeasance. It is the constitutional responsibility of the Grand Jury to review the conduct of government each year.  This entails having public officials appear before the jury for the purpose of providing information relative to their departments or offices.

While it is a part of the judicial system a Grand Jury is an entirely independent body. The Grand Jury judge, the district attorney, the county counsel, and the state attorney general act as its advisors, but cannot prevent the actions of the jury except on issues of legality.

Due to the confidential nature of a Grand Jury's work, most of it must be conducted in closed session. Members of a Grand Jury are sworn to secrecy, thus assuring all who appear before it that their testimony will be handled in strict confidence. No one may be present during the History of the Grand Jurysessions of a Grand Jury except those specified by law, and the minutes of its meetings may not be inspected by anyone, nor can its records be subpoenaed.

The smaller part of a Grand Jury's functions in California is the conduct of criminal investigations and the return of indictments. In some states all persons accused of felonies

History of the Grand Jury

must be indicted by a Grand Jury before being tried. This is also true of the federal courts. The vast majority of California criminal cases are presented to the court at a preliminary hearing, on a complaint issued by the district attorney. When the district attorney deems it appropriate, he may request the Grand Jury to hear evidence with the possibility of an indictment (see indictment section.)

Unlike a trial jury, a Grand Jury does not pass upon the guilt or innocence of the person accused. Its duty is to decide whether there is probable cause that a triable offense has been committed, whereas a trial jury decides if the evidence establishes guilt beyond a reasonable doubt.

A jury is called a Grand Jury because of its size as distinguished from a petit or trial jury of twelve citizens.

The Grand Jury serves as an ombudsman for citizens of the county. The Grand Jury may receive and investigate complaints by individuals regarding the actions and performances of county or public officials.

Grand jurors may act only through the Grand Jury as a body. Individually they have no official standing, power, or authority. A grand juror may take no official action without the prior approval and authorization of a majority of the Grand Jury. The Grand Jury, as a deliberative body, must of necessity, operate by consensus, and, thereby, express a collective opinion in its reports. The foreperson is the only official spokesman for the Grand Jury.

The members of the Grand Jury are collectively granted special powers and privileges to aid them in carrying out their duties. Grand jurors, in their official capacity, are permitted access to and the right to inspect prisons, jails and other government facilities, and to review official books and records to which other citizens are denied access, with limited exceptions.

Grand jurors, because of their extraordinary powers, privileges and responsibilities, have a special obligation to exercise their authority and carry out their duties in a proper and responsible manner within the boundaries of the law.

A Grand Jury is charged with a grave responsibility. Grand Jury service calls for diligence, impartiality, courage and responsibility. Selection for service is one of the greatest honors a citizen can receive and provides an opportunity to be of unique value to the community.

History of the Grand Jury

## C.    Grand Jury Legal Advisors

Whenever any juror may require a legal opinion or information as to procedure, a request for such should be made to the foreperson who may consult with the presiding judge, the county counsel, or the district attorney. It is advisable that each Grand Jury adopt a rule that all requests for opinions or assistance from the office of the district attorney or county counsel be made in writing, to be signed by the foreperson. No juror acting alone should make individual verbal or written requests. Legal opinions requested by the Grand Jury should likewise be provided in writing.

The Attorney General of the State of California is also available for advice and assistance. A request for the assistance of the attorney general by the Grand Jury may be made through any of the legal advisors mentioned above, or may be made in writing directly by the Grand Jury.

In other than criminal matters, the county counsel is the legal advisor to the county, all of its departments, officers, and commissions, all school districts in the county, and a number of other special districts. The Penal Code authorizes that any time the Grand Jury questions legality in investigating a matter brought to the Grand Jury's attention, the county counsel's opinion should be requested before starting an investigation. The Grand Jury, in obtaining these written opinions, should treat information obtained as confidential unless authorized to release its contents by the county counsel.

Inasmuch as the district attorney in criminal matters and the county counsel in other matters act as legal advisors to the Grand Jury, each is bound by secrecy restrictions regarding Grand Jury matters and confidentiality of the attorney-client relationship.

# Matrix of Investigations by Previous Grand Juries

## *Investigations by the Special Reports Committee Since 1995*

## *Yuba County Grand Jury*

| Special Reports | 95 | 96 | 97 | 98 | 99 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sewage Appeals Board | X | | X | | | | | | | | | | | | | | | | | | |
| Youth Project - Runaway Youth | | | | | | | | | | | X | | | | | | | | | | |
| Yuba County - 1997 Flood | | | X | | | | | | | | | | | | | | | | | | |
| Yuba Park | | | X | | | | | | | | | | | | | | | | | | |
| Yuba River Access | | X | | | | | | | | | | | | | | | | | | | |

Matrix of Investigations by Previous Grand Juries

### Investigations by the Health and Human Services Committee Since 1995
### Yuba County Grand Jury

| Health and Human Services | 95 | 96 | 97 | 98 | 99 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adult Services | | | | | | | X | | | X | | | X | | | | | | | | |
| CAL Works | | | | | | | | | | | | | | | | | | | | | |
| Child Protective Services | | | | X | X | X | X | | X | | | | | | X | | | | | X | |
| Day Care | | | | | | | | | | | | | | | | | | | | | |
| Environmental Health | | | | | | | | | | | X | | | | | | | | | | |
| EH - Personnel | X | | | | | | | | | | | | | | | | | | | | |
| EH - Onsite Sewage | X | | | | | | | | | | | | | | | | | | | | |
| EH - YSDI | | | | | | | | | | | X | | | | | | | | | | |
| First Five Yuba Commission | | | | | | | | | | | | | | | | X | | | | | |
| Fraud Investigations | | | | | | | | | | | X | | | | | | | | | | |
| Health & Human Services | X | | | | | | | | | | | X | | | X | | | | | | |
| H&H In Home Safety Visits | | | | | | | | | | | | | | | | | | X | | | |
| Health Department | | | | | | | | | X | | | | | | | | | | | | |
| Mental Health Services | | | | | | | | | | | | | | | | | | | | | |
| Peach Tree Clinic | | | | | | | | | | | | | | | | | | | | | |
| Public Guardian | | | | X | X | | | | X | | | | | | | | | | | | |
| Yuba-Sutter Veterans Services | | | | | | | | | | | X | | | | | | | | | | |

Matrix of Investigations by Previous Grand Juries

### *Investigations by the Special Districts Committee Since 1995*
### *Yuba County Grand Jury*

| Special Districts | 95 | 96 | 97 | 98 | 99 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Browns Valley Irrigation Dist. | | | | X | X | | | | | | | | | | | | | | | | |
| Camp Far West Irrigation Dist. | | | | | | | | | | | | | | | | | | | | | |
| Cemetery District - Browns Valley | | | | | | | | X | | | | | | | | | | | | X | |
| Cemetery District - Brownsville | | | | | | | | X | | | | | | | | | | | | X | |
| Cemetery District - Camptonville | | | | | | | | | | | | | | | | | | | | X | |
| Cemetery District - Keystone | | | | | | | | X | | | | | | | | | | | | X | |
| Cemetery District - Marysville | | | | | | | | | | | | | | | X | | | | | X | |
| Cemetery District - Peoria | | | | | | | | | X | | | | | | | | | | | X | |
| Cemetery District - Smartsville | | | | | | | | | | | | | | | | | | | | X | |
| Cemetery District - Strawberry Valley | | | | | | | | | | | | | | | | | | | | X | |
| Cemetery District - Upham | | | | | | | | | | | | | | | | | | | | X | |
| Cemetery District - Wheatland | | | | | | | | | | | | | | | | | | | | X | |
| Foothill Fire Protection | | | | | | | | | | | | | | | | | | | | | |
| Local Agency Formation Commission (LAFCO) | | | | | | | | | | | X | X | | | | | | | | | |
| Levee District 817 | | | | | | | | | | | | | | | | | | | | | |
| Linda Fire District | X | | | | | | | | | | | | | | | | | | | | |
| Marysville Levee District | | | | | | | | | | | | | | X | | | | | | | |
| Mosquito and Vector Control District | | | | | | | | | | | | | | | | | | | | | X |
| North Central Counties Consortium (NCCC) | | | | | | | | | | | | X | | | | | | | | | |
| Olivehurst Public Utility District | | | | | | | | X | | | X | | | | X | | | | | | |
| Olivehurst PUD -Water | | X | | | | | | | | | | | | | | | | | | | |
| Olivehurst PUD -Fire | | | | | | X | | | | | | | | | | | | | | | |
| Olivehurst PUD - Sewer | | | | | | | | | | | | | | | | | | | | | |
| Reclamation District 10 | | | | | | | | | | | | | | | | | | | | | |
| Reclamation District 2103 | | | | | | | | | | | | | | | | | | | | | |
| Reclamation District 817 | | | | | | | | | | | | | | | | | | | | | |
| Reclamation District 784 | | | X | | | X | | | X | | X | | | | | | | | | | |
| River Highlands Community Service | | | | | | | | | X | | | | | X | X | | | | | | |
| Smartsville Fire Department | | | | | | | | | | | | | X | | | | | | | | |
| Three Rivers Levee Improvement Auth. (TRILA) | | | | | | | | | | | | | | | | | X | | | | |
| Yuba County Water Agency | | X | | | | | | X | | X | X | X | | | | | | | | | |

Matrix of Investigations by Previous Grand Juries

### *Investigations by the Law Enforcement Committee Since 1995*
### *Yuba County Grand Jury*

| Law Enforcement | 95 | 96 | 97 | 98 | 99 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Animal Care Services | X | | X | X | X | | | | | X | | | | | X | | X | | | | |
| District Attorney | | X | | | | | | | | | | | | | | | | | | | |
| DA - Family Support Division | | | | | X | X | | | | | | | | | | | | | | | |
| DA - Public Administrator | | | | | X | | | | | | | | | | | | | | | | |
| Grand Jury - Report System | | | | | | | | X | | | | | | | | | | | | | |
| Juvenile Hall | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| Juvenile Traffic Court | | | | | | | | | | | | | | | | | | | | | |
| Marysville Police Department | | | | | | | | | | X | | | | X | | | X | | | | |
| Probation | | | | | | | | | | X | X | | | | | | | | | | |
| Probation - Victim/Witness | | | | | | | | | | | | | | | | | | | | | |
| Public Defender | | | | | | | | | | | | | | | | | | | | | |
| Sheriff | | X | X | | | | | | | X | X | | | | | | | | | | |
| Sheriff - K9 unit | | | | | | | | | | | | | | | | X | | | | | |
| Victim Witness | | | | | X | | | | | | | | | | | | | | | | |
| Wheatland Police Department | | | | | | | | | | | | | | X | | | | | | X | |
| Yuba County Jail | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |

Matrix of Investigations by Previous Grand Juries

*Investigations by the County Committee Since 1995*
*Yuba County Grand Jury*

| County Committee | 95 | 96 | 97 | 98 | 99 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Administrative Services | | | | X | | | | | | | | X | | | | | | | | | |
| Administrative Services - IT | | | | | | | | | | | | | X | | | | | | | | |
| Agriculture | | | | | | | | | | | | | | | | | | | | | |
| Airport Enterprise Zone | | | | X | | | | | | | | | | | | | | | | | |
| Assessor | | | | | | | | | | | | | | | | | | | | | |
| Auditor / Controller | | | | | | | | | | X | X | | | | | | | | | | |
| Board of Supervisors | | | X | | | | X | | X | | X | X | | | | | | | | | |
| BoS - Ordinances | | | | | | | | X | | | | | | | | | | | | | |
| BoS - Yuba County - Office Hours | | | | | X | | | | | | | | | | | | | | | | |
| Building - Permit Fees | | | | | | | | | | | | | | | | | | | X | X | |
| Clerk of the Board | | | | | | | | | | | | | | | | | | | | | |
| Clerk/Recorder/Elections | | | | | | | | | | X | | X | | | | | | | | | |
| Code Enforcement | | | | | | | | | | X | | | | | X | | | | | | |
| Community Development | X | | | | | | | | | | | | | X | X | | | | | | |
| County Administrator | X | | | | | | | | | | | | | | | | | | | | |
| County Counsel | X | | | | | | | | | | | | | | | | | | | | X |
| Economic Development | | | | | | | | | | X | | | | | | | | | | | |
| General Services - Buildings and Grounds | | X | | | | | | | | | | | | | | | | | | | |
| Library | | | | | | | | | | | | | | | | | | | | | |
| Office of Emergency Services | | | | | | | | | | | | | | | | | | X | | | X |
| Personnel Risk Management | | X | | | | | | | | | | | | | | | | | | | |
| Print Shop | | | | | | | | | | | | | | | | | | | | | |
| Public Administrator | | | X | | | | | | | | | | | | | | | | | | |
| Public Works - Road Dept. | | | | | X | X | | | | | | X | | | | | | | | X | |
| Treasurer/Tax Collector | | | | | | | | | | | X | | | | | | | | | | |
| Weights & Measures | | | | | | | | | | | | | | | | | | | | | |
| Yuba County Airport | | | | | X | | X | | | X | | | | X | | | | | | X | X |

Matrix of Investigations by Previous Grand Juries

*Investigations by the Cities Committee Since 1995*
*Yuba County Grand Jury*

| Cities Committee | 95 | 96 | 97 | 98 | 99 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Marysville Business Improvement District (BID) | | | X | | | | | | | | | | X | | | | | | | | |
| Marysville City Clerk's Office | | | | | | | | | | | | | | | | | | | | | |
| City Council | X | X | | | | | | | | | | | | | | | | | | | |
| Marysville City Council Meeting Minutes | | | | | | | | | | | | | | | | | X | | | | |
| City of Marysville | | | | X | X | | | | X | X | | | | X | | | | X | | | |
| City of Wheatland | | | | | | | X | | | X | X | X | | | | | | X | | | |
| Marysville Fire department | | | | | X | | | | | | X | | | | | | | | | | |
| Parks & Recreation - Ellis Lake | | | | | | | | | | | | | | | | | | | | X | |
| Marysville Public Works | X | | | | | | | | | | X | | | | | | | | | | |
| Marysville Red Light Camera System | | | | | | | | | | | | X | | | | | | | | X | |
| Marysville Redevelopment Agency | | | | | | | X | | | | | | | | | | | | | | |
| Marysville Website | | | | | | | | | | | | | | | | X | | | | | |

Matrix of Investigations by Previous Grand Juries

### *Investigations by the Schools Committee Since 1995*
### *Yuba County Grand Jury*

| Schools | 95 | 96 | 97 | 98 | 99 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abraham Lincoln (home) School | | | X | | | | | | | | | | | | | | | | | | |
| Alternative Education Program | | | | | | | | | | | | | | | | | | | | | |
| Anna McKenney Intermediate | | | | | | | | | | | X | | | | | | | | | | |
| Arboga Elementary School | | | | | | | | | | | | | | | | | | | | X | |
| Browns Valley Elementary | | | | | | | | | | | X | | | | | | | | | | |
| Camptonville Union School Dist | | | | | | | | | | | | | | | | | | | | | X |
| Charter School | | | X | | | | | | | | | | | | | | | | | | |
| Cedar Lane Elementary School | | | | | | | | | | | | | | | | | | | | X | |
| Citizen Bonds Oversight Com | | | | | | | | | | | | | | | | X | | | | | |
| Covillaud Elementary School | | | | | | | | | | | | | | | | | | | | X | |
| Dobbins Elementary School | | | | | | | | | | | | X | | | | | | | | | |
| Food Service - School Meals Program | | | | | | | | X | | | | | | | | | | | | | |
| Foothill Intermediate School | | | | | | | | | | | | | | | | | | | X | X | |
| Lindhurst High | | | | | | | | X | | | | | | | | | | | | | |
| Loma Rica Elementary | | | | | | | | | | | | | | | X | | | | | | |
| Mary Covillaud Elementary | | | | | | | | | | | X | | | | | | | | | | |
| Marysville High | | | | | | | | X | | | | | | | | | X | | | | |
| Marysville Joint Unified School Board | | X | | X | | | X | | | X | X | | X | | X | | | | X | | X |
| Office of Education | | X | | X | | | | | | | | | | | | | | | | | |
| Olivehurst Elementary | | | | | | | | | | | X | | | | | | | | | | |
| Plumas Elementary | | | | | | | | | | | | | | | | | | | | | |
| Regional Career Center JPTA | | | X | | | | | | | | | | | | | | | | | | |
| School Safety - Yuba County Schools | | | | | | | | X | | | | | | | | | | | | | |
| Wheatland Elementary School | | | | | | | | | | | | | | | | | | | | X | |
| Wheatland High | | | | | | | | | | | | | | | | | | | | | |
| Wheatland School District | | | | | | | | | | | X | X | | | | | | | | | |
| Wheatland School District Bldg. | | | | | | | | | | | | | X | | | | | | | | |
| Yuba College | | | | | | | | | | | | | | | | | | | | | |
| Yuba County of Education | | | | X | | | | | | X | | | | | | | | | | | |

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF YUBA

### GRAND JURY APPLICATION
*(Please attach additional sheets if necessary)*

## I. PERSONAL INFORMATION

Name: _____
        (Last)                      (First)           (Middle)

Other Names Used: _____

Residence Address: _____ City _____ Zip _____

Mailing Address: _____ City _____ Zip _____
*(If Different)*

Home Telephone: _____ Work Telephone: _____

Cell Telephone: _____ Pager: _____

Email Address: _____ Supervisorial District: _____

Social Security Number: _____ Drivers Lic. Number: _____

Date of Birth: _____ Place of Birth: _____

Marital Status: ☐ Married ☐ Single ☐ Divorced ☐ Widowed

Spouse's Name: _____

Spouse's Occupation: _____

Spouse's Employer: _____

## II. EDUCATION

Circle your highest level of education: 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16   Other: _____

High School _____ City & State _____

College/University _____ City & State _____

Graduate Level _____ City & State _____

Degrees _____ Honors _____

---

## III. OCCUPATION(S)

**Are you retired?** ☐ Yes ☐ No

If yes, what was your occupation? _____

Employer(s) or company name(s): _____

Business address: _____   Business Phone: _____

Highest position held and job title: _____

**Are you currently working?** ☐ Yes ☐ No

If yes, what is your occupation? _____

Employer(s) or company name(s): _____

Business address: _____

Highest position held or job title: _____

Former Occupation: _____

## IV. ABILITIES AND EXPERIENCE

**Do you have any ability and experience in writing, editing, and collating correspondence, minutes of meetings, reports, etc?**       ☐ Yes       ☐ No

If "yes", please describe: _____

_____

_____

**Do you have ability and experience in gathering facts and analyzing data?**       ☐ Yes       ☐ No

If "yes", please describe: _____

_____

_____

**Please list the computer programs with which you are familiar:** _____

_____

_____

## V.  QUALIFICATIONS

1.  Are you a citizen of the United States?  ☐ Yes  ☐ No

2.  Are you eighteen years or older?  ☐ Yes  ☐ No

3.  Have you been a continuous resident of Yuba County for one year?  ☐ Yes  ☐ No

4.  Are you in possession of your natural faculties, of ordinary intelligence, of sound judgment and of fair character?  ☐ Yes  ☐ No

5.  Do you speak, write and understand English?  ☐ Yes  ☐ No

6.  Have you been discharged as a Grand Juror in any court of this State within the last year?  ☐ Yes  ☐ No

7.  Have you ever served as a Grand Juror?
    If so, what county and when?_____  ☐ Yes  ☐ No

8.  Have you applied for the Grand Jury in the past?
    If so, what year(s)?_____  ☐ Yes  ☐ No

9.  Are you a registered voter?  ☐ Yes  ☐ No

10. Are you able and willing to define and evaluate issues without expressing personal bias?  ☐ Yes  ☐ No

11. If you are employed, does your employer know that you are interested in serving on the grand jury, and does he/she understand the nature and extent of the duties of a grand juror?  ☐ Yes  ☐ No

12. Are you capable of and willing to conduct detailed investigations of city and county governmental issues and prepare reports on those issues?  ☐ Yes  ☐ No

13. Are you currently serving as an elected public official or do you plan to run for public office within the next eighteen months?  ☐ Yes  ☐ No

14. Are you related to and closely associated with any of the following:

    Yuba County Superior Court judge?  ☐ Yes  ☐ No

    Current or former elected or appointed public official?  ☐ Yes  ☐ No

    Current or former employee of any local governmental entity?  ☐ Yes  ☐ No

    If yes, please explain:_____

    _____

15. As a member of any profession or organization or as a holder of any office, have you ever been suspended, disbarred or otherwise disqualified?  ☐ Yes  ☐ No

16.   **Have you been charged with any of the following:**

    **Malfeasance in office**                             ☐ **Yes**     ☐ **No**
    **Felony**                                          ☐ **Yes**     ☐ **No**
    **Misdemeanor** (including driving under the influence and reckless driving)   ☐ **Yes**     ☐ **No**

If you answered "yes" to any of the above, please provide details below:

| Offense | City/State | Date | Penalty |
|---------|-----------|------|---------|
|         |           |      |         |
|         |           |      |         |

*Please note that a misdemeanor conviction is not an automatic bar to acceptance of your application.*
*Each case is considered individually and confidentially.*

## VI.  CLUBS & ORGANIZATIONS

(List any fraternal, civic, professional, service or social organizations to which you have belonged.)

_____

_____

_____

## VII.   GENERAL

**Other interests, experience, comments or suggestions:**

_____

_____

_____

**Is there anything you would specifically like to accomplish during your tenure on the grand jury?**

_____

_____

_____

_____

_____

**Would you be willing to be the Jury Foreperson?**       ☐ Yes     ☐ No

I hereby certify that the foregoing information is true and correct to the be st of m y knowledge and belief and is submitted in support of m y application for selection as a member of the Yuba Count y Grand Jury.

Executed under penalty of perjury this _____ day of _____, 20_____
at _____, California.

_____
**Signature of Applicant**

---

### NOTE

All applications to serve as a member of the Yuba County Grand Jury will be subject to investigation by an appropriate law enforcement agency relative to the statutory qualifications for service and any other information that may bear on the prospective Grand Juror's ability and suitability for service.

---

### PLEASE RETURN COMPLETED APPLICATION TO:

YUBA COUNTY JURY SERVICES
215 Fifth Street, Suite 200
Marysville, CA  95901
(530) 749-7601
Website:  www.yubacourts.org



Pursuant to California Rules of Court, rule 989.3 and the Americans with Disabilities Act (ADA), the Superior Court of California, County of Yuba does not discriminate against persons with disabilities.  Please advise Jury Services (530) 749-7601 if you will require special accommodations to participate in this application process.

Superior Court of California
County of Yuba County Superior Court
Grand Jury Application
Last Name: _____

# RECRUITMENT SURVEY INFORMATION

Pursuant to California Rules of Court, Rule 10.625, the Jury Commissioner must capture and maintain in a database the following information on prospective grand jurors:

**Your age range:**

☐ 18 – 25   ☐ 26 – 34   ☐ 35 – 44   ☐ 45 – 54

☐ 55 – 64   ☐ 65 – 74   ☐ 75 and over

**Your Gender:**   ☐ Male   ☐ Female

**Your race or ethnicity** (you may select more than one category):

☐ American Indian or Alaska Native          ☐ Asian

☐ Black or African American                 ☐ Hispanic/Latino

☐ Native Hawaiian or other Pacific Islander ☐ White

☐ Other race or ethnicity (please state): _____

☐ Decline to answer

**How did you learn about becoming a candidate for grand jury service:**

☐ Random draw              ☐ Community Organization

☐ Newspaper                ☐ Received application in the mail

☐ Public Meeting           ☐ Television/radio

☐ Other: _____

☐ Nominated by: _____

**Map of Yuba County**



**Instructions for the Grand Jury Complaint Form**

## Filing a complaint with the Yuba County Grand Jury

GENERAL INFORMATION

A major function of the Yuba County Grand Jury is to examine local county and city government, special districts, school districts, and any joint powers agency located in the county to ensure their duties are being carried out lawfully. The Grand Jury:

- May review and evaluate procedures used by these entities to determine whether more efficient and economical methods may be employed;
- May inspect and audit the books, records and financial expenditures as noted above to ensure that public funds are properly accounted for and legally spent;
- May investigate any charges of willful misconduct in office by public officials;
- Shall inquire into the condition and management of the public prisons within the county.

Anyone may ask the Grand Jury to conduct an investigation of an issue within its jurisdiction. Whether it chooses to investigate a complaint is entirely at the Grand Jury's discretion and the decision may be affected by workload, resource limitations or legal restrictions. It is important to note that the Grand Jury may not investigate a matter that is currently being litigated in the court system.

By law, the proceedings of the Grand Jury are confidential. The findings and recommendations and issues it chooses to address are published in its final report.

COMPLAINT PROCESS

Fill out the Grand Jury complaint form as completely as possible. The Grand Jury is less likely to investigate complaints when the complainant does not include enough information to allow the validity of the issues to be evaluated. Present your complaint as early as possible in the Grand Jury term, because a complete investigation may take several months. The Grand Jury's term of service begins July 1st and ends June 30th of the following year.

- Identify your specific concern and describe the circumstances as clearly and concisely as possible.
- Document your complaint with copies of pertinent information and evidence in your possession.
- Mail or deliver your complaint in a sealed envelope to:

**Yuba County Grand Jury, c/o Yuba County Superior Court, 215 Fifth Street, Suite 200 Marysville, Ca 95901**

Instructions for the Grand Jury Complaint Form

Among the responsibilities of the Grand Jury is the investigation of the public's complaints to assure that all branches of city and county government are being administered efficiently, honestly and in the best interest of its citizens.

Complaints submitted to the Grand Jury will be treated confidentially whenever possible. However, it may be impossible to conduct an investigation without revealing your name and complaint.

The results of the complaints submitted by citizens and investigated by the Grand Jury are published in its final report. The final report is the Grand Jury's principle means of communicating to the residents of the county the results of its investigations, its findings and its recommendations. The government entities reported on by the Grand Jury are required by statute to respond, and these responses are then made public.

## GRAND JURY COMPLAINT FORM

**PERSON OR AGENCY ABOUT WHICH COMPLAINT IS MADE**

NAME: _____

ADDRESS: _____

_____

TELEPHONE NUMBER: _____

| GRAND JURY USE ONLY: |
|---|
| Date Received: _____ |
| Number: _____ |
| Subject: _____ |
| _____ |
| _____ |
| _____ |

**NATURE OF COMPLAINT** (Describe events in the order they occurred as clearly and concisely as possible.  Use extra sheets if necessary and attach copies of any correspondence you feel is pertinent.  Documentation becomes the property of the Grand Jury and will not be returned.  *Please note:  The Yuba County Grand Jury has no jurisdiction over state or federal agencies, the courts, judicial officers, private companies or most organizations.*)

**WHAT PERSONS OR AGENCIES HAVE YOU CONTACTED ABOUT YOUR COMPLAINT?**

| Person or Agency | Address | Date of Contact | Results |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**WHO SHOULD THE GRAND JURY CONTACT ABOUT THIS MATTER?**

| Person or Agency | Address | Telephone No. |
|---|---|---|
| | | |
| | | |

Your Name: _____

Address: _____

Telephone No: _____

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____          _____
Complainant's Signature                                    Date

(This blank form may be duplicated.)                                                     07/03

**California Penal Code 933.05**

933.05. (a) For purposes of subdivision (b) of Section 933, as to each Grand Jury finding, the responding person or entity shall indicate one of the following:

  (1) The respondent agrees with the finding.

  (2) The respondent disagrees wholly or partially with the finding, in which case the response shall specify the portion of the finding that is disputed and shall include an explanation of the reasons therefore.

     (b) For purposes of subdivision (b) of Section 933, as to each Grand Jury recommendation, the responding person or entity shall report one of the following actions:

  (1) The recommendation has been implemented, with a summary regarding the implemented action.

  (2) The recommendation has not yet been implemented, but will be implemented in the future, with a timeframe for implementation.

  (3) The recommendation requires further analysis, with an explanation and the scope and parameters of an analysis or study, and a timeframe for the matter to be prepared for discussion by the officer or head of the agency or department being investigated or reviewed, including the governing body of the public agency when applicable. This timeframe shall not exceed six months from the date of publication of the Grand Jury report.

  (4) The recommendation will not be implemented because it is not warranted or is not reasonable, with an explanation therefore.

     (c) However, if a finding or recommendation of the Grand Jury addresses budgetary or personnel matters of a county agency or department headed by an elected officer, both the agency or department head and the board of supervisors shall respond if requested by the Grand Jury, but the response of the board of supervisors shall address only those budgetary or personnel matters over which it has some decision making authority. The response of the elected agency or department head shall address all aspects of the findings or recommendations affecting his or her agency or department.

     (d) A Grand Jury may request a subject person or entity to come before the Grand Jury for the purpose of reading and discussing the findings of the Grand Jury report that relates to that person or entity in order to verify the accuracy of the findings prior to their release.

California Penal Code 933.05

(e) During an investigation, the Grand Jury shall meet with the subject of that investigation regarding the investigation, unless the court, either on its own determination or upon request of the foreperson of the Grand Jury, determines that such a meeting would be detrimental.

(f) A Grand Jury shall provide to the affected agency a copy of the portion of the Grand Jury report relating to that person or entity two working days prior to its public release and after the approval of the presiding judge. No officer, agency, department, or governing body of a public agency shall disclose any contents of the report prior to the public release of the final report.